UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| _____ | ) | |
| TOXICS ACTION CENTER, INC., and | ) | |
| CONSERVATION LAW FOUNDATION, | ) | |
| | ) | Civil Action No.: 18-cv-393 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| CASELLA WASTE SYSTEMS, INC., and NORTH | ) | |
| COUNTRY ENVIRONMENTAL SERVICES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>INTRODUCTION</u>

1.     Defendants discharge pollutants—including, but not limited to, contaminated groundwater, landfill leachate, iron, manganese, and 1,4-dioxane—to the Ammonoosuc River via a 370-foot-long drainage channel ("Drainage Channel") located near the North Country Environmental Services landfill ("Landfill") in Bethlehem, New Hampshire.  These discharges have violated, are violating, and will continue to violate the federal Clean Water Act ("CWA").

2.     Plaintiffs Toxics Action Center, Inc. ("Toxics Action") and Conservation Law Foundation ("CLF") have members who live near, swim in, and otherwise use or would like to use the Ammonoosuc River, and whose use and enjoyment of the river has been and continues to be adversely affected by the Defendants' illegal discharge of pollutants.

3.     Plaintiffs bring this citizen enforcement action under the "citizen suit" provision of the CWA, 33 U.S.C. § 1365, to end these longstanding, ongoing violations.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C.

§ 1365(a)(1) and 28 U.S.C. § 1331.

5.      Venue lies in this District under 33 U.S.C. § 1365(c)(1), because the Landfill and

Drainage Channel are located within the District.

6.      Pursuant to 33 U.S.C. § 1365(b), Plaintiffs gave notice of the violations alleged in

this Complaint more than 60 days prior to the commencement of this lawsuit by a letter ("Notice

Letter") mailed via U.S. mail to: (a) the Defendants; (b) the United States Environmental

Protection Agency ("EPA"); and (c) the New Hampshire Department of Environmental Services.

7.      A copy of the Notice Letter is attached as Exhibit 1 to this Complaint and is

incorporated by reference herein.

8.      Each of the parties listed above received the Notice Letter.  Copies of return

receipts and United States Postal Service tracking information are attached as Exhibit 2 to this

Complaint.

9.      The Notice Letter satisfies the pre-suit notice requirements of 33 U.S.C.

§ 1365(b)(1)(A).

10.     Subsequent to Defendants' receipt of the Notice Letter, Defendants' counsel

wrote a letter to Plaintiffs' counsel asking that communications with Defendants be directed to

Defendants' counsel, but otherwise did not communicate with Plaintiffs or their counsel about

the Notice Letter.

11.     Neither EPA nor the State of New Hampshire has contacted Plaintiffs or

Plaintiffs' counsel about the Notice Letter.

12.     Neither EPA nor the State of New Hampshire has commenced or is diligently prosecuting a civil or criminal action against Defendants to address any of the violations at issue in this case.  Neither EPA nor the State of New Hampshire has commenced, and neither is diligently prosecuting, any administrative penalty action against Defendants with regard to any of the violations at issue in this case.

## PARTIES

13.     Plaintiff Toxics Action is a non-profit corporation organized under the laws of Massachusetts.  Toxics Action has approximately 1,900 members.  Toxics Action works with citizens across New England in an effort to reduce, clean up, and remediate the effects of pollution in their communities.

14.     Toxics Action has members who live and own property near the Ammonoosuc River, who use the river for recreational and aesthetic purposes, and who are adversely affected by the Defendants' illegal pollutant discharges to the Ammonoosuc River.

15.     Plaintiff CLF is a non-profit corporation duly organized under the laws of Massachusetts with approximately 5,100 members, including approximately 550 members in New Hampshire.  CLF works to protect New England's environment for the benefit of all people.  CLF uses the law, science, and the market in an effort to create solutions that preserve natural resources, build healthy communities, and sustain a vibrant economy.

16.     CLF has members who live and own property near the Ammonoosuc River, who use the river for recreational and aesthetic purposes, and who are adversely affected by the Defendants' illegal pollutant discharges to the Ammonoosuc River.

17.     Defendant North Country Environmental Services, Inc. ("NCES"), is a for-profit corporation organized under the laws of New Hampshire.  NCES is a wholly owned subsidiary

of New England Waste Services, Inc., which is itself a wholly owned subsidiary of Defendant

Casella Waste Systems, Inc.  NCES is the owner, and an operator, of the Landfill.

18.     NCES plays a direct role in managing and funding the Landfill's operations and

pollution control activities.  Its operational role includes, but is not limited to, the management

and disposal of solid waste, groundwater well installation and monitoring, surface water

monitoring, maintenance and operation of leachate collection systems, maintenance and

operation of the Drainage Channel, and provision of services incidental to pollution control.

19.     Defendant Casella Waste Systems, Inc. ("Casella") is a publicly traded for-profit

corporation organized under the laws of Delaware and headquartered in Rutland, Vermont.  It is

registered to do business in New Hampshire.  Casella is an operator of the Landfill.

20.     Casella plays a direct role in managing and funding the Landfill's operations and

pollution control activities, including the maintenance and operation of the Drainage Channel.

Casella personnel regularly communicate with staff at the New Hampshire Department of

Environmental Services ("NHDES") regarding pollution control—including groundwater and

surface water monitoring—at the Landfill.  Casella personnel also work with third-party

contractors and consultants to prepare Water Quality Monitoring Results and other documents

related to the Landfill that are submitted to NHDES on behalf of NCES.

## CITIZEN ENFORCEMENT SUITS UNDER THE CLEAN WATER ACT

21.     The objective of the CWA "is to restore and maintain the chemical, physical, and

biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

22.     The CWA prohibits the addition of any pollutant to navigable waters from any

point source except as authorized by a National Pollutant Discharge Elimination System

("NPDES") permit applicable to that point source.  33 U.S.C. §§ 1311(a), 1342, 1362(12).

23.     The CWA authorizes citizens to commence an enforcement action against any person who violates "an effluent standard or limitation" of the CWA.  One such effluent standard or limitation is the requirement to obtain NPDES permit authorization before adding a pollutant to navigable waters from a point source.  33 U.S.C. §§ 1365(a), (f).

24.     The CWA grants jurisdiction to United States District Courts to enforce effluent standards or limitations, to issue injunctions, to impose appropriate civil penalties for violations, and to award costs of litigation to citizen plaintiffs.  33 U.S.C. §§ 1365(a), (d).

**FACTUAL BACKGROUND**

**The Landfill**

25.     The Landfill comprises approximately 46.5 acres of waste disposal space divided among five stages (numbered I–V), each of which incorporates synthetic liners and a leachate collection system.

26.     The Landfill is located approximately 800 feet south of the Ammonoosuc River.

27.     Beginning in the 1970s, Harold Brown owned and operated an unlined landfill ("Unlined Waste Disposal Space") at the site of what is now Stage II of the Landfill.

28.     In 1985, Sanco, Inc. ("Sanco") purchased the Unlined Waste Disposal Space from Brown, along with 41 undeveloped abutting acres.

29.     Beginning in 1987, Sanco constructed and/or directed the construction of Stage I of the Landfill.

30.     In 1989, NCES purchased Stage I, the Unlined Waste Disposal Space, and the undeveloped abutting acreage from Sanco.

31.     NCES subsequently excavated the Unlined Waste Disposal Space and placed the excavated material in Stage I of the Landfill.

32.     NCES constructed and/or directed the construction of Landfill Stages II–V. NCES and/or its consultants constructed Stage II of the Landfill in the excavated site formerly occupied by the Unlined Waste Disposal Space.  Stages III through V are located next to and above Stages I and II.

**The Drainage Channel**

33.     The Landfill lies within the Ammonoosuc River watershed.

34.     Groundwater underneath and near the Landfill flows to the northeast, towards the Ammonoosuc River.  Preferential groundwater flow patterns lead from the Landfill to a network of groundwater seeps on a steep slope south of the Ammonoosuc River.

35.     Casella, NCES, and their consultants refer to the one seep exhibiting the greatest discharge flow among the network of groundwater seeps as the "Main Seep."

36.     The Main Seep is connected to the Ammonoosuc River by the Drainage Channel. The Drainage Channel is approximately 370 feet long.

37.     The Main Seep and the Drainage Channel are located on property owned by NCES.

38.     The Drainage Channel collects water that emerges from the Main Seep, and from other nearby seeps and wetlands, and conveys that water to the Ammonoosuc River.

39.     The Drainage Channel also collects pollutants—including, but not limited to, contaminated groundwater, landfill leachate, iron, manganese, and 1,4-dioxane—that emerge from the Main Seep and then conveys those pollutants to the Ammonoosuc River.  Leachate is liquid that has passed through or emerged from solid waste and that contains soluble, suspended, or miscible materials removed from such waste.

40.     The Drainage Channel also collects pollutants—including, but not limited to, contaminated groundwater, landfill leachate, iron, manganese, and 1,4-dioxane—that emerge from other groundwater seeps and wetlands connected to the Drainage Channel and then conveys those pollutants to the Ammonoosuc River.

41.     NCES and Casella personnel, and/or consultants acting on behalf of NCES and Casella, manage and monitor pollutant discharges from the Drainage Channel to the Ammonoosuc River.  See infra Paragraphs 48–49, 56–62.

42.     In 2010, consultants for Casella and/or NCES excavated approximately 176 tons of sediment containing elevated levels of iron, manganese, and arsenic from the Main Seep and the Drainage Channel as part of a Seep Restoration Project.

43.     After excavating the discolored soil, consultants for Casella and/or NCES reconstructed the Drainage Channel.

44.     The reconstructed Drainage Channel was designed to convey water—and any pollutants dissolved, suspended, or otherwise mixed in that water—from the Main Seep, and from other nearby seeps and wetlands, to the Ammonoosuc River.

**Groundwater Permit and Water Quality Monitoring**

45.     The Landfill is registered under New Hampshire Groundwater Management and Release Detection Permit No. GWP-198704033-B-006 ("Groundwater Permit").

46.     The Groundwater Permit requires NCES to collect and test separate groundwater samples from monitoring wells near the Landfill, some of which are located in a Groundwater Monitoring Zone ("GMZ") located between the Landfill and the Ammonoosuc River.

47.     The Groundwater Permit also requires NCES to collect and test separate surface water samples from the Main Seep, from three other surface seeps in the GMZ, from the Drainage Channel, and from three locations in the Ammonoosuc River.

48.     NCES, through its consultant, Sanborn, Head, and Associates, Inc. ("Sanborn Head"), submits "Water Quality Monitoring Results" to NHDES three times per year.  The Water Quality Monitoring Results include test results from the required groundwater monitoring and surface water monitoring.

49.     Sanborn Head coordinates the preparation and submission of Water Quality Results with both NCES and Casella personnel.

50.     A copy of an Exploration Location Plan attached to the November 2017 Water Quality Monitoring Results submitted to NHDES is attached as Exhibit 3 to this Complaint and is incorporated by reference herein.  Exhibit 3 depicts the aforementioned monitoring wells, surface water monitoring locations, and GMZ, and also depicts the Landfill, its component stages, and the nearby Ammonoosuc River.

51.     The Water Quality Monitoring Results submitted to NHDES compare sample testing results to Ambient Groundwater Quality Standards ("AGQS") set by NHDES, and/or to Secondary Maximum Contaminant Levels ("SMCL") set by EPA, where applicable.

52.     The SMCL for iron is 0.3 mg/L.

53.     The SMCL for manganese is 0.05 mg/L.

54.     The AGQS for manganese is 0.84 mg/L.

**Pollutant Discharges from the Drainage Channel to the Ammonoosuc River**

55.     Water Quality Monitoring Results submitted to NHDES indicate that the Drainage Channel is discharging pollutants to the Ammonoosuc River.

56.     In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding iron and manganese concentrations in samples collected from the Main Seep (location S-1):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 56a | 11/6/12 | 0.54 | 0.18 |
| 56b | 4/10/13 | 4.5 | 0.65 |
| 56c | 7/9/13 | 1.0 | 0.18 |
| 56d | 11/5/13 | 2.4 | 0.50 |
| 56e | 4/21/14 | 0.25 | 0.12 |
| 56f | 7/17/14 | 0.09 | 0.06 |
| 56g | 11/5/14 | 1.1 | 0.21 |
| 56h | 4/15/15 | 0.75 | 0.15 |
| 56i | 7/21/15 | 0.12 | 0.038 |
| 56j | 11/10/15 | 0.77 | 0.14 |
| 56k | 4/11/16 | 0.87 | 0.097 |
| 56l | 7/12/16 | 0.12 | 0.053 |
| 56m | 11/7/16 | 0.16 | 0.044 |
| 56n | 4/3/17 | 0.38 | 0.075 |
| 56o | 7/26/17 | 0.32 | 0.077 |

57.     In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding iron and manganese concentrations in samples collected from the Drainage Channel (location SF-1):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 57a | 11/6/12 | 1.8 | 0.34 |
| 57b | 4/10/13 | 3.8 | 0.50 |
| 57c | 7/9/13 | 1.1 | 0.27 |

| 57d | 11/5/13 | 1.6 | 0.37 |
|---|---|---|---|
| 57e | 4/21/14 | 3.9 | 0.45 |
| 57f | 7/17/14 | 2.1 | 0.41 |
| 57g | 11/5/14 | 2.1 | 0.28 |
| 57h | 4/15/15 | 2.2 | 0.35 |
| 57i | 7/21/15 | 1.9 | 0.32 |
| 57j | 11/10/15 | 1.6 | 0.33 |
| 57k | 4/11/16 | 5.9 | 0.35 |
| 57l | 7/12/16 | 1.4 | 0.32 |
| 57m | 11/7/16 | 1.1 | 0.27 |
| 57n | 12/1/16 | 2.9 | 0.31 |
| 57o | 4/3/17 | 3.2 | 0.50 |
| 57p | 7/26/17 | 1.5 | 0.37 |
| 57q | 11/6/17 | 1.3 | 0.31 |

58.     In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding the concentrations of 1,4-dioxane in samples collected from the Drainage Channel (location SF-1):

| Complaint Paragraph Number | Sample Date | 1,4-Dioxane Concentration ($\mu$g/L) |
|---|---|---|
| 58a | 11/7/16 | 0.31 |
| 58b | 12/1/16 | 0.26 |
| 58c | 4/3/17 | 0.28 |

59.     The testing data listed in Paragraphs 57–58 indicate that the Drainage Channel is discharging iron, manganese, and 1,4-dioxane to the Ammonoosuc River.

60.     Testing data for samples collected from the Ammonoosuc River itself further indicate that the Drainage Channel is discharging these pollutants to the Ammonoosuc River.

61.     In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding iron and manganese concentrations in samples collected from the Ammonoosuc River *upstream* from the Drainage Channel (location AR-1):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 61a | 7/9/13 | 0.22 | 0.018 |
| 61b | 7/17/14 | 0.19 | 0.017 |
| 61c | 7/21/15 | 0.18 | 0.015 |
| 61d | 7/12/16 | 0.10 | 0.016 |
| 61e | 4/3/17 | 0.10 | 0.018 |
| 61f | 7/26/17 | 0.18 | 0.017 |

62.     In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding iron and manganese concentrations in samples collected from the Ammonoosuc River *downstream* from the Drainage Channel (location AR-2):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 62a | 7/9/13 | 0.24 | 0.021 |
| 62b | 7/17/14 | 0.43 | 0.031 |
| 62c | 7/21/15 | 0.25 | 0.030 |
| 62d | 7/12/16 | 0.17 | 0.029 |
| 62e | 4/3/17 | 0.20 | 0.037 |
| 62f | 7/26/17 | 0.23 | 0.029 |

63.     On each of the dates listed in Paragraphs 61 and 62, iron and manganese concentrations downstream from the Drainage Channel were higher than those upstream from the Drainage Channel.

64.     The presence of iron, manganese, and 1,4-dioxane in the Drainage Channel is attributable to, and indicative of, the presence of landfill leachate and/or contaminated groundwater from the Landfill and/or the Unlined Waste Disposal Space.

65.     Iron, manganese, and 1,4-dioxane are commonly found in landfill leachate, and in groundwater contaminated by landfill waste and/or by activities associated with waste disposal.

66.     1,4-dioxane is a synthetic industrial chemical; it is not naturally occurring.

67.     Consultants for Casella and/or NCES have concluded that the presence of iron and manganese in the Drainage Channel is the result of groundwater contamination from the Unlined Waste Disposal Space.

68.     Water Quality Monitoring Results indicate that leachate, contaminated groundwater, and other pollutants attributable to the Landfill are also present in the Drainage Channel.

69.     Water Quality Monitoring Results indicate that groundwater monitoring wells between the Landfill and the Ammonoosuc River regularly contain iron and manganese concentrations that exceed the applicable AGQS and/or SMCL.  These monitoring wells draw groundwater from the flow pattern that leads from the Landfill to the Drainage Channel.  See Paragraph 34; Exhibit 3.

70.     Water Quality Monitoring Results indicate the presence of 1,4-dioxane in groundwater monitoring wells between the Landfill and the Ammonoosuc River.  These monitoring wells draw groundwater from the flow pattern that leads from the Landfill to the Drainage Channel.  See Paragraph 34; Exhibit 3.

71.    The presence of 1,4-dioxane and elevated concentrations of iron and manganese in groundwater that flows from the Landfill to the Drainage Channel demonstrate that the Landfill is a source of the 1,4-dioxane, iron, and manganese in the Drainage Channel.

72.    Average iron and manganese concentrations in samples collected from some groundwater monitoring wells in the GMZ have increased from 2008 to present.  Other groundwater monitoring wells in the GMZ have contained consistent levels of iron and manganese from 2008 to present.

73.    The stable and/or increasing iron and manganese concentrations in these monitoring wells demonstrate that the presence of these metals in groundwater linking the Landfill to the Drainage Channel is attributable, at least in part, to the Landfill.  If iron and manganese concentrations were attributable solely to soil contamination from the Unlined Waste Disposal Space, the concentrations would be expected to exhibit a decreasing—rather than stable or increasing—trend from 2008 to the present, as the residual effects of the Unlined Waste Disposal Space diminish over time.

74.    Between 1996 and 2006, NCES applied sodium bromide to waste added to Stages II and III of the Landfill.  NCES intended the sodium bromide to function as a manner of leak detection—if bromide is detected in groundwater near the Landfill, it is an indication that Landfill cells are leaking.

75.    Following these applications of sodium bromide, bromide has been regularly detected in samples collected from monitoring wells that draw groundwater from the flow pattern that leads from the Landfill to the Drainage Channel.  The presence of bromide in these samples is an indication that the Landfill is releasing leachate and other pollutants to

groundwater that is thereafter collected and discharged to the Ammonoosuc River by the

Drainage Channel.

### ADVERSE EFFECTS OF POLLUTANTS DISCHARGED
### FROM THE DRAINAGE CHANNEL

76.     When iron is present in water at concentrations above the SMCL, it can result in a

rusty hue, a reddish-colored sediment, and a metallic taste.

77.     Iron can form solid precipitates in water that can settle on the gills and eggs of

aquatic organisms and obstruct oxygen uptake and negatively affect reproduction and mobility.

78.     Dissolved iron can be absorbed through the gills and stomachs of aquatic

organisms and can bioaccumulate to levels that interfere with cellular processes.

79.     Exposure to elevated levels of manganese can damage the gills, intestinal mucosa,

and kidneys of fish.

80.     1,4-dioxane is a likely human carcinogen.  EPA has classified 1,4-dioxane as

likely to be carcinogenic by all routes of exposure.

81.     1,4-dioxane is highly mobile in water and does not readily biodegrade in the

environment.

82.     Because leachate contains pollutants removed from solid waste, it can present a

diverse and variable array of environmental risks depending on its constituents.  The nature of

these constituents, and thus the degree of risk, can change over time.  To Plaintiffs' knowledge,

the constituents of the leachate discharged to the river via the Drainage Channel are not being

regularly and comprehensively characterized.

83.     Groundwater contaminated by landfilling activity can also present a diverse and

variable array of environmental risks depending on its constituents.  The nature of these

constituents, and thus the degree of risk, can change over time.  To Plaintiffs' knowledge, the

14

constituents of the contaminated groundwater discharged to the river via the Drainage Channel are not being regularly and comprehensively characterized.

## VIOLATIONS OF THE CLEAN WATER ACT

84.     Defendants have violated and continue to violate the CWA because they have discharged and continue to discharge pollutants—including, but not limited to, landfill leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane—to the Ammonoosuc River without NPDES permit authorization.

85.     Defendants' past and ongoing discharges of pollutants from the Drainage Channel to the Ammonoosuc River violate the CWA, 33 U.S.C. §§ 1311 and 1342, because: (a) the Drainage Channel is a "point source" within the meaning of the CWA; (b) the Ammonoosuc River is a "navigable water" within the meaning of the CWA; (c) the Drainage Channel is adding substances to the Ammonoosuc River that are "pollutants" within the meaning of the CWA; and (d) Defendants are not authorized by any NPDES permit to discharge pollutants from the Drainage Channel to the Ammonoosuc River.

### A.      The Drainage Channel is a Point Source.

86.     The CWA defines point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

87.     The Drainage Channel is a confined and discrete channel, or conduit, from which groundwater that emerges from the Main Seep, and from other groundwater seeps and wetlands, is discharged to the Ammonoosuc River.

88.     As discussed above in Paragraphs 55–75, water discharged from the Drainage Channel to the Ammonoosuc River contains leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane.

89.     Leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane are pollutants within the meaning of the CWA.  See infra Paragraphs 96–97.

90.     The Drainage Channel thus is a confined and discrete conduit from which pollutants may be, and are, discharged to the Ammonoosuc River, and is therefore a point source within the meaning of the CWA.

**B.     The Ammonoosuc River is a Navigable Water.**

91.     The CWA defines navigable waters as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  "Waters of the United States" are defined by EPA regulations to include, inter alia, all tributaries to interstate waters.  See 40 C.F.R. § 122.2.

92.     The Ammonoosuc River is a permanent flowing body of water that empties into the Connecticut River.  The Connecticut River is an interstate waterway.  It serves as a border between New Hampshire and Vermont, flows south into Massachusetts and Connecticut, and empties into Long Island Sound.

93.     The Ammonoosuc River thus is a navigable water within the meaning of the CWA.

**C.     The Drainage Channel is Adding Pollutants to the Ammonoosuc River.**

94.     The CWA defines "pollutant" as including, inter alia, "solid waste, . . . chemical wastes, . . . and industrial [and] municipal waste." 33 U.S.C. § 1362(6).

95.     The Drainage Channel is adding iron, manganese, 1,4-dioxane, contaminated groundwater, and leachate to the Ammonoosuc River.  Each of these substances is a pollutant within the meaning of the CWA.

96.     The iron, manganese, and 1,4-dioxane discharged via the Drainage Channel are solid and chemical waste, because they are discarded to the river as waste by Defendants, and they are solid, chemical, and industrial and/or municipal waste because they originate from and/or are attributable to industrial waste, municipal waste, and/or activities associated with waste disposal.

97.     The contaminated groundwater and leachate discharged via the Drainage Channel are solid and chemical waste because they are discarded to the river as waste by Defendants, and because they contain chemicals that are discarded to the river as waste by the Defendants.  They are also solid, chemical, and industrial and/or municipal waste because they are attributable to, originate from, and/or contain chemicals that originate from industrial waste, municipal waste, and/or activities associated with waste disposal.

**D.      Defendants Are Not Authorized to Discharge Pollutants From the Drainage Channel to the Ammonoosuc River.**

98.     No NPDES permit authorizes the discharge of pollutants from the Drainage Channel to the Ammonoosuc River.

99.     The Landfill is registered under the 2015 NPDES Multi-Sector General Permit ("MSGP").

100.    The MSGP does not authorize the discharge of pollutants from the Drainage Channel to the Ammonoosuc River.

101.    Section 8.L.3.1 of the MSGP, concerning sector-specific requirements for "Landfills, Land Application Site, and Open Dumps," states that the MSGP does not authorize discharges of leachate, drained free liquids, or contaminated groundwater.

102.    The New Hampshire Groundwater Permit does not authorize the discharge of pollutants from the Drainage Channel to the Ammonoosuc River.

        **E.**      **Defendants' Unauthorized Discharges Are Ongoing and Continuous.**

103.    Defendants have conveyed pollutants—including, but not limited to, landfill leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane—to the Ammonoosuc River via the Drainage Channel each day from March 8, 2013, (the start of the applicable statute of limitations under the CWA) through the present, and they will continue to discharge these pollutants each day unless or until action is taken to stop the discharge.

104.    The Water Quality Monitoring Results and other monitoring conducted by Defendants and/or their consultants generally indicate that the flow of contaminated groundwater from the Main Seep to the Discharge Channel is continuous, and they do not indicate any interruption in this flow.  Defendants and/or their consultants have estimated this flow as being approximately 100 gallons per minute, which translates to 144,000 gallons per day.

105.    Each day of discharge of each pollutant from the Drainage Channel to the Ammonoosuc River without NPDES permit authorization constitutes a separate and distinct day of violation of the CWA.

      **PLAINTIFFS AND THEIR MEMBERS ARE HARMED BY THE CWA VIOLATIONS**

106.    Members of Toxics Action and CLF live near, own property near, work near, and/or visit the Ammonoosuc River and use the river for recreational and aesthetic purposes.

107.    Plaintiffs' members consider a clean and vibrant Ammonoosuc River to be an important resource and an aesthetically significant part of the area in which they live, work, visit, and/or recreate.

108.    Plaintiffs have members who want the Ammonoosuc River to contain as little pollution as possible, to be free of illegal pollution discharges, and to be afforded the full protections of the Clean Water Act.

109.    Plaintiffs have members who used to swim in and otherwise use the Ammonoosuc River downstream from the Drainage Channel, but now limit, or avoid entirely, swimming in or using those areas due to concerns about the human health, aquatic health, and aesthetic impacts of pollutants discharged by the Defendants to the Ammonoosuc.

110.    Plaintiffs have members who have observed discoloration and other signs of pollution in and near the Ammonoosuc River (including red, brown, and/or orange discoloration, which can be attributable to iron pollution), which has decreased their enjoyment of the river.

111.    Plaintiffs have members who would recreate in or near, or otherwise use and enjoy the area of the river downstream from the Drainage Channel, but who refrain from doing so because they are concerned about the cancer risk from 1,4-dioxane.

112.    Plaintiffs have members who are concerned that the Ammonoosuc River has been polluted by Defendants' discharges and that the health of aquatic life has been harmed by this pollution.  Their enjoyment derived from activities in and around the Ammonoosuc River is diminished due to these concerns.

113.    Plaintiffs have members who spend less time in and around the Ammonoosuc River than they otherwise would because they are concerned about pollutants discharged by Defendants to the Ammonoosuc River.

114.    Plaintiffs have members who are concerned that the Ammonoosuc River has been, and continues to be, deprived of the protections afforded by the Clean Water Act, and who have been deprived of the public process and other avenues for access and comment associated with the Clean Water Act's permitting process.

115.    Because Defendants have not applied for, or received, a NPDES permit for pollutant discharges from the Drainage Channel to the Ammonoosuc River, Plaintiffs and their members are deprived of access to the monitoring and reporting that would be required if Defendants were governed by an NPDES permit authorizing their discharge of pollutants to the Ammonoosuc River.

## **RELIEF REQUESTED**

Plaintiffs request that this Court:

a.    Declare Defendants to have violated and be in violation of the CWA by discharging pollutants from the Drainage Channel to the Ammonoosuc River without NPDES authorization;

b.    Order Defendants to comply with the CWA by ceasing all unauthorized pollutant discharges to the Ammonoosuc River, seeking NPDES permit authorization for any future pollutant discharges to the Ammonoosuc River, and complying with the discharge limitations, monitoring requirements, and other requirements of such permit if and when issued;

c.    Order Defendants to implement measures to remedy, mitigate, or offset the harm to the environment caused by the violations alleged herein;

d.     Assess an appropriate civil penalty against Defendants for each day of each

violation of the CWA occurring from March 8, 2013, forward, as provided by 33

U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4.

e.     Award Plaintiffs their costs of litigation (including reasonable attorney and expert

witness fees), as provided by 33 U.S.C. § 1365(d);

f.     Order such other relief as the Court deems appropriate.


                                    PLAINTIFFS,

                                    TOXICS ACTION CENTER, INC., and
                                    CONSERVATION LAW FOUNDATION

Dated: May 14, 2018                 /s/ Thomas Irwin
                                    Thomas Irwin (NH Bar #11302)
                                    Conservation Law Foundation
                                    27 North Main Street
                                    Concord, NH 03301
                                    (603) 573-9139
                                    *Attorney for Conservation Law Foundation*
                                    Email: tirwin@clf.org

                                    /s/ Daniel J. Mullen
                                    Daniel J. Mullen (NH Bar #1830)
                                    Ransmeier & Spellman P.C.
                                    One Capitol Street
                                    Concord, NH 03301
                                    (603) 410-6643
                                    *Attorney for Toxics Action Center*
                                    Email: dmull@ranspell.com

                                    Kevin P. Budris
                                    Joshua R. Kratka
                                    Charles C. Caldart
                                    *Pro hac vice motions to be filed*
                                    National Environmental Law Center
                                    294 Washington Street, Suite 500
                                    Boston, MA 02108
                                    (617) 747-4304

*Attorneys for Conservation Law Foundation*
*and Toxics Action Center*
Email: kevin.budris@nelconline.org

David A. Nicholas
*Pro hac vice motion to be filed*
20 Whitney Road
Newton, MA 02460
(617) 964-1548
*Attorney for Toxics Action Center*
Email: dnicholas@verizon.net