UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____
                                                          )
TOXICS ACTION CENTER, INC.                )
and CONSERVATION LAW FOUNDATION,   )
                                                          )
                        Plaintiffs                        )
                                                          )
            v.                                            )                    Case No. 1:18-cv-00393-PB
                                                          )
CASELLA WASTE SYSTEMS, INC.            )
and NORTH COUNTRY                          )
ENVIRONMENTAL SERVICES, INC.          )
                                                          )
                        Defendants                     )
_____ )

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Defendants, North Country Environmental Services, Inc. ("NCES") and Casella Waste

Systems, Inc. ("Casella"), move to dismiss the plaintiffs' complaint pursuant to Fed. R. Civ. P.

12(b)(1) and 12(b)(6).  This motion rests on the following grounds.

## I.      Introduction

As to both defendants, the complaint is subject to dismissal because the plaintiffs lack

standing and because the complaint does not allege a cognizable violation of the Clean Water

Act, 33 U.S.C. §1251 (the "CWA" or the "Act").  Plaintiffs' claim is contrary to the law of this

circuit because the complaint alleges that the CWA regulates groundwater when the First Circuit

has observed that it does not.  The complaint also fails to state a claim because it does not allege

the existence of a point source within the meaning of the Act.  As to Casella, the complaint

should be dismissed because the fact that it is the ultimate parent of NCES does not make it

liable for NCES's alleged regulatory obligations.

## II.     Statement of Facts

NCES owns and operates a solid waste landfill in Bethlehem, New Hampshire. Complaint at ¶ 26.  The facility began as a four-acre, unlined landfill developed by Bethlehem resident Harold Brown in 1976.  *Id.* at ¶ 27; *North Country Environmental Services v. Town of Bethlehem*, 146 N.H. 348, 350 (2001) ("*NCES I*").  Brown expanded the unlined landfill's footprint by one acre the following year.  *Id.*  He then subdivided a ten-acre parcel that included the existing five-acre unlined landfill footprint and sold the parcel to Sanco, Inc., in 1983.  *Id.* Two years later, Brown subdivided another forty-one acres of his land abutting the ten-acre parcel and sold the newly subdivided parcel to Sanco as well.  *Id.*

In 1987, Sanco sought and received approval from the New Hampshire Department of Environmental Services ("NHDES") to construct an eighteen-acre, double-lined landfill cell comprised of four phases.  This cell was denominated "Stage I."  *Id.* at 351; *see also* Solid Waste Facility Permit DES-SW-87-022 (June 30, 1987) (Exhibit A).[1]  The double-liner system was one of the requirements[2] imposed by NHDES's rules implementing "subtitle D" of the Resource Conservation and Recovery Act of 1976.  *See* 42 U.S.C. § 6944 (RCRA's rulemaking authority and requirement for disposal of solid waste in a "sanitary landfill"); 40 C.F.R. Part 258 (2008) (rules implementing § 6944).  Such facilities are now commonly known as "subtitle D landfills."

In 1989, Sanco received NHDES approval for a seven-acre, double-lined expansion of the landfill.  *NCES I*, 146 N.H. at 351; *see also* Secure Solid Waste Landfill Facility Permit

---

[1] Permits contained in Exhibits A and B are appended to this motion solely for informational purposes; these documents are not intended to modify or contradict the factual allegations of the plaintiffs' complaint.

[2] Other requirements imposed by these rules for the protection of human health and the environment include, without limitation, leachate collection, conveyance and disposal systems, groundwater monitoring wells, stormwater swales, landfill gas collection systems, and landfill gas management and monitoring systems.  *Appeal of Town of Bethlehem*, 154 N.H. 314, 317 (2006).

DES-SW-89-009 (April 24, 1989) (Exhibit B).  As part of that approval, NHDES required Sanco to excavate all of the solid waste from the unlined landfill that Brown and Sanco had operated and relocate it within Stage I.  *Id.* at 6, § 2.9; *see also* Complaint at ¶¶ 27, 30-31.  Also in 1989, Sanco sold the landfill to Consumat Sanco, Inc., a Virginia corporation.  A subsidiary of Casella purchased the stock of Consumat Sanco in the early 1990s and changed the name of the corporation to North Country Environmental Services, Inc.

The landfill is located south of the Ammonoosuc River and lies within the river's watershed.  Complaint at ¶¶ 33-34.  Groundwater[3] on the south side of the watershed flows in a general north/northeast direction, passing beneath the liner system and continuing toward the river.  Because the Ammonoosuc north of the landfill lies at the bottom of a long, sloped embankment and the elevation of the water table is well above the level of the river when it intersects with the river bank, groundwater emerges as a network of seeps along the bank.  *Id.* One of these seeps is referred to as the "main seep."  *Id.* at ¶ 35.  Once the groundwater emerges at one of the seeps, it flows down the river bank and into the river.  This flow has formed a natural stream bed from the seep over time.  It is this formation that plaintiffs characterize as a "drainage channel."  *Id.* at ¶¶ 36-38; *see also* Exhibit C (photographs of the main seep and a portion of the stream bed from the seep system to the river).[4]

---

[3]  "Groundwater" refers generally to the accumulated water lying below the "water table." Groundwater flows through and around subsurface soils and rock in the direction of the water table's gradient.  Depending on such factors as the steepness of the gradient and the transmissivity of the material through which groundwater is traveling, it can take weeks, months, or even years for groundwater to move as little as one hundred feet.  *See* "Groundwater," Environmental Protection Agency, https://www.epa.gov/sites/production/files/documents/groundwater.pdf  (last accessed June 12, 2018).

[4]  Again, this exhibit is provided for informational purposes, not to modify or contradict the allegations of the complaint.

The groundwater system downgradient of the landfill, part of which emerges at the seeps, is regulated by NHDES under a New Hampshire Groundwater Management and Release Detection Permit. *Id*. at ¶ 45. The groundwater management aspect of this permit is the consequence of the contaminant plume created by the unlined landfill previously operated by Brown and Sanco. Despite the fact that NCES excavated the unlined landfill over twenty years ago, some low-level contaminants persist and continue to flow generally to the north of the landfill. The permit requires placement of groundwater monitoring wells throughout the groundwater management zone ("GMZ") and periodic sampling from the wells, the seeps, and the river. *Id.* at ¶¶ 46-47.

NCES, through its consultant, Sanborn, Head and Associates, Inc. ("Sanborn Head"), submits the water quality monitoring results from the GMZ, including the main seep, to NHDES. *Id*. at ¶ 48. Plaintiffs allege that the groundwater emerging from the seeps has elevated levels of iron and manganese. *Id*. at ¶ 63. Sanborn Head has concluded that these levels of iron and manganese in the seep and its stream bed are the result of historic groundwater contamination from the former unlined landfill area.[5] *Id*. at ¶ 67. The water quality results on which plaintiffs

---

[5] Iron and manganese occur naturally in groundwater in New Hampshire. *See* "New Hampshire Department of Environmental Services Fact Sheet: Iron and/or Manganese in Drinking Water" (2013), https://www.des.nh.gov/organization/commissioner/pip/factsheets/dwgb/documents/dwgb-3-8.pdf (last accessed June 12, 2018). Sanborn Head has determined that there are higher concentrations of these metals in the groundwater at the seeps because the contamination from the unlined landfill has caused reducing conditions (also known as "redox"). *See, e.g.*, "2003 Summary of Water Quality Monitoring," Sanborn, Head & Associates, September 29, 2002, at 8, http://www4.des.state.nh.us/IISProxy/IISProxy.dll?ContentId=4180578 (last accessed June 13, 2018). Simply put, reducing conditions alter the normal oxidation rate of certain elements or molecules. *See, e.g.*, "Reduction-Oxidization (Redox) Control in Ohio's Ground Water Quality," EPA.ohio,gov, http://epa.ohio.gov/Portals/28/documents/gwqcp/redox_ts.pdf (last accessed June 13, 2018). In this case, under the reducing conditions, the naturally occurring iron and manganese dissolve into groundwater more readily than they would in the absence of the chemical changes caused by the unlined landfill. 2003 Summary of Water Quality Monitoring at 8.

rely to form their conclusions in this case were collected and publicly reported pursuant to

NHDES's groundwater permit and monitoring standards.  *Id*. at ¶ 61.

On May 14, 2018, plaintiffs Toxics Action Center, Inc. ("TAC"), and Conservation Law

Foundation ("CLF"), filed this action against NCES and Casella, seeking injunctive relief,

damages, and attorney's fees.  Both plaintiffs are corporations organized under the laws of

Massachusetts.  *Id*. at ¶¶ 13 and 15.  Plaintiffs do not allege specific counts in their pleading but

generally allege previous and ongoing violations of the CWA.  Specifically, the plaintiffs

contend that NCES has discharged and continues to discharge pollutants into the Ammonoosuc

River.  *Id*. at ¶ 84.

Plaintiffs contend that NCES was required to obtain a NPDES permit because NCES is

allegedly discharging pollutants from a "point source" into navigable waters.  *Id*. at ¶ 85.

Plaintiffs identify the alleged point source in this case as the stream bed commencing at the main

seep.  *Id*. at ¶¶ 34, 90.  Plaintiffs contend that groundwater at the main seep and the other nearby

seeps discharges through this "channel" into the Ammonoosuc River.  *Id*. at ¶ 38.

The complaint alleges that NCES is wholly owned by New England Waste Services, Inc.

which is itself wholly owned by Casella.  *Id*. at ¶ 17.  It also alleges that Casella "plays a direct

role in managing and funding" the landfill and "pollution control activities, including the

maintenance and operation[6] of the" stream bed below the main seep.  *Id*. at ¶ 20.  The complaint

specifies only two ways in which Casella "plays a . . . role" in "pollution control" at the landfill,

however.  Casella allegedly communicates with NHDES about pollution control and works with

"third-party contractors and consultants" to prepare water quality monitoring reports for

---

[6] This characterization of the seep stream bed as something the defendants maintain and operate
is grossly misleading and should be corrected by plaintiffs.  The seep stream bed is a natural watercourse
and is not maintained or operated.

submission to NHDES.  *Id.*  The complaint does not allege that Casella owns the property on which the landfill or the seep stream bed is located or that Casella is a permittee for the operation of the landfill or for the monitoring of groundwater or surface water downgradient from the landfill.

## III.    Argument

To maintain an action before this court, a plaintiff must establish its standing.  U.S. Const. art. III, § 2, cl. 1; *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975); *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992).  "Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States."  *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982).  The burden rests with the plaintiff to establish "sufficient factual matter to plausibly demonstrate [its] standing to bring the action."  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016).  In considering a motion to dismiss for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1), the court "accept[s] as true all well-pleaded factual averments in the plaintiff's complaint and indulge[s] all reasonable inferences therefrom in his favor."  *Katz v. Pershing, LLC,* 672 F.3d 64, 70 (1st Cir. 2012) (quotations and ellipsis omitted).  "[A] suit will not be dismissed for lack of standing if there are sufficient allegations of fact . . . in the complaint or supporting affidavits."  *Conservation Law Foundation, Inc. v. Continental Paving, Inc.*, No. 16-CV-339-JL, 2016 WL 7116019, at *2 (D.N.H. Dec. 6, 2016), *quoting Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 65 (1987).

Standing implicates both constitutional and prudential considerations: "constitutional limitations on federal court jurisdiction and prudential limitations on its exercise."  *Benjamin v. Aroostook Medical Center, Inc.*, 57 F.3d 101, 104 (1st Cir. 1995).  The constitutional limitations

derive from the requirement that federal courts may only adjudicate a "justiciable case or controversy." *Dubois v. U.S. Dep't. of Agric.*, 102 F. 3d 1273, 1280-81 (1st Cir. 1996), *citing* U.S. Const. Art. III. To satisfy the constitutional standing requirements, the plaintiff must establish that:

> (1)    it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

> (2)    the injury is fairly traceable to the challenged action of the defendant; and

> (3)    it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180-81 (2000) ("*Laidlaw*"). The prudential standing limitations prevent a court from adjudicating "questions of broad social import where no individual rights would be vindicated and . . . [act to] limit access to the federal courts to those litigants best suited to assert a particular claim." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985), *quoting Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100, (1979).

Through the CWA citizen-suit provision, an organization may be able to establish standing on behalf of its members. 33 U.S.C. § 1365. Standing in these circumstances is not a foregone conclusion, however; prudential limitations require that the organization demonstrate: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n.*, 432 U.S. 333, 343 (1977); *see also International Union, United Automotive, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 290 (1986). Individual members have standing in their own right under Article III

where they demonstrate invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Furthermore, the plaintiff must establish the remaining elements of Article III standing, *i.e.,* a causal connection between the injury and the conduct complained of and that the injury must be "fairly traceable to the challenged action of the defendant, and not [the] result [of] the independent action of some third party not before the court."  *Id*. (ellipses and brackets omitted), *quoting Simon v. Eastern Kentucky Welfare Rights Organizatio*n, 426 U.S. 26, 41-42 (1976).  The court also requires that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."  *Id*.

Assuming the plaintiffs can establish their standing, the complaint must still state a claim upon which relief can be granted to survive a motion to dismiss.  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader."  *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010).  The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and it must allege each of the elements of the cause of action and "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal punctuation omitted).  Thus, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal brackets omitted).  If the facts asserted in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture" then the court must dismiss the claim.  *Tambone*, 597 F.3d at 442.

A. *The Plaintiffs Lack Standing.*

In this case, the plaintiffs claim to have standing on behalf of their members pursuant to the Act's citizen-suit provision.  Complaint at ¶¶ 23-24.  They do not claim standing in their own right.  Thus, the plaintiffs are required to demonstrate that their members have an injury that is not speculative in nature and is fairly traceable to the alleged actions of NCES.  The plaintiffs have categorically failed to do so.  The complaint does not identify any member who has been injured, nor does the complaint allege any facts to support an actual or imminent injury.  There is no allegation that plaintiffs' members are actually aware of the results of the sampling and testing of the groundwater at the seeps and in the river, nor have plaintiffs alleged that anything in particular about those results has caused the "concerns" or "aesthetic impacts" that have allegedly affected their use and enjoyment of the river.  Plaintiffs have not therefore alleged that their members' "concerns" or "impacts" are fairly traceable to defendants' alleged violations.  Thus, as a matter of law plaintiffs have failed to establish standing.

In environmental cases, associations are permitted to establish standing through their members.  *See Town of Norwood v. Federal Energy Regulatory Commission*, 202 F.3d 392, 405-406 (1st Cir. 2000) (holding an environmental organization must identify at least one member who has standing in order for the organization to maintain suit).  This fact, however, does not in any fashion obviate an organizational plaintiff's responsibility to satisfy the constitutional standing requirements.  Accordingly, an organization must show that at least one of its members satisfies all of the following three requirements: 1) has sustained an injury in fact which is 2) caused by the violation and 3) is redressable.  *See Lujan*, 504 U.S. at 560-61.  Plaintiffs have failed to establish that even one of its members has suffered an injury in fact.  Indeed, plaintiffs do not so much as *identify* a single member, much less one who has suffered or will suffer an

actual or imminent injury as a result of the circumstances alleged in the complaint.  *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (declining to find standing for association based on "an affidavit asserting that many of [the association's] members asked it to take legal action[,]" explaining that "the association must, at the very least, identify a member who has suffered the requisite harm").  Instead, the plaintiffs generally allege that they have members who live near the Ammonoosuc River and "are adversely affected" by the alleged "pollutants" in some of the groundwater emerging from one of the seeps.  Complaint at ¶¶ 14, 16.  The complaint provides no specificity as to these "adverse effects"; it offers only the bare conclusion that such effects exist.

It is true that harm to aesthetic and recreational interests *may* constitute injury in fact sufficient to establish an individual's standing.  *See*, *e.g., Laidlaw*, 528 U.S. at 183; *Lujan*, 504 U.S. at 562-63.  The nature of and facts supporting the alleged injury, however, must be stated with specificity to ensure "that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *Valley Forge Christian College,* 454 U.S. at 472.  The standing requirement is also important to judicial economy and clarity as it "assures an actual factual setting in which the litigant asserts a claim of injury in fact, [and] a court may decide the case with some confidence that its decision will not pave the way for lawsuits which have some, but not all, of the facts of the case actually decided by the court."  *Id.*

In *Laidlaw*, several environmental organizations brought a citizen suit under the CWA for injunctive relief and civil penalties, alleging that the defendant violated its NPDES permit at a hazardous waste incinerator.  *Laidlaw,* 528 U.S. at 176-77.  Several of the plaintiff organizations' members filed affidavits identifying themselves by name and detailing the injury

each member suffered or would suffer because of the alleged pollution.  *Id*.  The Supreme Court

held that the organizational plaintiffs had demonstrated standing in that its members had stated

injuries to their aesthetic and recreational interests which were *sufficiently specific*.  *Id*. at 183.

Each member had demonstrated that he or she used the river in question "and [was a] person[ ]

'for whom the aesthetic and recreational values of the area will be lessened' by the challenged

activity."  *Id*., *quoting Sierra Club*, 405 U.S. at 735.  The plaintiffs described the proximity of the

river to where the affected members lived and specified the activities in which the members

participated on the river, activities they no longer pursued because of their unwillingness to

encounter the alleged pollutants.  *Id*.  Thus, an individual member must show "a connection to

the area of concern sufficient to make credible the contention that the person's future life will be

less enjoyable – that he or she really has or will suffer in his or her degree of aesthetic or

recreational satisfaction – if the area in question remains or becomes environmentally degraded."

*Ecological Rights Found. v. Pacific Lumber Co.,* 230 F.3d 1141, 1149 (9th Cir. 2000).

Recently this court examined CLF's standing in a case involving a CWA claim against a

paving company.  *Conservation Law Foundation, Inc. v. Continental Paving, Inc.*, No. 16-CV-

339-JL, 2016 WL 7116019 (D.N.H. Dec. 6, 2016).  The defendant filed a motion to dismiss

alleging that CLF had failed to establish standing.  In its decision denying the motion to dismiss,

this court acknowledged that CLF's complaint may have lacked sufficient facts to support

standing.  *Id*. at *3 (pointing to generalized language in the pleading submitted by CLF: "If the

court had examined only the Complaint in isolation, it might have found [defendant's] argument

meritorious, as the complaint alleges only that CLF members use and enjoy New England's

waterways, and that Continental's alleged discharges into the Soucook and Merrimack Rivers

adversely affect CLF members' use and enjoyment of those water resources.").  (Internal

quotations omitted.)  The plaintiffs survived the motion to dismiss, however, because CLF

submitted declarations from three members describing how the alleged pollution actually

impacted them.  *Id*.  No such declarations or assertions have been provided here; instead, TAC

and CLF have made allegations in their complaint similar to the allegations that Judge Laplante

suggested were likely deficient in *Continental Paving*.  TAC alleges merely that:

> [TAC] has members who live and own property near the Ammonoosuc River,
> who use the river for recreational and aesthetic purposes, and who are adversely
> affected by the Defendants' illegal pollutant discharges to the Ammonoosuc
> River.

Complaint at ¶ 14.  CLF simply repeats *verbatim* TAC's conclusory allegations:

> CLF has members who live and own property near the Ammonoosuc River, who
> use the river for recreational and aesthetic purposes, and who are adversely
> affected by the Defendants' illegal pollutant discharges to the Ammonoosuc
> River.

*Id*. at ¶ 16.  Both TAC and CLF add equally vague allegations of injury to their members later in

the complaint:

> Members of the [TAC] and CLF live near, own property near, work near and/or
> visit the Ammonoosuc River and use the river for recreational and aesthetic
> purposes.

*Id*. at ¶ 106.

> Plaintiffs have members who used to swim in and otherwise use the Ammonoosuc
> River downstream from the Drainage Channel, but now limit, or avoid entirely,
> swimming in or using those areas due to concerns about the human health, aquatic
> health, and aesthetic impacts of pollutants discharged by the Defendants to the
> Ammonoosuc.

*Id*. at ¶ 109.

> Plaintiffs have members who are concerned that the Ammonoosuc River has been
> polluted by Defendants' discharges and that the health of aquatic life has been
> harmed by this pollution. Their enjoyment derived from activities in and around
> the Ammonoosuc River is diminished due to these concerns.

*Id*. at ¶ 112.

Plaintiffs do not provide the identities of these allegedly injured members, where specifically the members have allegedly observed or experienced polluted waters, or how the water quality in the seep stream bed has led to the alleged "concerns" or "impacts." Abstract injury is not enough to establish standing. *Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 (1983); *see also Conservation Law Foundation of New England, Inc. v. Reilly*, 950 F.2d 38, 41-42 (1st Cir. 1991) (in context of CERCLA citizen-suit, court held that plaintiffs lacked standing where complaint alleged members reside in four dozen cities and towns near which a federal facility on the hazardous waste docket was located and alleged injury was "the increased threat to public health and natural resources from exposure to contaminants from the unevaluated facilities").

Furthermore, plaintiffs' complaint does not claim that any alleged injury is actual or imminent. In *Lujan* the court noted that injury cannot rest on a purely speculative concern:

> . . . [A]lthough "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to "ensure that the alleged injury is not too speculative for Article III purposes – that the injury is *certainly* impending. It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control . . . .

*Lujan*, 504 U.S. at 564 n.2 (internal citations omitted; emphasis in original).

Plaintiffs state that their members "are concerned that the Ammonoosuc River has been polluted . . ." and "have observed discoloration or other signs of pollution." Complaint at ¶¶ 110-112. Plaintiffs further allege that their members' "enjoyment has been diminished due to these concerns." *Id*. at ¶ 112. The plaintiffs' complaint simply repeats language from *Laidlaw* and cases citing it without providing any particularized facts to support the existence of concrete harm to at least one identified member, a causal connection between the alleged violation and the claimed harm, or a fairly traceable nexus between the alleged injury and the defendants' actions being challenged in the complaint.

Finally, the plaintiffs' claimed injury is not meaningfully redressable.  Here, the plaintiffs acknowledge that NHDES regulates and monitors the groundwater both before and after it emerges from the seeps and flows down the river bank and into the river.  Complaint at ¶¶ 45-48, 55-63.  Plaintiffs do not claim that NHDES's regulation and monitoring of this groundwater is somehow deficient or that regulation and monitoring under an NPDES permit would differ from NHDES's regulation and monitoring.  Hence, plaintiffs have not alleged that the injunction they request would have any substantive impact on the alleged discharges from the seeps into the stream bed, or in any way affect their claimed injuries.  In short, the "facts" provided by CLF and TAC to establish standing are insufficient and the complaint should be dismissed.

      B.    *The Plaintiffs Have Failed to State a Claim Upon Which Relief Can be Granted.*

      **1.    As a Matter of Law, the CWA Does Not Regulate Groundwater.**

Assuming *arguendo* that the court determines that the plaintiffs have demonstrated standing, the complaint should nonetheless be dismissed for failure to state a claim.  The plaintiffs allege that this court should exercise its jurisdiction pursuant to the CWA, 33 U.S.C. § 1365(a)(1) and 28 U.S.C. § 1331.  Complaint at ¶ 4.  The U.S. Court of Appeals for the First Circuit, however, has cited favorably authority that the Act did not disturb the authority of the states to regulate groundwater.

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas*, LLC 141 F. Supp. 3d 428, 434-35 (M.D.N.C. 2015).  Through the CWA, Congress instituted a regime of strict liability for discharges of pollutants from a "point source" into navigable waters. *Sierra Club*, 781 F.3d at 284.  If a discharge from a point source occurs the owner must obtain a National Pollutant Discharge Elimination System ("NPDES") permit, which imposes

"limitations on the discharge of pollutants, and [establishes] related monitoring and reporting requirements." *Laidlaw*, 528 U.S. at 174.  To establish a violation of the CWA "a plaintiff [proceeding under the Act's citizen suit provisions] must prove that the defendant (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1142 (10th Cir. 2005).  The term "navigable waters" means "waters of the United States." 33 U.S.C. § 1362(7).

According to the complaint, groundwater containing three pollutants emerges at the seeps, enters the main seep stream bed (which plaintiffs call the "Drainage Channel"), and then travels down the riverbank into the river.  Complaint at ¶¶ 38-40, 64.  The complaint also acknowledges that NHDES monitors and regulates groundwater for contamination between the landfill and the river both before and after it emerges on the river bank and runs into the river. *Id.* at ¶¶ 45-48.

The First Circuit has endorsed the decisions of other circuits finding that the CWA has no application to groundwater.  *See United States v. Johnson*, 437 F.3d 157, 161 n.4 (1st Cir. 2006) (citing Seventh Circuit cases as to "why ground water is a limiting principle for the CWA" and noting, "The CWA does not cover any type of ground water; the CWA covers only surface water.  Nothing in the terms of the CWA or the regulation at issue here interpreting the CWA could be construed as extending jurisdiction to a body of ground water.  Federal regulation of ground water is covered in other statutes.") (*vacated and remanded on other grounds, U.S. v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006)); *see also, e.g., Exxon Corp. v. Train*, 554 F.2d 1310, 1322 (5th Cir. 1977) ("In our view, the evidence is so strong that Congress did not mean to substitute federal authority over groundwaters for state authority that the [EPA] Administrator's construction, although not unreasonable on its face, must give way because it is contrary to

congressional intentions." (internal quotations omitted)); *Rice v. Harken Exploration Co.*, 250 F.

3d 264, 269 (5th Cir. 2001) ("The law in this circuit is clear that ground waters are not protected

waters under the CWA."); *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F. 3d 962,

965-66 (7th Cir. 1994).

In *Village of Oconomowoc*, the Seventh Circuit cited the CWA's legislative history to

support its conclusion that the Act does not regulate groundwater.  After noting that "[n]either

the Clean Water Act nor the EPA's definition asserts authority over ground waters, just because

these may be hydrologically connected with surface waters," the court quoted from the report of

the U.S. Senate Committee on Public Works on the CWA:

> Several bills pending before the Committee provided authority to establish
> [f]ederally approved standards for groundwaters which permeate rock, soil, and
> other subsurface formations.  Because the jurisdiction regarding groundwaters is
> so complex and varied from State to State, the Committee did not adopt this
> recommendation.

*Village of Oconomowoc,* 24 F.3d at 965, *quoting* S. Rep. No. 414, 92d Cong., 1st Sess. 73

(1972); *see also Exxon*, 554 F.2d at 1324 (concluding that CWA's provisions for gathering

information about groundwater pollution were designed to distribute the information needed by

states to "cope intelligently with groundwater pollution" and it is clear that "Congress meant for

the *states* to benefit from the knowledge being developed while retaining control of their own

groundwater pollution control programs.").  Emphasis supplied.  *Id.*

More recently, a district court in North Carolina concluded that the "CWA does not

generally require NPDES permits for discharges to groundwater" and determined that "Congress

did not intend for the CWA to extend federal regulatory authority over groundwater, regardless

of whether that groundwater is eventually or somehow 'hydrologically connected' to navigable

surface waters."  *Cape Fear River Watch v. Duke Energy Progress*, 25 F. Supp. 3d 798, 810

(E.D.N.C. 2014).  In that case, the court later amended its previous order to state that "plaintiffs' claim(s) relying on the independent jurisdiction of the CWA over groundwater, as opposed to state law, are dismissed for lack of subject matter jurisdiction under the CWA."  *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, No. 7:13-CV-200-FL, 2014 WL 10991530, at *1 (E.D.N.C. Aug. 1, 2014); *see also Umatilla Waterquality Protective Ass'n., Inc. v. Smith Frozen Foods, Inc.*, 962 F. Supp. 1312, 1318 (D. Or. 1997) (holding that discharges of pollutants into groundwaters that are hydrologically connected to surface water are not subject to CWA jurisdiction.).[7]

This does not mean that discharges to groundwater escape regulation.  Where pollution is being discharged into groundwater, such discharges are typically categorized as "non-point source pollution" which is regulated by the states.  *See Rapanos v. United States*, 547 U.S. 715, 803 (2006) (Stevens, J. dissenting).  In New Hampshire, NHDES regulates contamination of groundwater.  *See generally* N.H. RSA 485-C:1, I (among other things, New Hampshire's

---

[7]  Nationally, the law remains unsettled with respect to whether discharges of pollutants to groundwater that make their way into navigable waters are regulated by the Act.  *See Hawaii Wildlife Fund v. County of Maui*, 886 F.3d 737 (9th Cir. 2018) (plaintiffs stated a claim under the CWA where defendant injected "3 to 5 million gallons of treated wastewater per day into the groundwater via its wells" and plaintiffs demonstrated that injected wastewater traveled through groundwater to the Pacific Ocean); *and Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 651 (4th Cir. 2018) (plaintiff stated a claim under the CWA where gasoline seeped through ruptured pipeline and into groundwater less than 1,000 feet from the navigable water because plaintiffs demonstrated a "direct hydrological connection" between the groundwater and navigable water).  There is also a case pending in the Sixth Circuit on this issue.  *See Kentucky Waterways All. v. Kentucky Utilities Co.*, No. CV 5: 17-292-DCR, 2017 WL 6628917, *12 (E.D. Ky. Dec. 28, 2017) (appeal filed February 1, 2018) (discharge of pollutants to a navigable water via hydrologically connected groundwater is not subject to the CWA's NPDES permit requirement.) Following the 9th Circuit's decision in *Hawaii Wildlife*, the EPA issued a request for comments regarding "whether pollutant discharges from point sources that reach jurisdictional surface waters via groundwater or other subsurface flow that has a direct hydrological connection to the jurisdictional surface water may be subject to CWA regulation."  *See Clean Water Act Coverage of "Discharges of Pollutants" via Direct Hydrologic Connection to Surface Water*, 83 Fed Reg. 7126 (February 20, 2018) (comment period closed May 21, 2018).  The EPA has yet to propose rules or provide guidance in response to the comments it has received.

Groundwater Protection Act is intended to "provide for consistent, protective management and remediation of groundwater affected by regulated contaminants.").

Here, plaintiffs explicitly and repeatedly allege that contaminated groundwater is subject to regulation under the Act.  Complaint at ¶¶ 40, 84, 89. The plaintiffs assert that contaminated groundwater travels to the seeps and into the "Drainage Channel" which ultimately leads to the Ammonoosuc River.  Complaint at ¶ 40 ("The Drainage Channel also collects pollutants – including, but not limited to, contaminated groundwater, landfill leachate, iron, manganese, and 1,4-dioxane[8] – that emerge from other groundwater seeps and wetlands connected to the Drainage Channel and then conveys those pollutants to the Ammonoosuc River").  Indeed, the plaintiffs concede that NHDES has classified the water in the main seep as groundwater and regulates it as such.  Complaint at ¶¶ 45 -51.  The water quality data on which the plaintiffs rely were collected and reported pursuant to the Groundwater Permit.  *Id*. at ¶ 70 ("Water Quality Monitoring Results indicate the presence of 1,4-dioxane in groundwater monitoring wells between the landfill and the Ammonoosuc River.  These monitoring wells draw groundwater from the flow pattern that leads from the Landfill to the Drainage Channel.").

Against the First Circuit's articulation of the law, ample authority in two other circuits and many district courts, clear congressional intent to leave regulation of groundwater to the states, and plaintiffs' express recognition that NHDES regulates groundwater contamination in New Hampshire, plaintiffs have asked this court to subject alleged groundwater contamination to

---

[8]  This allegation is misleading because it implies that there are at least five forms of pollutants in the "Drainage Channel," when the specific allegations elsewhere in the complaint reveal that that is not the case.  These latter allegations make clear that the "groundwater" is "contaminated" only by elevated levels of iron, manganese, and – intermittently – 1,4-dioxane.  Complaint at ¶¶ 59, 71. Thus, listing "contaminated groundwater" *and* these three contaminants exaggerates the conditions at the site.  The complaint is utterly devoid of any specific allegation that there is landfill leachate in the groundwater that emerges at the seeps, and that is because there is no good-faith basis whatsoever upon which plaintiffs could make such an allegation.

federal regulation under the Act.  As a matter of law, the CWA does not exert federal jurisdiction

over groundwater, and plaintiffs' complaint must be dismissed as a consequence.

### 2.        The Stream Bed Is Not a Point Source.

Even if the court were to determine that Congress intended to regulate groundwater

contamination under the Act, the complaint is also defective because the "Drainage Channel" is

not a "point source" within the meaning of the Act.  "The CWA divides the sources of water

pollution into categories: point source . . . and nonpoint source." *Tennessee Clean Water*

*Network v. Tennessee Valley Auth.*, 273 F. Supp. 3d 775, 827 (M.D. Tenn. 2017).  The CWA

defines a point source as "a discrete conduit or conveyance in which pollutants are collected or

channeled." *See Murray v. Bath Iron Works Corp.*, 867 F. Supp. 33, 44-45 (D. Me. 1994), *citing*

33 U.S.C. § 1362(14).  Conversely, the migration of pollutants through soil and groundwater

constitutes "nonpoint source pollution" which is not subject to CWA regulation.  *See, e.g*., *Tri-*

*Realty Co. v. Ursinus College*, Civil Action No. 11-5885, 2013 WL 6164092, at *8 (E.D. Pa.

Nov. 21, 2013) (unpublished) ("[d]iffuse downgradient migration of pollutants on top of or

through soil and groundwater . . . is nonpoint source pollution outside the purview of the

CWA.")  Nonpoint source pollution is regulated by states.  *Rapanos*, 547 U.S. at 803 (Stevens, J.

dissenting) ("States had the power to impose tougher water pollution standards than required by

the Act, §1370, and to prevent the [Army] Corps [of Engineers] and the EPA from issuing

permits, §1341(a)(1) – not to mention nearly exclusive responsibility for containing pollution

from nonpoint sources."); *see also Consumers Power Co*., 862 F.2d at 587-88 ("Although an

essential element in a national effort to control water pollution, the NPDES permit program

stands alongside of the system controlling 'nonpoint sources' of pollution[;] . . . State water

quality standards are the basis of the nonpoint source program.").

Plaintiffs have alleged that NCES is discharging pollutants through the seep stream bed and that the alleged pollutants reached the "Drainage Channel" through contaminated soil and groundwater.  Nowhere does the complaint allege that the seep stream bed is the *source* of the contaminants it allegedly conveys.  Nor does the complaint allege that the contaminants emerge from one or more discrete *points*.  Instead, the complaint alleges that there is diffuse groundwater contamination between the landfill and the river and that *wherever* that groundwater emerges from the ground and enters the river it becomes a point source.  This would have the practical effect of subjecting all groundwater contaminant plumes in the country to regulation under the Act and transforming each landowner on whose property such groundwater emerges and enters a river into the proprietor of a point source.  That is not the law.  The discharge of pollutants into navigable waters occurring only through migration of groundwater represents "nonpoint source" pollution which is subject to state regulation.  *See Sierra Club*, 421 F.3d at 1140 n.4 ("Groundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting."); *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 220-21 (2d Cir. 2009) ("In practical terms, nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, atmospheric deposition, or percolation") (*quoting* EPA Office of Water, Nonpoint Source Guidance 3 (1987)).

"[S]urface water runoff which is neither collected nor channeled [by the alleged violator] constitutes nonpoint source pollution and consequentially is not subject to the CWA permit requirement."  *Id.* at 221; *cf. Tennessee Clean Water Network*, 273 F. Supp. 3d at 831 (ash pond complex with a series of discernible, confined and discrete man-made ponds that receive, treat, and convey wastewater into the river is a point source) and *Sierra Club v. Abston Const. Co.*, 620

F.2d 41, 44 (5th Cir. 1980) (". . . runoff collected or channeled *by the operator* constitutes a point source discharge."  Emphasis supplied.).

The seep stream bed is therefore neither a "point" nor a "source."  By plaintiffs' own description, it is merely one of many ways in which groundwater enters the river.  Complaint at ¶¶ 34-35.  ("Preferential groundwater flow patterns lead from the Landfill to a network of groundwater seeps on a steep slope south of the Ammonoosuc River . . . [Casella's] consultants refer to the one seep exhibiting the *greatest discharge flow among the network of groundwater seeps* as the Main Seep . . . ").  Emphasis supplied.  Because the seep stream bed is not a point source as a matter of law, the complaint fails to state a claim under the Act.

### 3. The Complaint Does Not Allege Any Basis on Which Casella Can Be Liable on Plaintiffs' Claims

The complaint fails on yet another ground to state a claim against Casella.  Plaintiffs make the bare allegation that Casella is an "operator" of the landfill (Complaint at ¶ 19) and that Casella plays a direct role in managing and funding the Landfill's operations and pollution control activities, including the maintenance and operation of the "Drainage Channel."  *Id.* at ¶ 20.  Plaintiffs further allege that Casella personnel "communicate" with NHDES and "work with third-party contractors" to prepare documents related to the landfill "on behalf of NCES."  *Id.*  The complaint does not allege that Casella owns the property on which the landfill or the seep stream bed is located or that Casella is a permittee for the operation of the landfill or the monitoring of groundwater or surface water downgradient from the landfill.  Taken in total, plaintiffs' specific allegations about Casella's "role" describe nothing beyond the ordinary working relationship between a parent corporation and a subsidiary.

"Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent."

*U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC.*, 261 F. Supp. 2d 17, 25 (D. Me. 2003) (citation omitted); *see also Anderson v. Abbott*, 321 U.S. 349, 362 (1944) ("Limited liability is the rule, not the exception").  The "presumption of corporate separateness [must] be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir. 1980).  Whether the court should "pierce the corporate veil" and impose liability on a parent corporation depends on the lack of corporate independence, fraudulent intent, and manifest injustice.  *U.S. Public Interest Research Group*, 261 F. Supp. at 25; *see also United States v. Bestfoods*, 524 U.S. 51, 62-65 (1998) (in the context of a CERCLA action, holding parent corporations are liable for violations of subsidiaries only when there is sufficient evidence to pierce corporate veil or when parent can be shown to be true facility "operator").  The First Circuit has articulated the test as follows:

> (1)  Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2)  Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3)  The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*U.S. Public Interest Research Group*, 261 F. Supp. at 25 (citations omitted); *see also id.* at 28 (holding a parent company exercised "complete dominance and control" over a subsidiary where it took control of stock of the subsidiary, made up its board of directors, took over regulatory compliance for subsidiary, supplied and harvested fish for the subsidiary's business, supplied the feed for the fish, and paid for the labor of the subsidiary employees).  Where a parent company

exercises control over the finances, management and business operations of a subsidiary "to such an extent that there is no actual corporate independence between [the parent and subsidiary]" a parent corporation may be liable for the actions of a subsidiary.  *Id*. at 29-30.

Here, plaintiffs' allegations do not even approach this exacting standard.  Plaintiffs make no claim that Casella controls NCES's finances, management or business operations.  Nor have plaintiffs alleged that NCES is the operator of the landfill in name only.  Indeed, they have alleged that NCES is responsible for the operation of the landfill, the monitoring of the groundwater, and the claimed pollution of the seep stream bed.  *Id*. at ¶¶ 17-18, 48.  The complaint does not allege that Casella exercises "complete dominance" over NCES or that it employed that dominance to commit a fraud or to perpetrate a violation of the law, causing the plaintiffs' alleged injuries.  As a result, the complaint fails to state a claim against Casella.

**IV.    Conclusion**

In accordance with the foregoing, defendants, NCES and Casella, respectfully request that the court dismiss the complaint because plaintiffs have not established that they have standing and because the complaint fails to allege cognizable claims.

Respectfully submitted,

NORTH COUNTRY ENVIRONMENTAL
SERVICES, INC. and
CASELLA WASTE SYSTEMS, INC.,
By Their Attorneys,


Date: June 15, 2018                    /s/ Bryan K. Gould
                                       Bryan K. Gould, Esq. (NH Bar #8165)
                                       gouldb@cwbpa.com
                                       Cooley A. Arroyo, Esq. (NH Bar #265810)
                                       arroyoc@cwbpa.com
                                       Cleveland, Waters and Bass, P.A.
                                       Two Capital Plaza, P.O. Box 1137
                                       Concord, NH 03302-1137
                                       Telephone: (603) 224-7761
                                       Facsimile:  (603) 224-6457


## CERTIFICATE OF SERVICE

I hereby certify that the within pleading is being served electronically upon counsel listed below through the court's ECF system.

Daniel J. Mullen, Esq., Ransmeier & Spellman P.C.
David A. Nicholas, Esq., Nicholas Law Office
Joshua R. Kratka, Esq., National Environmental Law Center
Kevin P. Budris, Esq., National Environmental Law Center
Thomas Irwin, Esq., Conservation Law Foundation


Date: June 15, 2018                    /s/ Bryan K. Gould
                                       Bryan K. Gould, Esq.


4847-1703-4087, v. 2