Case 1:18-cv-00393-PB   Document 21   Filed 10/08/18   Page 1 of 72

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * *

4    TOXICS ACTION CENTER, INC., *

5    et al.                      *
                                      18-cv-00393-PB
6    v.                          *    September 25, 2018
                                      10:20 a.m.
7    CASELLA WASTE SYSTEMS, INC. *

8    et al.                      *

9    * * * * * * * * * * * * * * *

10
                TRANSCRIPT OF MOTION HEARING
11
          BEFORE THE HONORABLE PAUL J. BARBADORO
12

13

14   APPEARANCES:

15
     For the Plaintiffs:   Kevin Budris, Esq.
16                         National Environmental Law
                           Center
17

18   For the Defendants:   Cooley A. Arroyo, Esq.
                           Cleveland, Waters & Bass
19

20   Court Reporter:       Deanna J. Dean, LCR, RDR, CRR
                           Contract Court Reporter
21                         United States District Court
                           55 Pleasant Street
22                         Concord, NH 03301

23

24

25

2

1              P R O C E E D I N G S

2          THE DEPUTY CLERK:  This court is in

3     session and has for consideration a motion

4     hearing in civil matter 18-cv-393-PB, Toxics

5     Action Center, Incorporated, et al. v. Casella

6     Waste Systems, Incorporated, et al.

7          THE COURT:  I want to deal with the

8     standing issue first.  Then I want to deal with

9     the point source issue, and then I'll deal with

10    the issue of whether the parent can be named as

11    defendant here.  Okay?

12         Let's see.  Mr. Irwin is on the complaint.

13    Right?  Mr. Irwin?

14         THOMAS IRWIN:  Yes, your Honor.

15         THE COURT:  And your spouse is Lauren

16    Irwin?

17         THOMAS IRWIN:  That's correct.

18         THE COURT:  Okay.  I just want to disclose

19    for the record Lauren Irwin is a lawyer who

20    practices employment law.  She has appeared at a

21    class I teach at the Tuck School of Business to

22    speak to my class along with another lawyer

23    about employment law.  She teaches a class on

24    employment law and I've agreed if she asked me

25    to speak at her class.  I don't know of any

1    other relationship with her in any way.

2          I've examined the issue on my own and

3    determined that it's not a basis for me to

4    recuse myself from the matter, but I'm simply

5    noting for the parties that I have had that

6    interaction with her, completely unrelated to

7    environmental law or this case or -- and that's

8    really my sole interaction with her, other than

9    to say hello to her if I see her on the street.

10          So I'm not going to recuse myself.  I'm

11    disclosing it so that anyone who has any

12    concern, if you want to try to pursue it with me

13    you can feel free to do that; but don't just sit

14    back and wait six months and then decide that

15    that's a problem for you.  If it's a problem for

16    you, I need to hear about it.  It isn't a

17    problem for me.  I've independently determined

18    that I have no obligation to recuse myself.

19    Okay?

20          So, that said, let's go and deal with the

21    standing issue first.  Who is going to speak on

22    that for the defendants?

23          MS. ARROYO:  Good morning.  Cooley Arroyo,

24    Cleveland, Waters & Bass, representing the

25    defendants.

4

1          The original motion to dismiss addressed

2     standing, but in the plaintiffs' objection, they

3     presented affidavits substantiating their

4     standing.  So we're really happy to move on from

5     that particular point with the motion to dismiss

6     on that basis.

7          THE COURT:  All right.  Well, let me make

8     sure I understand the extent of your concession.

9          I understood you to make two standing

10    arguments, one of which you abandon in your

11    reply brief.  I understood you to make an

12    associational standing argument that these

13    associations lack standing to proceed because

14    the members' individual interests weren't

15    sufficiently identified.  In your reply brief,

16    you, in my mind, conceded that argument that

17    their affidavits are sufficient to satisfy that

18    aspect of the standing requirement.

19          I understood you in your reply brief to

20    press a second standing argument addressing the

21    redressability requirement of standing.  If

22    you're conceding that, I'm happy to move on.  If

23    you aren't, I want to hear whatever you have to

24    say about it.

25          Are you still pressing an argument that

1    there is no standing here because any injury

2    that the plaintiffs claim is not redressable

3    given the relief that they're seeking?

4         MS. ARROYO:  We are maintaining that, your

5    Honor.

6         THE COURT:  So whoever wants to present

7    that argument, do it.

8         MS. ARROYO:  Okay.  Yes, your Honor.  We

9    will maintain the redressability argument.

10        Here, the plaintiffs have argued certain

11   injuries arising from North Country

12   Environmental Services, the fact that it doesn't

13   have an NPDES permit.  But here, there's no

14   indication or allegation, even, that -- in the

15   complaint that an NPDES permit would redress

16   those specific injuries.

17        For example, the individuals in their

18   affidavits talked about the fact that they can't

19   go swimming, that they can't use the river

20   because of their concern for the pollution.

21   There is no --

22        THE COURT:  You're saying that an NPDES

23   permit has no value in producing clean water, so

24   we shouldn't allow them to have standing?  Is

25   that your position?

1           MS. ARROYO:  No, I'm not saying that it

2     wouldn't --

3           THE COURT:  Well, isn't it designed to

4     ensure that point source discharges of

5     pollutants are appropriately regulated?  For

6     example, an NPDES permit could be denied.  If I

7     wanted to pour high concentrations of mercury

8     through a pipe into the Ammonoosuc River, I

9     suspect that they would say, "No, you can't have

10    a permit to do that."  Right?  And I could stop

11    it altogether.

12          Isn't there a possibility that if you

13    don't do what's required here, that you would be

14    denied an NPDES permit altogether and that would

15    redress the plaintiffs' injuries which they

16    claim they're suffering because you're currently

17    disposing of pollutants into the Ammonoosuc

18    River?

19          MS. ARROYO:  Well, here, your Honor, the

20    purpose of an NPDES permit is to impose

21    monitoring and reporting requirements, which are

22    already imposed --

23          THE COURT:  Well, I -- and, again, I used

24    to be an environmental lawyer but that was 26

25    years ago when I was in private practice, so I'm

1       a little dated.  But -- so you're saying that

2       all the NPDES permit does is it doesn't in any

3       way restrict what you can dump into a river, it

4       only requires that you disclose information

5       about what you're dumping?

6            MS. ARROYO:  It oversees the -- if a party

7       subject to an NPDES permit is going to be

8       discharging pollutants, it oversees that and

9       monitors it and --

10           THE COURT:  But can we deny someone who

11      wants to dump high concentrations of mercury

12      through a pipe into the Ammonoosuc River?  Can

13      they say, "No, we're not going to give you an

14      NPDES permit, and you must stop it"?

15           MS. ARROYO:  The regulator could decide to

16      deny an NPDES permit, correct.

17           THE COURT:  Yeah.  So isn't that a

18      possibility here?  If you're subject to a

19      requirement that you have a permit, then there's

20      the possibility that you won't get the permit

21      without doing certain things?

22           MS. ARROYO:  Well, here, the problem --

23           THE COURT:  Maybe -- why don't you step

24      back and just explain to me in more general

25      terms your understanding of exactly what an

8

1    NPDES permit, what -- if you are under that

2    regulatory regime, what you are subjected to.

3    You seem to be suggesting it's merely an

4    informational requirement, so that you conduct

5    certain testing and that you disclose certain

6    things to the agency and perhaps the public, but

7    that there's no other regulatory engagement with

8    someone who is subject to a permit.

9         If that's what you're maintaining, could

10   you explain that to me, and if it's not, could

11   you just tell me that it's not so I can move on?

12        MS. ARROYO:  My understanding is that the

13   NPDES permit is regulation by the EPA over

14   contaminants, the discharge of contaminants into

15   navigable waters, where the discharge would be

16   subject to the Clean Water Act.  So, obviously,

17   we have kind of a broader question here as to

18   whether the Clean Water Act applies in this

19   instance.

20        But in addition to that, I agree, your

21   Honor, of course, that the regulator could deny

22   a permit if it saw fit; but here, where the

23   discharges of pollutants that have occurred are

24   so minor, I don't foresee such a denial

25   happening in the event that a regulator

1    determined an NPDES permit is required.

2            THE COURT:  Could a regulator impose

3    conditions on an NPDES permit such as if you're

4    going to continue to discharge these, you have

5    to pretreat the discharge to reduce the level of

6    contaminants to a certain point before you

7    discharge?  Is that within the regulatory

8    authority of the EPA when it considers whether

9    to issue an NPDES permit under what conditions

10   the permittee will be subjected to?

11           MS. ARROYO:  Your Honor, I'm not

12   immediately familiar with what conditions the

13   EPA could enforce.  I'm sure with any permit --

14   I mean, with the groundwater management permit

15   in place by the DES at this time, there are

16   conditions imposed.  So I --

17           THE COURT:  I guess -- here's the issue.

18   So you agree that a citizen's supervision allows

19   the citizen standing to recover penalties for

20   violations of the permit.  Right?

21           MS. ARROYO:  If the --

22           THE COURT:  It's a form of relief.  If

23   somebody has an NPDES permit and they're

24   violating the terms of that permit, a citizen

25   can sue and recover civil penalties under the

1    Clean Water Act payable to the government.

2    Right?  And that's one of the kinds of relief

3    that they're seeking here, aren't they?

4            MS. ARROYO:  Correct.

5            THE COURT:  Okay.  And they're also

6    seeking declaratory and injunctive relief here.

7    Right?  Saying don't discharge without a permit,

8    and discharge only under the conditions of any

9    permit that's issued.  Right?

10           MS. ARROYO:  Correct.

11           THE COURT:  Okay.  The plaintiffs'

12   individual members want to go into the river and

13   engage with the river in ways that would expose

14   them to pollutants, and they're concerned that,

15   given the pollutants that are being discharged,

16   that they're going to be injured by engaging

17   with the water in that way.  They want to stop

18   that, and one way to stop that is to require you

19   to have a permit that will either prohibit you

20   entirely from discharging because you don't --

21   you can't get a permit, or establish conditions

22   under which you can discharge pursuant to the

23   permit.  Those conditions will relieve the

24   injury that they claim they're suffering and

25   that they want penalties to deter you from

1    future violations, they want injunctive relief

2    to stop you from existing violations, and

3    declaratory relief to say that you're subject to

4    the permitting requirements so you'll go get it.

5         Why aren't all of those things

6    redressable?  All of the injuries that they

7    claim they're suffering are redressable through

8    declaratory relief, injunctive relief, and civil

9    penalties.

10        MS. ARROYO:  I think here, your Honor,

11   this might be leading into the second point you

12   mentioned that we wanted to address today, but I

13   think it gets into the nature of what is being

14   discharged here, and it's groundwater.

15        So groundwater comes -- groundwater

16   passing under the landfill.  It doesn't just

17   come out of this one location.  It comes out

18   under the riverbed itself.  It comes out in

19   other seeps along the riverbed.

20        THE COURT:  As I understand their

21   complaint, this is not a case where they're

22   arguing that groundwater releases into the

23   Ammonoosuc River make the groundwater regulable

24   under the Clean Water Act.  They're making a

25   different argument, as I understand it, which is

1    the particular discharges here are through a

2    point source and as such are regulable under the

3    Clean Water Act.

4        I see those as two distinct arguments.

5    And I want maybe the plaintiff to just tell

6    me -- I do not understand the plaintiff to

7    assert -- either plaintiff to assert that this

8    case is subject to Clean Water Act regulation

9    because groundwater is migrating into the

10   Ammonoosuc River and therefore there's a

11   hydraulic connection between the groundwater and

12   the surface water sufficient to make the

13   groundwater subject to Clean Water Act

14   regulation.

15       I didn't see this as what your complaint

16   is about.  I saw your complaint as they built,

17   essentially, you would say, a canal to collect

18   seepage and discharge it through a point source

19   into the river, and that's the problem.  That

20   problem requires an NPDES permit.  I'm not

21   making a claim in this case at this time that

22   the groundwater itself is regulable under the

23   Clean Water Act because it's hydraulically

24   connected to the river.

25       So are you making that second argument or

1      are you confining it to the first that I --

2              MR. BUDRIS:  You're correct, your Honor.

3      We're not making that second argument.  This

4      case isn't about a direct hydrologic connection

5      between the landfill itself and the Ammonoosuc

6      River.  The case is about discharges from the

7      stream.

8              THE COURT:  If they didn't have the

9      drainage, what you -- whatever you call it --

10     because I know you guys disagree about what you

11     call it.  But if you -- if they didn't have that

12     drainage canal, you wouldn't be here, because it

13     wouldn't be an argument for point source.

14             Seeps that come out of the ground

15     naturally and end up in the river are not point

16     source discharges under your theory.  It's that

17     they physically altered and dredged and cleaned

18     out a pathway that you think makes that

19     regulable and subject to an NPDES permit.

20     Right?

21             MR. BUDRIS:  The drainage channel is

22     certainly the key part of this case.  Now, what

23     the site would look like without the drainage

24     channel, I don't know.

25             THE COURT:  Yeah, but you wouldn't have

1    this complaint, and you're not asking me to like

2    it.

3         MR. BUDRIS:  Yes.  Yes.  That is exactly

4    right.

5         THE COURT:  If I were to say that -- if

6    the facts were to show you're just wrong here,

7    this is just a naturally occurring, low-lying

8    area where water naturally collects and gets out

9    there and they've done nothing to modify it, you

10    might be bringing a different complaint.  But

11    you wouldn't -- that's not the theory under

12    which you're proceeding here.  You would lose

13    this complaint if that's what the evidence

14    showed.

15         MR. BUDRIS:  Yeah.  Our --

16         THE COURT:  Do you agree with that?

17         MR. BUDRIS:  I do agree with that.  Our

18    theory is contingent on the existence of the

19    drainage.

20         THE COURT:  Right.  So it's a very

21    different -- I won't ask you to concede that the

22    other kind of case could not possibly succeed,

23    but that's not the case you brought, so I don't

24    need to pay any attention to that case.  And

25    this so-called circuit split and all of that is

1   completely unrelated to the case you brought.

2   The case you brought is we're digging out a

3   channel, it's a point source, and as a result it

4   has to be subject to an NPDES permit.

5       MR. BUDRIS:  Yes.  Exactly.

6       THE COURT:  All right.  Because I think

7   the issue about hydrologic connection, if the

8   groundwater is regulable as a water of the

9   United States because it is -- there's a

10   hydrologic connection, then if they are

11   depositing waste into the groundwater, that

12   could require an NPDES permit.

13       But that's not what we're talking about

14   here.  That's a whole different kind of effort

15   to extend the Clean Water Act in ways that it

16   has not authoritatively been extended by the

17   Supreme Court.  That's my view.

18       So I don't want to get into that problem,

19   you know.  That's not what this case is about.

20       MR. BUDRIS:  Neither do plaintiffs.

21       THE COURT:  Okay.  All right.  So we're

22   clear about that.  That's not what this case is

23   about.  Okay?  So let's focus on this particular

24   issue.

25       And so my challenge to you is, it appears

1    that their injury -- the only standing argument

2    you have left is a redressability argument.  It

3    appears to me that they are seeking declaratory

4    relief, injunctive relief, and civil penalties.

5    In each case, they're seeking that relief

6    because they want to protect their interest in

7    enjoying the water -- the use of the Ammonoosuc

8    River.  They also have an informational

9    argument, which I'll hear if we get to it.  But

10   the principal argument is basically I want to go

11   into the river and I don't want to be exposed to

12   contaminants.  The NPDES permit is not just a,

13   like, randomly imposed, let's just make --

14   impose requirements on people.  It serves a

15   purpose and it's designed to protect the waters

16   of the United States.  And insisting that they

17   comply with the law here is not just an

18   abstract, non-concrete injury.  It will protect

19   my interest in using the waters.

20        What's your response to that?

21        MS. ARROYO:  My response gets to the point

22   of what the point source is because I think that

23   kind of gets at the redressability aspect as

24   well.

25        Here in your conversation with Attorney

1    Budris that you kind of touched on that is

2    whether the channel is the point source or

3    whether the groundwater is the point source,

4    because --

5         THE COURT:  So -- just understand.  The

6    channel's the point source.  That's what they're

7    saying.  They may not be right about that.

8    That's what they're saying.  That's all they're

9    saying.  If they aren't right about that, they

10   lose this particular case.

11        You agree with that.  Right?

12        MR. BUDRIS:  Yes, your Honor.

13        THE COURT:  Okay.  So we're done with we

14   don't know whether this is seepage or the

15   ground.  It's the channel that is collecting

16   contaminated water that is being discharged into

17   the river, and that's what the case is about and

18   it's only about that.  All right?  So focus on

19   that.

20        Now tell me why injury is not redressable

21   through the relief they're seeking.

22        MS. ARROYO:  Because groundwater is what

23   is coming down that stream bed.

24        THE COURT:  Yeah.

25        MS. ARROYO:  And groundwater is also

1    coming out another --

2         THE COURT:  Okay.  You really want to

3    argue the second argument, which is -- you know,

4    if you don't want to say anything more about

5    redressability.

6         But I would say to you do you have any

7    doubt that if I operated a -- oh, say, a case I

8    had when I was suing a company 30 years ago, I

9    had a battery factory and along the side of the

10   river.  Right?  And over the years it had been

11   releasing all kinds of lead into the groundwater

12   on my property.  And I'm modifying the facts

13   slightly.

14        But suppose that I drilled a well on my

15   property and pumped that lead-contaminated

16   groundwater up to the surface, and then I put a

17   pipe and I ran it through the pipe right into

18   the river.  Do you have any doubt that that

19   would be subject to the requirement for an NPDES

20   permit?

21        MS. ARROYO:  Not at all, your Honor.

22        THE COURT:  Okay.  So it doesn't matter

23   where the contamination comes from, and, in

24   fact, the Supreme Court has specifically

25   rejected the argument that the contaminant has

1    to come from the point source.  It is the use of

2    the point source to transmit contaminated water,

3    wherever it comes from.  So it doesn't matter.

4         And so this is the second argument.  It's

5    not the first.  But I -- so I'm not sure where

6    you're going with this.

7         MS. ARROYO:  Your Honor, in the situation

8    you just described, if it was a circumstance

9    where an NPDES permit was required and the

10    pollution was as egregious in the example you

11    gave, I agree that the EPA could require an

12    NPDES permit and impose conditions that would

13    ameliorate the situation.

14         THE COURT:  And if there was a contaminant

15    pond, and somebody drilled -- installed a

16    channel from that pond to let overflow go into

17    the river, they'd need an NPDES permit.  Right?

18         MS. ARROYO:  Again, yes.  In a textbook

19    case like that, certainly.

20         THE COURT:  Okay.  So -- and the problem

21    with -- I don't know whether what they're saying

22    is right or not, but the fundamental problem I

23    have with you is you're too early in the process

24    to try to raise this.  It's a quintessential

25    factual dispute.  They say there -- you guys

1    dredged the channel, cleaned it out, made it

2    able to transmit contaminants into the river.

3    You say we didn't do that.  That didn't happen.

4    This is naturally occurring, et cetera, et

5    cetera.

6         I don't know who's right.  But at the

7    12(b)(6) stage, I have to assume that their

8    well-pleaded factual allegations are true,

9    except in very unusual circumstances that don't

10   appear to me to be present.

11        But let me first ask you to just go back

12   to the redressability argument.  If you have

13   nothing more to say about it, that's fine.  If

14   there is anything you want to say about it, I'll

15   hear you on it.  Otherwise, I'll then ask them

16   to respond.

17        MS. ARROYO:  I don't think I have anything

18   further on the redressability point.

19        THE COURT:  Okay.  All right.

20        So what do you want to say on the

21   redressability issue?

22        MR. BUDRIS:  Your Honor, Kevin Budris on

23   behalf of plaintiffs.

24        I'd like to first and foremost point out

25   on the redressability issue that the NPDES

1    permitting program requires any permit so issued

2    to include technology-based effluent limitations

3    and water quality-based effluent limitations.

4          THE COURT:  So you agree with me that an

5    NPDES permit is more than just report all the

6    bad stuff you're doing; it actually imposes

7    requirements about what you can release, how you

8    can release it, what you must do before you

9    release it as well?

10          MR. BUDRIS:  Precisely, your Honor.  And

11   the permits they have here don't include those

12   types of limitations.  As you've mentioned, the

13   more monitoring --

14          THE COURT:  You guys will -- if they're

15   required to have it, you'll get into an argument

16   with them and you may get the State involved and

17   you'll say, "Do X, Y, and Z to the water before

18   you release it," if you can release it at all.

19   And they'll say, "We don't need to do that

20   much," and then you'll come to some kind of an

21   agreement.

22          Because, you know, the problem, as you

23   know, at least based on the information that's

24   been presented to me, there's contaminated

25   groundwater.  The groundwater level is above the

1    river level, and the groundwater is therefore

2    going to seep out into the river whether they

3    have an NPDES permit or not.  So you want to

4    engage with them in some kind of way that -- to

5    help improve the quality of the Ammonoosuc

6    River, and you'll have a back-and-forth with

7    them about that with the drainage channel.

8         But, I mean, I suppose one response they

9    could say is, "Let's get the bulldozers out here

10   and just block that channel out completely so

11   that there's no more discharge through it, and

12   let's let the natural seepage occur."  And, you

13   know, then you don't have an NPDES permit, in my

14   view.  You may have some kind of very esoteric

15   argument that you do, but it doesn't seem to me

16   to have any merit.

17        But in any event, here, you've got a --

18   you made clear to me -- I don't think they

19   dispute it -- that, in fact, the regulations

20   that govern the issuance of an NPDES permit

21   impose requirements to address the contaminants

22   that are going to be released.  And it is well

23   within the regulatory authority of the regulator

24   to require that certain things be done to

25   minimize discharges and pollutants.

1          MR. BUDRIS:  Yes, your Honor.  And those

2     requirements are precisely oriented towards the

3     type of injuries that plaintiffs' members have

4     experienced here, you know, that they don't want

5     to use the river because they're concerned about

6     what's coming out of this point source and if

7     this permitting process is geared to make sure

8     that the proper permit is set with the proper

9     limits so that people who want to use the river

10    can do so.

11         THE COURT:  Okay.

12         And you also have this informational

13    argument.  Did you want to say anything about

14    that?

15         MR. BUDRIS:  Certainly, your Honor.

16         In addition to the effluent limitations,

17    the NPDES permitting process has certain rights

18    to public participation -- a right to submit

19    comments, a right to hearings, and, importantly,

20    any permit that's issued either have to be

21    public -- there has to be public reporting of a

22    facility's compliance or lack of compliance with

23    the effluent limitations.

24         THE COURT:  They say that that information

25    is already essentially available under the state

1    permitting process for the groundwater

2    contamination at the site.

3        Is that right or wrong, in your view?

4        MR. BUDRIS:  Well, some information is

5    available under the state monitoring

6    requirements.  You know, they test this drainage

7    channel three times a year.  And any issued

8    NPDES permit, the testing requirements are going

9    to be much higher than that, and so there would

10   be more information available.  And the studies

11   that would have to be done, again to ensure that

12   the proper water quality-based effluent

13   limitations are set, would also be made

14   available to the public.  So it's those pieces

15   of information that --

16       THE COURT:  So your position is -- so,

17   first of all, the NPDES permit, in fact, will

18   produce changes to the releases that are

19   occurring there that will benefit your clients

20   in their engagement with the river; and, second,

21   the permitting process itself will result in the

22   disclosure of more information which will assist

23   your clients in making judgments about the

24   extent to which they want to engage in the river

25   in that area, and if they are hearing and

1    learning through the permitting process that

2    there are these contaminants, that that could

3    affect their decision about do I want to eat

4    fish from the river, do I want to swim in the

5    river, do I want to paddle in the river, and so

6    on and so forth?

7            MR. BUDRIS:  Precisely, your Honor.  And

8    the last kind of piece of the puzzle there, and

9    it's something that you mentioned earlier, is

10   that NPDES permit limits are enforceable by

11   citizens in citizen suits.  So having an NPDES

12   permit allows them, if defendants are violating

13   permit limits in the future, to be able to sue

14   to stop those violations.  They don't have that

15   type of remedy available to them now.

16           THE COURT:  Okay.  All right.  Well, yeah,

17   they don't -- they have a limited remedy, and

18   they know there's a requirement for a permit and

19   it's not being complied with.

20           MR. BUDRIS:  Yes, that's correct.

21           THE COURT:  They could sue to remedy that.

22           MR. BUDRIS:  Yes.

23           THE COURT:  Yeah.  Okay.  All right.

24   Thank you.

25           Do you want to say anything else about

1    redressability?  And then we'll go on to your

2    second argument if you don't.

3         MS. ARROYO:  Sure.  Thank you, your Honor.

4         Just to kind of tie off what we were

5    talking about a few moments ago, just to be

6    clear, there's no dispute -- I don't think

7    either party would dispute that the water in

8    that stream bed is emerging groundwater.  And --

9         THE COURT:  No, I'm assuming that that's

10   true.

11        MS. ARROYO:  Right.  And that that

12   groundwater is emerging elsewhere around and --

13        THE COURT:  I'm assuming that that's true.

14        MS. ARROYO:  -- inside the river.

15        So in terms of redressability, it's really

16   unclear, and the question remains, how

17   regulation of this one spot, where this fraction

18   of that groundwater is emerging from the ground

19   into the river, how remedying or monitoring with

20   an NPDES permit that one specific place would

21   ameliorate and resolve the plaintiffs' injuries

22   concerning the river as a whole.

23        THE COURT:  Well, any reduction in

24   contaminants that are injurious is a benefit,

25   isn't it?  That you can't completely eliminate

1    the contamination is not an argument that

2    partially eliminated contamination is beneficial

3    to the plaintiffs.  And if the collection point

4    for most of the groundwater is the channel, and

5    they're required to pretreat the water before it

6    goes through the channel into the river to

7    reduce the contaminants, that provides a

8    benefit.

9         Your argument is, well, yeah, it's still

10   going to be contaminated, so why should they

11   care?

12        MS. ARROYO:  Well, no.  Here, it's not

13   that it's most of the groundwater entering that

14   channel, for example.  It's a very small trickle

15   of several seeps in one area coming down the

16   slope into the water.  So I just want to make

17   sure the description of the property is kind of

18   in our minds, because it's more diffuse than

19   that.  It's not as though all of this

20   groundwater is coalescing in this one place.

21        THE COURT:  Okay.

22        MS. ARROYO:  So keep that in mind for the

23   remediation component.

24        THE COURT:  All right.  Anything else you

25   want to say on redressability?

1          MS. ARROYO:  No.

2          THE COURT:  Okay.  Thank you.  So let me

3     just rule on the standing issue.

4          The standing claim is based on Rule

5     12(b)(1).  No one is arguing that I need to

6     conduct an evidentiary hearing in order to

7     resolve the standing question.

8          As initially briefed, the plaintiff

9     presented an argument that I would characterize

10    as an associational standing argument that the

11    organizations that have sued in this case lack

12    standing to sue on behalf of their members

13    because the complaint was not supported with

14    sufficient factual assertions as to the injuries

15    of individual members to justify a conclusion

16    that the associations have standing.

17         The plaintiffs responded by disclosing

18    affidavits.  The defendants, to their credit,

19    abandon the issue of associational standing.  So

20    I'm not going to rule on that issue in light of

21    the affidavits that were filed by the plaintiff

22    in response to the original motion.

23         There is a remaining argument.  That

24    argument is that the injury here is not

25    redressable through the relief being sought.  Of

1    course, to satisfy the requirements of standing,

2    there must be an injury in fact which is

3    sufficiently particularized and concrete.  The

4    injury has to be traceable and it has to be

5    redressable.

6        Here, the only remaining standing argument

7    focuses exclusively on the redressability

8    component.  So I'm not going to examine an

9    argument on concreteness such as the one that

10   was considered by the Supreme Court in Spokeo

11   because the defendant hasn't presented a

12   concreteness argument.  Their sole argument is

13   redressability.

14       I am not persuaded by the argument that

15   the defendant -- that the defendants have

16   presented that the injury here isn't

17   redressable.  Each form of relief -- declaratory

18   relief, injunctive relief, and civil

19   penalties -- are designed to encourage

20   compliance with the NPDES permitting

21   requirement.  That permitting requirement is

22   valuable and directly provides benefits to the

23   plaintiff by subjecting the defendants to a

24   regulatory regime.  If, in fact, they're

25   required to be subjected to that regime, that is

1   designed to address precisely the kind of

2   injuries that the plaintiffs claim that they

3   will suffer.

4        Accordingly, in my view, the relief sought

5   is redressable -- redresses the injuries that

6   are the basis for standing, and I deny the

7   motion to dismiss to the extent that it's based

8   on a lack of standing.

9        What remains is a Rule 12(b)(6) motion.

10  The principal argument that applies to both

11  defendants is an argument that the complaint is

12  not sufficient -- does not sufficiently allege

13  that the defendants are engaging in a point

14  source discharge of pollutants, and therefore

15  the complaint fails to state a viable claim for

16  relief.

17       Of course, the standard of review that I

18  use in ruling on a 12(b)(6) motion is I construe

19  the well-pleaded allegations in the complaint in

20  the light most favorable to the plaintiff.  I

21  remove from the complaint any allegations that

22  are purely conclusory and ask if what remains is

23  a plausible claim to relief.  If people think

24  that I should apply a different standard, please

25  tell me.  Otherwise, I'll assume that you agree

1    with me that that's the standard that I'm going

2    to use.  If you disagree with the standard, tell

3    me now.  If not, present your argument that the

4    complaint doesn't allege a viable point source.

5         MS. ARROYO:  Thank you, your Honor.

6         The focus here, as you say, is on the

7    point source, and the Clean Water Act defines a

8    point source quite clearly as a discernible,

9    confined, and discrete conveyance, and it

10   provides a non-exhaustive list of examples.  And

11   those examples really kind of match the tone and

12   tenor of the hypotheticals you provided a few

13   moments ago, for example, pipes, ditches, wells,

14   things like that.  You know, the cases that were

15   cited in our papers, I think, create a nice

16   dichotomy for what is a point source and what's

17   not.  And while it is a case-by-case-basis

18   situation, the controlling characteristic is

19   that it is discrete.  It is noticeable.  It is

20   confined and identifiable.

21        THE COURT:  So if there's a dried-out

22   stream bed on a piece of property that has no

23   water releases into the Ammonoosuc River --

24   completely dried out, silted in, it's no longer

25   a path for which water goes -- and you dredge

1    that dried-out stream bed so as to collect

2    seepage, and you just dredge it out and run

3    it -- it's like a ditch now.  You're digging a

4    ditch in a dried-out stream bed.  Is that not

5    the creation of a point source discharge?

6         MS. ARROYO:  I think it would depend on

7    the kind of dredging that's done.  Here, in

8    2010 --

9         THE COURT:  But isn't that what they

10   essentially -- they essentially allege something

11   equivalent to that in here.  And I agree with

12   you:  it's a highly factually dependent issue.

13   I don't -- but I can't -- I can't fact-find

14   today.  I can't know the details.  I just look

15   at their complaint and say what do they say in

16   their complaint?  And what they say in their

17   complaint is that you guys have taken tons of

18   material out of there and cleaned it up so that

19   it's a way of having the seepage collect and

20   discharge into the river, and that looks like a

21   canal or a ditch or the kinds of things that are

22   specifically denominated point sources.

23        And I don't know whether it's true.  You

24   say it isn't.  You've got a right to your day in

25   court, but you don't get a right to throw out

1    their case before we have the day in court.

2    That's why you don't use the 12(b)(6) motion to

3    address cases that are essentially

4    quintessentially factual disputes.

5        MS. ARROYO:   I think, to answer your

6    question, to kind of contrast the example you

7    just gave and what the plaintiffs have said, I

8    want to contrast that with what the courts have

9    found as nonpoint source pollution because I

10   think that's more indicative of what we have

11   here.

12       Nonpoint source pollution, or pollution,

13   for example, in the Maui case that the Ninth

14   Circuit put out earlier this year, they

15   described it as arising from dispersed

16   activities over large areas not traceable to any

17   single discrete source and due to its diffuse

18   nature are very difficult to regulate through

19   individual permits.

20       THE COURT:   I agree completely.   That's --

21   and that's -- if they were bringing a case to me

22   that said there are these seepages that are

23   occurring at the property because the

24   contaminated groundwater is above the elevation

25   of the river, and those seepages are draining

1     into the river and they want an NPDES permit,

2     I'd be saying, boy, that's a real stretch to me.

3     It doesn't make a lot of sense to me.

4          That's why I wanted to make clear with

5     them from the very beginning, that's not the

6     case they brought.  They agree if that's what's

7     all that they're alleging, they lose this case,

8     because their case is based on a different

9     theory than that.  They're not conceding.  I'm

10    not requiring them to concede that that couldn't

11    support a claim.  But they do concede that this

12    particular complaint would have to be dismissed

13    if that's what, in fact, is all that was

14    alleged.

15         MS. ARROYO:  Well, just --

16         THE COURT:  So I think -- again, you keep

17    coming back and wanting to say, "It's really not

18    what they're saying it is, Judge, and what's

19    really going on there really doesn't require a

20    permit."  And you may be right.  But that's

21    summary judgment, you know.  That's not

22    12(b)(6).

23         MS. ARROYO:  Well, I think considering the

24    allegations in the complaint kind of broadly

25    within the other allegations in the complaint,

1    the point source here, if it is one, is only one

2    of many points.  And, indeed, it's by pure

3    happenstance that groundwater happens to come

4    from this particular naturally occurring --

5         THE COURT:  So if it were a natural

6    swale -- and this is the example I was thinking

7    of.  There was a swale on the property, and

8    during certain times of the year, that swale

9    causes a discrete runoff.  I think they would

10   have a very tough time arguing that that's a

11   point source discharge.  But that's not what

12   they're alleging.

13        MS. ARROYO:  Well, what they're --

14        THE COURT:  So I agree with you.  Look.

15   Those fact patterns are really interesting and

16   create really tough questions.  But what they

17   said in the complaint doesn't seem real tough to

18   me.

19        MS. ARROYO:  Well, I think just to

20   distinguish it from the example you gave here,

21   this is not a dried-up stream bed and that's not

22   what they've alleged in the complaint.  What we

23   have here is that they're alleging that NCES

24   took action to remove deposits and clean up and

25   kind of dredge this specific area.

1          And just by way of background, the CECRA

2     mediation that happened in 2010 was just that.

3     It was a remediation.  It was an esthetic

4     cleanup of this particular area.  It wasn't an

5     intention to create this gully or funnel

6     pollutants to the river.

7          THE COURT:  Yeah, I'm not sure that

8     intention is the standard that determines

9     whether something is or is not -- it's

10    different.  But let's just -- the controlling

11    document here is the complaint, isn't it?

12         MS. ARROYO:  Correct.

13         THE COURT:  Okay.  So let's look at what

14    they actually say about what you have done.

15         In 2010 consultants for Casella and/or

16    NCES excavated approximately 176 tons of

17    sediment containing elevated levels of iron --

18    blah, blah, blah -- from the main seep and the

19    drainage channel as part of the seep restoration

20    project.  The reconstructed drainage channel was

21    designed to convey water and any pollutants

22    dissolved, suspended, or otherwise mixed in that

23    water from the main seep and from other nearby

24    seeps and wetlands to the Ammonoosuc River.

25    They then go on to allege that that's what's

1   happening there.

2          So I -- again, I can't ignore what they're

3   saying.  They may be lying to me.  I don't know.

4   Maybe they're just a bunch of liars.  But that's

5   what they're saying.  So I have to assume it's

6   true, don't I?

7          MS. ARROYO:  That is the standard, your

8   Honor.

9          THE COURT:  Yeah.  So if I assume it's

10  true, why is that not a point source?  And,

11  again, I don't know whether it's true, and it

12  may not be.  And if you do some quick discovery

13  and you get back in front of me with a summary

14  judgment motion, I might have a completely

15  different take on it.

16         But the 12(b)(6) standard, if you've ever

17  gone to our CLEs -- you've heard me drone on

18  about this for 25 years -- is the least

19  effective motion in the arsenal of a defendant.

20  It almost never works.  It almost always, under

21  First Circuit precedent, allows somebody to

22  amend around to address it.  This is not a crazy

23  case.  And it's just -- it's very hard to make

24  it work for you.  I understand why people try

25  it.  They want to show how tough they are, that

1    they'll fight this to the end, and they want to

2    reassure the client that they're going to come

3    after it and resist this and they want to -- but

4    it almost never works.  And I'm not seeing how

5    it works here.

6        MS. ARROYO:  I guess my answer to that,

7    your Honor, just going back to the standard in

8    the CWA for what a point source is is coming

9    back to that word "discrete."  "Discrete"

10   suggests that it comes from only one place.

11       So, here, the alleged contaminants aren't

12   coming from one place.  They're coming from

13   several places.  So --

14       THE COURT:  No, but it can come from one

15   place being a point source and 30 other places

16   that are not point sources.  It doesn't

17   eliminate the need to have a permit for the

18   point source.  Do you see what I'm saying?

19       MS. ARROYO:  I do see what you're saying.

20       THE COURT:  So I don't think that that

21   really cuts it for me.  I mean, let me just -- I

22   would just ask my clerk, if you could run

23   upstairs for me, and I think on my desk I've

24   left some additional cases that I use.  I want

25   to potentially talk about those.

1    But -- okay.  So any other arguments you'd

2    like to make?  And I'm happy to have a

3    free-for-all here.  If Callan wants to add

4    something, he can do it.  I don't care.  I'd

5    rather hear the arguments.  But -- so whatever

6    you'd like to tell me on this, I'd be happy to

7    hear it.

8         MS. ARROYO:  Thank you.

9         I would just also point out here that

10   focusing on the -- this particular conveyance,

11   like the drainage channel or the stream bed, to

12   use your own phrase --

13        THE COURT:  Yeah.

14        MS. ARROYO:  -- doesn't necessarily change

15   anything about how the groundwater moves.

16        So here, again, we've got the groundwater

17   moving under the landfill, to the embankment,

18   and down the side.  It doesn't really change

19   anything about that.  This particular naturally

20   occurring stream bed just happens to be where a

21   few of those seeps coalesce and move down to the

22   river.  That doesn't mean that there isn't --

23   you know, that these seeps don't happen

24   naturally in other locations and under the

25   riverbed itself.

1          THE COURT:  Had you not cleaned it out,

2     maybe you'd be in a better position on that.  I

3     mean, if what you're saying is -- your position

4     is this is naturally occurring.  Right?  And we

5     didn't do anything that in any way changed what

6     is naturally occurring and happening there.  And

7     maybe factually you'll be right about that.  But

8     they're saying, "That's absolutely not what

9     we're saying, Judge."  Look at -- and I'll hear

10    them on a second on it -- but I know from having

11    read their complaint, they're saying something

12    very different, that they created a channel, in

13    effect.

14          And so that's where we are.  But if either

15    of you would like to say -- unless anybody else

16    on your side wants to say anything else, I'll

17    hear from the plaintiff on it.

18          No?  Okay.  Thank you.

19          So, I mean, I probably previewed your

20    argument.  What do you want to say?

21          MR. BUDRIS:  Your Honor, I don't know that

22    we have too much to say on this point, at this

23    point in time.

24          THE COURT:  You are -- I'm not

25    mischaracterizing what you're saying.  You're

1    saying this is an artificially created channel

2    that collects groundwater that seeps out under

3    the surface of the property, collects it, and

4    discharges it directly into the river.

5         MR. BUDRIS:  Yes.  This drainage channel

6    as it exists now is a constructed transport

7    system carrying pollutants from the main seep to

8    the river.

9         THE COURT:  And if it were not a

10   constructed transport system, you would have to

11   make a very different argument from the one

12   you're making to claim that it is subject to

13   NPDES regulation.

14        MR. BUDRIS:  We would make a different

15   argument than what we're making.  There is case

16   authority that, you know, naturally occurring

17   channels are point sources.  But that's not this

18   case.

19        THE COURT:  I think that's a much, much

20   tougher argument.  So I --

21        MR. BUDRIS:  In any event, it's not this

22   argument.

23        THE COURT:  They don't have to get into

24   that, because if we do -- and maybe we will on

25   summary judgment -- you'll reserve your right.

1          But I want you to understand, I have

2     difficulty in understanding how that argument --

3     they're -- they must be regulated under the

4     State.  They might be regulated under other

5     federal environmental regulations.  But I don't

6     see how you get an NPDES permit out of naturally

7     occurring seeps that get into the river or a

8     naturally occurring stream bed that is

9     contaminated by groundwater on the property and

10    that runs into the Ammonoosuc.  I mean, if that

11    is the case, that would explode the number of

12    people who are subject to NPDES permitting.  And

13    as you well know -- and, again, I'm many years

14    from this -- but there's a carefully constructed

15    environmental regime that deal very differently

16    with point source and nonpoint source

17    pollutants.  And nonpoint source pollutants are

18    regulated not exclusively but primarily by the

19    states, and Congress has made a decision that we

20    want the states to be aggressive in policing

21    nonpoint pollutant discharges.

22          And if the argument that you're not

23    presenting here, that you might try to present

24    later, I want you to understand my view is that

25    that would vastly alter that well-established

1    relationship in which we have both state

2    regulators and federal regulators.  And without

3    some clear indication by Congress or the EPA

4    that that's what they're intending to have

5    happen here, you're not going to find a very

6    receptive audience in me on that.  Okay?

7            MR. BUDRIS:  Certainly, your Honor.

8            THE COURT:  Okay.

9            MR. BUDRIS:  And as to the distinction

10   between, you know, the nonpoint source pollution

11   which is regulated by the states in this EPA

12   regime regulating point sources, cases like

13   Abston are clear that you can have nonpoint

14   source pollution, but once that is gathered up

15   and can define a point source like this one --

16           THE COURT:  Oh, I completely -- I

17   completely agree with that.  In my example of

18   pumping out the groundwater and then releasing

19   it through a pipe, the defendants concede that

20   would require a point source discharge.

21           I don't know if Mr. Irwin was in this

22   case, but I dealt with a case 25 years ago where

23   I came out differently and perhaps wrongly about

24   dealing with transportation of one surface water

25   through a pipe into another surface water, and

1   that was at a time before some of the -- EPA had

2   provided less clarification on an issue.  And I

3   still think the Supreme Court treats that as an

4   unresolved question:  When you have releases of

5   surface water from one body in the United States

6   into another through a pipe or a channel or

7   something like that, does that require an NPDES

8   permit?

9       So I've dealt with this.  I've been on

10  both sides of the issue.  But it's a very

11  different regime for dealing with nonpoint

12  source and point source.  And in order to upset

13  that regime and basically subject a vast

14  percentage of nonpoint source discharges to

15  NPDES permitting requirements, I'm going to need

16  to see some language in the statute or the

17  regulatory regime that implements the statute

18  before I would ever do that.  Because I

19  understand Congress to have wanted to leave

20  certain areas to regulation to the state, and

21  where they do that, we need to -- the courts

22  need to respect that.

23      But -- so you're not making that case?

24      MR. BUDRIS:  No.

25      THE COURT:  What else do you want to say

1     about the case you are making?

2          MR. BUDRIS:  Your Honor, I don't think

3     that we really have anything else to say here.

4     We have a constructed ditch that's discharging

5     pollutants into the Ammonoosuc River.  This

6     ditch is a point source.  The materials that it

7     is discharging, including contaminant

8     groundwater, are pollutants.  Multiple courts

9     have recognized that contaminated groundwater is

10    a pollutant under the Clean Water Act.  And

11    you've got A; you've got B; you've got C here,

12    which is a Clean Water Act violation.

13         THE COURT:  Now you need to see whether

14    the facts support what you're saying.  But

15    that's not for today.

16         Did you want to respond to anything else

17    on this point?

18         MS. ARROYO:  Yes, I do, your Honor.

19         Your Honor, I would just note if the

20    allegation here was that there was no

21    preexisting groundwater at this particular

22    stream bed and that there was no preexisting

23    channel before the 2010 restoration project,

24    then, yes, I think we would have a problem on

25    our hands.  But that's not what the case is

1     here.

2          And the complaint itself at paragraph 42

3     describes the 2010 project as a restoration

4     project.  It was an effort to restore the seep

5     to what it looked like before, to return it to

6     its natural state.  I mean, that's the name of

7     it:  It's the SEEP Restoration Project.

8          So constructing this as --

9          THE COURT:  So you'd put this in the "no

10    good deed goes unpunished" category.  Right?  I

11    mean, here we are trying to restore, and we're

12    now being attacked for trying to restore.

13         Maybe you're right.  I don't know.

14         But -- okay.  So I get your point.  You're

15    saying these things were occurring naturally.

16    Even if we did restore it to its natural state,

17    that's not sufficient.

18         MS. ARROYO:  Correct.  And here, too,

19    there's no allegation that polluted groundwater,

20    to the extent that it exists, travels any

21    differently after that restoration, that

22    anything that was done to that channel in 2010

23    changed what it was like in its natural state

24    before that.

25         So to the extent that the argument is that

1  the construction in 2010 somehow altered the

2  nature of that natural state and transformed it

3  into a CWA point source, the facts aren't

4  there -- aren't alleged in the complaint -- the

5  allegations.  Excuse me.  They're not facts yet.

6  The allegations aren't there in the complaint to

7  show how that actually somehow changed the

8  nature of this to convert it into a point

9  source.

10      And, you know, just, I think we touched on

11  it, but just to kind of add additional comfort,

12  nothing in the defendants' motion here is

13  intended to suggest that NCES should operate a

14  landfill without supervision.  That's not the

15  case.  The groundwater has been monitored at

16  this site for decades at this point.  The

17  restoration project was done at NHDES's

18  suggestion and request, and it was coordinated

19  and collaborated with the local regulator to do

20  that work.

21      So, here, we have a very closely monitored

22  site that is only different because DES asked us

23  to make it different to restore the -- this

24  particular location to its natural state.

25      THE COURT:  All right.  Thank you.

1          So this particular issue is really --

2     turns on the standard of review that I have to

3     apply in examining the defendants' argument.   As

4     I noted, this is a 12(b)(6) motion.   I have to

5     construe the allegations in the complaint in the

6     light most favorable to the plaintiff.   Even

7     when I strip out conclusory allegations, it

8     appears to me that there's sufficient facts

9     alleged when construed in the light most

10    favorable to the plaintiff to support a

11    plausible claim that this is, in fact, a point

12    source, and there are no other challenges to the

13    viability of the claim other than that.

14          The defendant raises a number of good

15    arguments, and I think there are factual issues

16    that might well cause the case to tip in the

17    defendants' favor.   I don't need to reach those

18    very fact-specific arguments today and I don't

19    do so.   I merely determine that, as alleged in

20    the complaint, there's sufficient facts under

21    the 12(b)(6) standard to support a plausible

22    claim that this is a point source subject to the

23    NPDES permitting requirements.

24          Accordingly, I deny the defendants' motion

25    to dismiss to the extent it is based on the

1    assertion that the plaintiff has pleaded

2    insufficient facts to support a claim that this

3    is a point source discharge that must be subject

4    to the NPDES permitting regime.

5         That leaves only the argument, as I

6    understand it, that Casella should not be named

7    as a defendant in this action.  And I think on

8    this one it makes sense for me to engage with

9    the plaintiffs first and then to give you a

10   chance to respond.  Okay?

11        So let me ask you a couple of questions

12   first.  You are not presenting a veil-piercing

13   theory of liability.  Am I right?

14        MR. BUDRIS:  You are right.  We are not.

15        THE COURT:  So I'm going to look at it

16   totally as an argument that they are a person

17   named as a person under the Clean Water Act that

18   can be subject to liability based on its own

19   actions, not based in any way on the actions of

20   its subsidiary.

21        MR. BUDRIS:  That is correct.

22        THE COURT:  Okay.  So just explain to

23   me -- I mean, let me ask a practical question.

24   Why do you care?  The owner is the sub.  Right?

25   The owner of the property.  The owner of the

1    sub is -- the sub is a viable entity.  It's not

2    going to disappear.  What you want here is to

3    engage with the owner and get the owner to do it

4    the right way.  Why do you need Casella in here

5    at all?

6         MR. BUDRIS:  Well, your Honor, the Clean

7    Water Act imposes liability against owners and

8    operators, and there are facts alleged in our

9    complaint and the facts that we've come upon

10   show that Casella, the parent, is intimately

11   involved here.

12        THE COURT:  So RCRA and CERCLA

13   specifically and expressly impose liability on

14   owners and operators.

15        Does the Clean Water -- I thought it used

16   the term "person" and I didn't think the

17   definition of "person" expressly incorporated

18   the owner-operator language.  I haven't gone

19   back to look.  But does the Clean Water Act

20   expressly use the term "owner" or "operator" in

21   the same way that RCRA and CERCLA do?

22        MR. BUDRIS:  My apologies, your Honor.  It

23   uses the term "person."

24        THE COURT:  "Person."

25        MR. BUDRIS:  But the case law here is

1      clear that that person can come in the form of

2      an owner and operator.

3           THE COURT:  I agree with you that if the

4      owner -- Casella was the owner, and the owner

5      engaged in a contract with Acme Corporation, and

6      the contract with Acme is you will operate this

7      site for us and deal with all of those issues

8      associated with this, and, you know, we'll pay

9      you a million dollars a year, that Acme could be

10     held liable even though it was not an owner.

11     Right?  And I don't know that the defendants

12     would disagree with me on that.

13          The problem here is that you do not allege

14     any kind of contract or express engagement.

15     What you allege in terms of -- in the complaint,

16     and I may be not doing complete justice to it,

17     but you allege that they play a direct role in

18     managing and funding the landfill's operation

19     and pollution controls activities, including the

20     maintenance and operation of the drainage

21     channel.  And then you provide a more specific

22     allegation:  "Casella personnel regularly

23     communicate with staff at the New Hampshire

24     Department of Environmental Services regarding

25     pollution control, including groundwater and

1    surface water monitoring of the landfill.

2    Casella personnel also work with third-party

3    contractors and consultants to prepare water

4    quality monitoring results."

5         Do you have -- you make an allegation

6    about maintenance and operation, but you don't

7    provide a lot more specifics than that, other

8    than communicating with staff and overseeing the

9    monitoring activities.  Is that the sum total of

10   what it is you allege that they do here?

11        MR. BUDRIS:  Well, your Honor, it's

12   Casella -- it's Casella staff communicating with

13   staff at DES.

14        THE COURT:  Right.

15        MR. BUDRIS:  So there's that.  And as you

16   mentioned --

17        THE COURT:  But wouldn't the parent have a

18   natural interest in knowing about whether its

19   sub is violating the law in ways that could

20   suppose the sub to damages which could affect

21   the parent's financial interest as the sole

22   owner of the sub?

23        So I'm not sure that that alone is going

24   to be enough to --

25        MR. BUDRIS:  Well, your Honor, there's a

1    difference between the parent keeping itself

2    apprised of the communications as opposed to the

3    parent itself being the one that's interacting

4    with DES on the day-to-day about what's going on

5    with the drainage channel and --

6         THE COURT:  Do you have any belief that

7    they're doing anything other than that,

8    providing information, reviewing reports, and

9    telling the sub, you know, you're doing the

10   right thing, or you need to do more, or

11   something like that?

12        MR. BUDRIS:  Well, yes, we do, your Honor.

13   And that's the second part of this allegation,

14   which is that it's Casella personnel that are

15   responsible for preparing these water quality

16   monitoring reports, which is the predominant

17   form of the oversight of this drainage channel.

18   It's Casella personnel that are working to

19   prepare these reports.  It's Casella personnel

20   that are representing what's in these reports.

21        THE COURT:  Let's see if we can find -- do

22   you have the actual language of the person

23   liability provision of the Clean Water Act?

24   What does it actually say?

25        MR. BUDRIS:  I do not have that statutory

1    section in front of me.

2         THE COURT:  Maybe my clerk -- do you know,

3    in these materials, do we have that section that

4    I -- I did not ask you to pull it together for

5    me, so you might not have it.

6         LAW CLERK:  I'm not sure.

7         THE COURT:  Okay.  Maybe if you could run

8    upstairs and see if you could find the volume

9    that has the -- I assume there's a statutory

10   provision that says "person," and then I don't

11   know if there's a definition of "person."  If

12   there is, if you could pull the volume that has

13   both of those and just bring them down to me.

14        Are there cases that specifically say that

15   and that alone, what you described, that is,

16   overseeing monitoring and communicating with

17   environmental regulators is sufficient to make

18   you a liable person if the owner dredges a

19   channel and starts putting bad stuff into the

20   river?

21        MR. BUDRIS:  Well, your Honor, there are

22   cases which we've cited in our briefs that speak

23   to this specifically with respect to the Clean

24   Water Act and also RCRA.

25        I would point the court first to the

1       Citizens Coal Council, the Emerald Coal

2       Resources case from the Western District of

3       Pennsylvania.  And in that case, plaintiffs

4       allege in the complaint that the parent's

5       employees communicated with Pennsylvania DEP

6       regarding environmental compliance and

7       permitting at the facility, and the court held

8       that that was sufficient to tie the parent in

9       for Clean Water Act liability.

10           THE COURT:  What's the name of that case

11      again?

12           MR. BUDRIS:  It's Citizens Coal Council,

13      the Emerald Coal Resources.

14           THE COURT:  Okay.  I don't know that I

15      have actually read that one.  Do you have a copy

16      of it?

17           MR. BUDRIS:  I do not have a copy of it,

18      your Honor.  I'd be happy to provide you with

19      the cite if you'd like it.

20           THE COURT:  Well, I'm already running my

21      poor clerk up and down the stairs.

22           So the cases that I found most help speak

23      of it sort of this way.  The ability to control

24      the facility coupled with knowledge of the

25      violation could be sufficient to make someone a

1    liable person.  So even though you're not the

2    technical owner, if you control -- I've seen

3    cases that suggested liability on both the party

4    who actually performed the work and the party

5    with responsibility or control over performance.

6    That's what I have been thinking about in terms

7    of liability that isn't veil-piercing liability.

8         The Clean Water Act at Section 1362(5)

9    defines a person to include individuals and

10   corporation, and it imposes liability on -- only

11   on persons that either perform the work or had

12   responsibility for or control over the

13   performance of the work.  That's the way -- the

14   standard that I've been inclined to look at is

15   either you perform the work or have

16   responsibility for or control over, and not

17   sufficiently you allege the violation of that

18   standard.

19        MR. BUDRIS:  Well, your Honor,

20   respectfully, plaintiffs disagree in stating

21   that, you know, Casella personnel are

22   responsible for the water quality monitoring

23   here.  And we're not saying that it's Casella

24   that's responsible.  It's not that vague an

25   allegation.  It's actual Casella staff are

1       performing this work on behalf of the landfill.

2       I believe that does satisfy that standard.

3            THE COURT:  Well -- so which plaintiff do

4       you represent?

5            MR. BUDRIS:  I represent both Toxics

6       Action and CLF.

7            THE COURT:  So suppose that the defendant

8       engaged in a contract with CLF to have CLF

9       communicate with the authorities and monitor

10      what's going on at the site, and yet there were

11      still violations.  Could CLF be sued as a person

12      under the Clean Water Act?

13           MR. BUDRIS:  Well, your Honor, I highly

14      doubt that CLF would enter into that contract.

15      But --

16           THE COURT:  Well, CLF does all kinds of

17      stuff.  I mean, I had a case with them involving

18      the Portsmouth -- the Portsmouth wastewater

19      discharge facility where they're very supportive

20      and engaged with the efforts to do what the City

21      of Portsmouth wants to do.  And they're really

22      engaged in monitoring stuff all the time.  I

23      could see them well being, as a part of a

24      consent decree, assuming the power to monitor

25      and report and engage in dialogue with.

1        MR. BUDRIS:  And your Honor, if CLF as a

2   third party, or any other third party, were

3   taking on the responsibility to perform this

4   work and were actually performing the work, then

5   that would satisfy that Clean Water Act

6   standard.  They would be operating this

7   discharge channel alongside NCES, which is what

8   Casella is doing here.  They are both taking on

9   responsibility for the operation of the drainage

10  channel and the monitoring of the drainage

11  channel here.

12        THE COURT:  Okay.  I mean, I think this is

13  your most strained argument, and -- but what you

14  really are saying is, in terms of specific

15  actions, you're saying they receive and they --

16  they conduct the monitoring.  Are you saying

17  that they contract with the environmental firm

18  that's doing the monitoring?  Is it a contract

19  with Casella or is it a contract with the sub?

20        MR. BUDRIS:  We at this point, having not

21  gotten to discovery yet, we are not sure who the

22  contract is with, but we know that Casella

23  personnel are listed as the responsible parties

24  on those ultimate water quality monitoring

25  reports that are submitted.  So that's enough,

1    again, at this 12(b)(6) stage to get us to

2    discovery on this issue.  It's a plausible

3    allegation that Casella personnel are doing the

4    work here.

5         THE COURT:  Okay.  Let me hear your

6    response.

7         MS. ARROYO:  Your Honor, I think what's

8    important to -- I just want to direct us back to

9    the actual language of the complaint.

10        One of the allegations is that Casella

11   personnel -- this is in paragraph 20 -- also

12   worked with third-party contractors and

13   consultants to prepare the water quality

14   monitoring results.  It's not an allegation that

15   they're doing it.  And, really, that's what the

16   standard here is.  It's who is doing the work.

17        And Attorney Budris mentioned one of the

18   cases cited in his papers, but the other one

19   is the Best Foods case, which says the question

20   is not whether the parent operates a subsidiary

21   but rather whether it operates the facility, and

22   that operation is evidenced by participation in

23   the activities of the facility, not the

24   subsidiary.

25        The complaint doesn't allege activities at

1    the facility, at the landfill.  What it does is

2    allege that Casella owns the parcel, is a

3    permittee under the current regulated

4    activities.  There is no allegation of control

5    over daily policy, policy decisions, business

6    practices, are we going to put cover on today or

7    are we going to put cover on tomorrow.  Those

8    aren't the questions that Casella has any

9    involvement in.  Instead, as you suggested in

10   your conversation with Attorney Budris, it's a

11   parent-subsidiary relationship:  checking boxes,

12   keeping an eye on reporting, and making sure

13   that everything is being --

14        THE COURT:  The parents of wholly owned

15   subsidiaries have all kinds of interest in the

16   activities of their subsidiary, and that they

17   maintain an interest in the activities of their

18   subsidiary won't support liability under a

19   veil-piercing theory unless more than mere

20   interest -- tell me what you're doing, give me

21   reports of what your potential liabilities are,

22   or -- and it wouldn't support veil-piercing

23   liability even if the parent were contacting the

24   DES or said to the subsidiary, "We want to be

25   the sole point of contact."  I don't think that

1   would make them liable under a veil-piercing

2   theory, nor do I think that alone, being the

3   contact point, is sufficient, it seems to me, to

4   make them liable.

5        I am sympathetic to the argument that the

6   plaintiff is making that they have not yet

7   engaged in discovery.  And certainly since the

8   rest of the case is going to proceed against the

9   subsidiary, one possible way of dealing with

10  that is to say you really haven't gathered

11  sufficient information to allege a plausible

12  claim.

13       And, therefore, I grant the motion to

14  dismiss but without prejudice to your right to

15  seek to add them back if you acquire information

16  in discovery that demonstrates that their

17  involvement is more than just a communicator --

18  collector and communicator of information, which

19  is, although they make kind of more general

20  manage and so forth, those statements seem to be

21  conclusory at this point and are the kind of

22  statements that I should probably disregard

23  under the Iqbal Twombly standard and look to

24  more of the underlying facts which look more at

25  this point like the parent collects information

1    that the subsidiary produces through contractors

2    or something else, and communicates and engages

3    in discussions with, which, you know -- so one

4    answer is to dismiss this without prejudice and

5    let them come in and bring Casella back in if

6    necessary.

7          What else did you want to say?

8          MS. ARROYO:  Well, just -- you beat me to

9    it.  I had a note as well that conclusory is a

10   standard here, because -- and, you know, your

11   Honor, you have reiterated several times today

12   the standard for a motion to dismiss, and it's

13   what's in the complaint.  And what's in the

14   complaint, regardless of what may be discovered

15   in discovery, what's in the complaint is

16   insufficient to rise to that standard of whether

17   Casella is just as liable to the extent NCES is

18   liable.  I don't think that the kitchen sink

19   should go forward at this point, based on what's

20   in the complaint.

21         THE COURT:  Okay.  So there is this

22   allegation about funding the landfill's

23   operation.  I mean, if they were actually

24   providing funds directly to pay for the

25   operation of the landfill, that might also be

1      different.

2              Do you have anything to say about that?

3              MS. ARROYO:  Well, I think here it doesn't

4      sound like there's any dispute that NCES is the

5      owner and it's also the operator of its own

6      facility.  So it's due -- the reporting is done

7      by its consultant, Sam Moorhead.  The funding

8      alone doesn't seem necessary to give rise to

9      that involvement at the facility to its

10     day-to-day operations.

11             THE COURT:  It would depend.  If they

12     loaned money to the company to pay -- the

13     subsidiary to pay for it, that wouldn't make

14     them a person liable.  If they're just running

15     the whole thing, paying the contractors, doing

16     all of that, and there isn't any agreement about

17     how -- I mean, I say a loan agreement where a

18     sub says, "I need a million dollars to do this."

19     The parent says, "Okay, we'll loan you a million

20     dollars.  Here's the note.  Here's the" -- but

21     we just don't know at this point what this

22     so-called funding is or what the basis for the

23     allegation about funding is.

24             MS. ARROYO:  Well, the allegation for a

25     motion to dismiss should be more than funding.

1    Because I agree:  I think giving a check for one

2    thing is very different than saying, "Parent

3    company, I'd like money for this particular

4    project," and then the parent company guiding

5    the implementation of that proposed policy, for

6    example.

7          So, again, the basis of the complaint here

8    is really limited to paragraph 20.  It's a

9    fairly scant allegation.  It seems insufficient

10   based on the standard for motion to dismiss.

11         THE COURT:  All right.  Thank you.

12         Let me just hear your response to this.

13   How are you going to be harmed if I dismiss

14   without prejudice Casella?  Is it going to

15   affect your ability to get discovery?  Is it

16   going to affect your ability to proceed with the

17   case?  If you get the contracts with the

18   environmental consultants and their contracts

19   with Casella, if you have contracts for the

20   removal of the soil and their Casella contracts,

21   obviously you'll have a different argument to

22   present.  But just telling me, well, factually

23   what we know is that they communicated with DES

24   and they were communicating with the company's

25   monitoring facility, that doesn't seem to be all

1    that sufficient.

2            MR. BUDRIS:  Well, your Honor, as to the

3    prejudice to plaintiffs, you know, the issue

4    here is Casella personnel, whether Casella is

5    involved.  And if Casella is no longer in the

6    case, we won't be able to take discovery from

7    Casella itself on that.

8            So to the extent that the --

9            THE COURT:  I don't think that's true.

10   Are you going to tell me you'll resist discovery

11   if you're out of the case?

12           MS. ARROYO:  (Shaking head.)

13           THE COURT:  They're saying no, and I'm

14   going to hold them to that promise.  So I don't

15   think that it will affect your ability to do

16   discovery in any way.

17           MR. BUDRIS:  That -- Casella's counsel

18   having said that here gives us some level of

19   comfort.  But I would like to point out one

20   more -- two more things in rebuttal to what

21   Attorney Arroyo said, first as to the issue of

22   plaintiffs not alleging that Casella is

23   operating the facility as a whole.

24           Well, there's a specific reason we didn't

25   do that, because this case isn't about the

66

1    facility as a whole.  This case, again, its

2    focus is about the drainage.  So we allege the

3    ways in which Casella personnel are involved in

4    the drainage channel.

5         And the second point ties in there

6    because, again, we didn't allege that Casella

7    personnel are overseeing the water quality

8    monitoring reports or receiving communication

9    about them.  We are saying they are working with

10   third-party contractors and consultants to

11   prepare water quality monitoring results.  We

12   are alleging that they are involved in the

13   preparation.  They're not just catching wind of

14   the water quality monitoring reports.  They're

15   not receiving them and putting a rubber stamp on

16   them and saying, "Okay.  This is great.  Our

17   subsidiary is doing well."  They are working on

18   the ground with those consultants and

19   contractors to prep that monitoring, which is a

20   key part of what's going on here with the

21   drainage channel.

22        THE COURT:  All right.  Thank you.

23        So it's a very close call.  I have to say,

24   looking at the 12(b)(6) standard, there are two

25   ways I could do this.  I could deny the motion

1    without prejudice and allow for a limited

2    expedited discovery on the specific role that

3    Casella plays, or I could grant the motion and

4    dismiss without prejudice and allow for

5    discovery and you can bring them back in.  I

6    wouldn't want to throw Casella out here without

7    allowing for some additional information to be

8    collected.  And so I think it's a close case.

9           What I'm suggesting to you is that it is

10   very slim but minimally sufficient to survive a

11   12(b)(6) motion, but I want in your discovery

12   plan the parties to agree to expedited discovery

13   on Casella's specific involvement.  If you can

14   show you didn't -- weren't involved in

15   dredging -- because they allege you and/or the

16   sub did the remediation work.  You and/or the

17   sub did this.  They make these allegations about

18   the parent managing.  And, you know, it's

19   debatable whether those are conclusory and

20   should be disregarded or not.

21          But what I'm telling you both is that if

22   at the end of the day all that you have is, you

23   have a sub who entered into contracts with

24   environmental consultants, a sub who did the

25   removal project, a sub who reported information

to a parent, a parent who sent its own people to
the meetings and talked about what was going on,
had their own people communicate with DES, and
that's what all you have; but the sub did the
excavation, the sub manages the entire facility,
including this aspect of the project, and that
the only involvement with the parent is they
communicated with, they received results, they
gave general guidance to the sub, I would expect
you to agree to the dismissal of the parent so
that we don't have further litigation.  And if
after expedited discovery you want to renew your
motion, I explained to you at least what my
moderately informed view is about the standard.
It requires more than what is concretely and
specifically alleged here, that is, overseeing
monitoring and in communicating with.  It's
going to require more than that, some kind of
active engagement.  And without that evidence, I
expect you to agree to the dismissal of the
parent.

In any event, since the defendant is
cooperative on this, as it should be, because
they would get discovery of the parent's people
anyways, I don't see how you really benefit from

1        this unless you have a strong argument that

2        they're actually involved.

3               So please don't waste my time or their

4        time and make them file another motion to

5        dismiss.  Conduct what discovery you need to to

6        make a relatively expedited determination about

7        the parent's liability.  And I hope you'll do

8        the right thing if you can uncover more evidence

9        than the kind that I think is insufficient, or

10       you can come forward with a clearer briefing of

11       the law to explain to me that my preliminary

12       assessment of what's required is insufficient.

13              So -- okay.  So I'm going to deny the

14       motion without prejudice on that ground, direct

15       that the parties build into their discovery plan

16       some expedited discovery, and require the

17       parties after that discovery is completed to

18       meet and confer and attempt to agree on a

19       agreed-upon disposition in the claim against the

20       parent.  Right?  That's really not what's

21       driving the case.  We ought to -- you know, I

22       hope you can not get too distracted with that

23       and we can focus on what really is the core of

24       the case, and that is what did go on with that

25       alleged drainage channel or not.  Because I can

1     see fact patterns where there's no NPDES permit

2     required and I can see fact patterns where it

3     is, and I think we just need to know more about

4     the case.

5         So to the extent you have this good

6     argument that you haven't done anything more

7     with Casella than what's been described, and you

8     can cooperate with them and produce actual

9     documents and let them interview the person

10    who's most knowledgeable or depose them and that

11    can get rid of it, that might be a way to get

12    rid of that part of the case relatively quickly.

13    All right?

14        So, bottom line summary, the motion to

15    dismiss for lack of standing is denied for the

16    reasons I specified.  The motion to dismiss for

17    failure to state a claim that this is a point

18    source discharge is denied.  The motion to

19    dismiss for failure to state a claim that

20    Casella is liable as a person under the Clean

21    Water Act is denied without prejudice.

22        The parties should conduct additional

23    discovery on that issue on an expedited basis

24    and at the completion meet and confer and

25    attempt to agree upon a disposition of that

1    particular matter.  If a disposition can't be

2    agreed upon, the defendant is free to file a

3    further motion.  It probably would be a very

4    brief focused motion for partial summary

5    judgment as to that defendant, which I don't

6    expect the plaintiff would oppose unless they

7    have a good-faith basis for doing so.

8         All right.  Anything else we need to talk

9    about today?

10        MR. BUDRIS:  No, your Honor.

11        MS. ARROYO:  No, your Honor.

12        THE COURT:  Okay.  My thanks to the court

13   reporter, who I made you stay probably longer

14   than you're used to.  But that's what happens

15   when you come to my courtroom.

16        Thank you.

17        (Conclusion of hearing 11:35 a.m.)

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3          I, Deanna J. Dean, LCR, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and

5    accurate transcription of the within proceedings,

6    to the best of my knowledge, skill, ability, and

7    belief.

8

9

10   _____

11               Deanna J. Dean, LCR, RDR, CRR

12               Licensed Court Reporter No. 87

13               Signed this 8th day of October, 2018

14

15

16

17

18

19

20

21

22

23

24

25