UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| TOXICS ACTION CENTER, INC., and CONSERVATION LAW FOUNDATION, ) ) ) ) Plaintiffs, ) ) v. ) ) CASELLA WASTE SYSTEMS, INC., and NORTH COUNTRY ENVIRONMENTAL SERVICES, INC., ) ) ) ) ) Defendants. ) | Civil Action No.: 18-cv-393 **FIRST AMENDED COMPLAINT** |

## INTRODUCTION

1.      Defendants discharge pollutants—including, but not limited to, contaminated groundwater, landfill leachate, iron, manganese, and 1,4-dioxane—to a 370-foot-long drainage channel ("Drainage Channel") located near the North Country Environmental Services landfill ("Landfill") in Bethlehem, New Hampshire, and then from the Drainage Channel into the Ammonoosuc River.  These discharges have violated, are violating, and will continue to violate the federal Clean Water Act ("CWA").

2.      Plaintiffs Toxics Action Center, Inc. ("Toxics Action") and Conservation Law Foundation ("CLF") have members who live near, swim in, and otherwise use or would like to use the Ammonoosuc River, and whose use and enjoyment of the river has been and continues to be adversely affected by the Defendants' illegal discharge of pollutants.

3.      Plaintiffs bring this citizen enforcement action under the "citizen suit" provision of the CWA, 33 U.S.C. § 1365, to end these longstanding, ongoing violations.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C.

§ 1365(a)(1) and 28 U.S.C. § 1331.

5.      Venue lies in this District under 33 U.S.C. § 1365(c)(1), because the Landfill and

Drainage Channel are located within the District.

6.      Pursuant to 33 U.S.C. § 1365(b), Plaintiffs gave notice of the violations alleged in

Count I of this First Amended Complaint more than 60 days prior to the commencement of this

lawsuit by a letter ("Notice Letter") mailed via U.S. mail to: (a) the Defendants; (b) the United

States Environmental Protection Agency ("EPA"); and (c) the New Hampshire Department of

Environmental Services.  Pursuant to 33 U.S.C. § 1365(b), Plaintiffs gave notice of the violations

alleged in Count II of this First Amended Complaint more than 60 days prior to the amendment

that added Count II to this lawsuit by a letter ("Second Notice Letter") mailed via U.S. mail to:

(a) the Defendants; (b) the United States Environmental Protection Agency ("EPA"); and (c) the

New Hampshire Department of Environmental Services.

7.      A copy of the Notice Letter is attached as Exhibit 1 to this First Amended

Complaint and is incorporated by reference herein.  A copy of the Second Notice Letter is

attached as Exhibit 4 to this First Amended Complaint and is incorporated by reference herein.

8.      Each of the parties listed above received the Notice Letter.  Copies of return

receipts and United States Postal Service tracking information are attached as Exhibit 2 to this

Complaint.  Each of the parties listed above received the Second Notice Letter.  Copies of return

receipts are attached as Exhibit 5 to this Complaint.

9.      The Notice Letter and Second Notice Letter each satisfy the pre-suit notice

requirements of 33 U.S.C. § 1365(b)(1)(A).

10.     Subsequent to Defendants' receipt of the Notice Letter, Defendants' counsel wrote a letter to Plaintiffs' counsel asking that communications with Defendants be directed to Defendants' counsel, but otherwise did not communicate with Plaintiffs or their counsel about the Notice Letter.

11.     Neither EPA nor the State of New Hampshire has contacted Plaintiffs or Plaintiffs' counsel about the Notice Letter or the Second Notice Letter.

12.     Neither EPA nor the State of New Hampshire has commenced or is diligently prosecuting a civil or criminal action against Defendants to address any of the violations at issue in this case.  Neither EPA nor the State of New Hampshire has commenced, and neither is diligently prosecuting, any administrative penalty action against Defendants with regard to any of the violations at issue in this case.

## PARTIES

13.     Plaintiff Toxics Action is a non-profit corporation organized under the laws of Massachusetts.  Toxics Action has approximately 1,900 members.  Toxics Action works with citizens across New England in an effort to reduce, clean up, and remediate the effects of pollution in their communities.

14.     Toxics Action has members who live and own property near the Ammonoosuc River, who use the river for recreational and aesthetic purposes, and who are adversely affected by the Defendants' illegal pollutant discharges to the Ammonoosuc River.

15.     Plaintiff CLF is a non-profit corporation duly organized under the laws of Massachusetts with approximately 5,100 members, including approximately 550 members in New Hampshire.  CLF works to protect New England's environment for the benefit of all

people.  CLF uses the law, science, and the market in an effort to create solutions that preserve natural resources, build healthy communities, and sustain a vibrant economy.

16.     CLF has members who live and own property near the Ammonoosuc River, who use the river for recreational and aesthetic purposes, and who are adversely affected by the Defendants' illegal pollutant discharges to the Ammonoosuc River.

17.     Defendant North Country Environmental Services, Inc. ("NCES"), is a for-profit corporation organized under the laws of New Hampshire.  NCES is a wholly owned subsidiary of New England Waste Services, Inc., which is itself a wholly owned subsidiary of Defendant Casella Waste Systems, Inc.  NCES is the owner, and an operator, of the Landfill.

18.     NCES plays a direct role in managing and funding the Landfill's operations and pollution control activities.  Its operational role includes, but is not limited to, the management and disposal of solid waste, groundwater well installation and monitoring, surface water monitoring, maintenance and operation of leachate collection systems, maintenance and operation of the Drainage Channel, and provision of services incidental to pollution control.

19.     Defendant Casella Waste Systems, Inc. ("Casella") is a publicly traded for-profit corporation organized under the laws of Delaware and headquartered in Rutland, Vermont.  It is registered to do business in New Hampshire.  Casella is an operator of the Landfill.

20.     Casella plays a direct role in managing and funding the Landfill's operations and pollution control activities, including the maintenance and operation of the Drainage Channel. Casella personnel regularly communicate with staff at the New Hampshire Department of Environmental Services ("NHDES") regarding pollution control—including groundwater and surface water monitoring—at the Landfill.  Casella personnel also work with third-party

contractors and consultants to prepare Water Quality Monitoring Results and other documents related to the Landfill that are submitted to NHDES on behalf of NCES.

### CITIZEN ENFORCEMENT SUITS UNDER THE CLEAN WATER ACT

21.     The objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

22.     The CWA prohibits the addition of any pollutant to navigable waters from any point source except as authorized by a National Pollutant Discharge Elimination System ("NPDES") permit applicable to that point source.  33 U.S.C. §§ 1311(a), 1342, 1362(12).

23.     The CWA authorizes citizens to commence an enforcement action against any person who violates "an effluent standard or limitation" of the CWA.  One such effluent standard or limitation is the requirement to obtain NPDES permit authorization before adding a pollutant to navigable waters from a point source.  33 U.S.C. §§ 1365(a), (f).

24.     The CWA grants jurisdiction to United States District Courts to enforce effluent standards or limitations, to issue injunctions, to impose appropriate civil penalties for violations, and to award costs of litigation to citizen plaintiffs.  33 U.S.C. §§ 1365(a), (d).

### FACTUAL BACKGROUND

#### The Landfill

25.     The Landfill comprises approximately 46.5 acres of waste disposal space divided among five stages (numbered I–V), each of which incorporates synthetic liners and a leachate collection system.

26.     The Landfill is located approximately 800 feet south of the Ammonoosuc River.

27.     Beginning in the 1970s, Harold Brown owned and operated an unlined landfill ("Unlined Waste Disposal Space") at the site of what is now Stage II of the Landfill.

28.    In 1985, Sanco, Inc. ("Sanco") purchased the Unlined Waste Disposal Space from Brown, along with 41 undeveloped abutting acres.

29.    Beginning in 1987, Sanco constructed and/or directed the construction of Stage I of the Landfill.

30.    In 1989, NCES purchased Stage I, the Unlined Waste Disposal Space, and the undeveloped abutting acreage from Sanco.

31.    NCES subsequently excavated the Unlined Waste Disposal Space and placed the excavated material in Stage I of the Landfill.

32.    NCES constructed and/or directed the construction of Landfill Stages II–V. NCES and/or its consultants constructed Stage II of the Landfill in the excavated site formerly occupied by the Unlined Waste Disposal Space.  Stages III through V are located next to and above Stages I and II.

**The Drainage Channel**

33.    The Landfill lies within the Ammonoosuc River watershed.

34.    Groundwater underneath and near the Landfill flows to the northeast, towards the Ammonoosuc River.  Preferential groundwater flow patterns lead from the Landfill to a network of groundwater seeps on a steep slope south of the Ammonoosuc River.

35.    Casella, NCES, and their consultants refer to the one seep exhibiting the greatest discharge flow among the network of groundwater seeps as the "Main Seep."

36.    The Main Seep is connected to the Ammonoosuc River by the Drainage Channel. The Drainage Channel is approximately 370 feet long.

37.    The Main Seep and the Drainage Channel are located on property owned by NCES.

38.     The Drainage Channel collects water that emerges from the Main Seep, and from other nearby seeps and wetlands, and conveys that water to the Ammonoosuc River.

39.     The Drainage Channel also collects pollutants—including, but not limited to, contaminated groundwater, landfill leachate, iron, manganese, and 1,4-dioxane—that emerge from the Main Seep and then conveys those pollutants to the Ammonoosuc River.  Leachate is liquid that has passed through or emerged from solid waste and that contains soluble, suspended, or miscible materials removed from such waste.

40.     The Drainage Channel also collects pollutants—including, but not limited to, contaminated groundwater, landfill leachate, iron, manganese, and 1,4-dioxane—that emerge from other groundwater seeps and wetlands connected to the Drainage Channel and then conveys those pollutants to the Ammonoosuc River.

41.     NCES and Casella personnel, and/or consultants acting on behalf of NCES and Casella, manage and monitor pollutant discharges from the Drainage Channel to the Ammonoosuc River.  See infra Paragraphs 48–49, 56–62.

42.     In 2010, consultants for Casella and/or NCES excavated approximately 176 tons of sediment containing elevated levels of iron, manganese, and arsenic from the Main Seep and the Drainage Channel as part of a Seep Restoration Project.

43.     After excavating the discolored soil, consultants for Casella and/or NCES reconstructed the Drainage Channel.

44.     The reconstructed Drainage Channel was designed to convey water—and any pollutants dissolved, suspended, or otherwise mixed in that water—from the Main Seep, and from other nearby seeps and wetlands, to the Ammonoosuc River.

**Groundwater Permit and Water Quality Monitoring**

45.     The Landfill is registered under New Hampshire Groundwater Management and Release Detection Permit No. GWP-198704033-B-006 ("Groundwater Permit").

46.     The Groundwater Permit requires NCES to collect and test separate groundwater samples from monitoring wells near the Landfill, some of which are located in a Groundwater Monitoring Zone ("GMZ") located between the Landfill and the Ammonoosuc River.

47.     The Groundwater Permit also requires NCES to collect and test separate surface water samples from the Main Seep, from three other surface seeps in the GMZ, from the Drainage Channel, and from three locations in the Ammonoosuc River.

48.     NCES, through its consultant, Sanborn, Head, and Associates, Inc. ("Sanborn Head"), submits "Water Quality Monitoring Results" to NHDES three times per year.  The Water Quality Monitoring Results include test results from the required groundwater monitoring and surface water monitoring.

49.     Sanborn Head coordinates the preparation and submission of Water Quality Results with both NCES and Casella personnel.

50.     A copy of an Exploration Location Plan attached to the November 2017 Water Quality Monitoring Results submitted to NHDES is attached as Exhibit 3 to this Complaint and is incorporated by reference herein.  Exhibit 3 depicts the aforementioned monitoring wells, surface water monitoring locations, and GMZ, and also depicts the Landfill, its component stages, and the nearby Ammonoosuc River.

51.     The Water Quality Monitoring Results submitted to NHDES compare sample testing results to Ambient Groundwater Quality Standards ("AGQS") set by NHDES, and/or to Secondary Maximum Contaminant Levels ("SMCL") set by EPA, where applicable.

52.     The SMCL for iron is 0.3 mg/L.

53.     The SMCL for manganese is 0.05 mg/L.

54.     The AGQS for manganese is 0.84 mg/L.

**Pollutant Discharges from the Drainage Channel to the Ammonoosuc River**

55.     Water Quality Monitoring Results submitted to NHDES indicate that the

Drainage Channel is discharging pollutants to the Ammonoosuc River.

56.     In the November 2017 Water Quality Monitoring Results, NCES reported the

following information regarding iron and manganese concentrations in samples collected from

the Main Seep (location S-1):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 56a | 11/6/12 | 0.54 | 0.18 |
| 56b | 4/10/13 | 4.5 | 0.65 |
| 56c | 7/9/13 | 1.0 | 0.18 |
| 56d | 11/5/13 | 2.4 | 0.50 |
| 56e | 4/21/14 | 0.25 | 0.12 |
| 56f | 7/17/14 | 0.09 | 0.06 |
| 56g | 11/5/14 | 1.1 | 0.21 |
| 56h | 4/15/15 | 0.75 | 0.15 |
| 56i | 7/21/15 | 0.12 | 0.038 |
| 56j | 11/10/15 | 0.77 | 0.14 |
| 56k | 4/11/16 | 0.87 | 0.097 |
| 56l | 7/12/16 | 0.12 | 0.053 |
| 56m | 11/7/16 | 0.16 | 0.044 |
| 56n | 4/3/17 | 0.38 | 0.075 |
| 56o | 7/26/17 | 0.32 | 0.077 |

57.    In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding iron and manganese concentrations in samples collected from the Drainage Channel (location SF-1):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 57a | 11/6/12 | 1.8 | 0.34 |
| 57b | 4/10/13 | 3.8 | 0.50 |
| 57c | 7/9/13 | 1.1 | 0.27 |
| 57d | 11/5/13 | 1.6 | 0.37 |
| 57e | 4/21/14 | 3.9 | 0.45 |
| 57f | 7/17/14 | 2.1 | 0.41 |
| 57g | 11/5/14 | 2.1 | 0.28 |
| 57h | 4/15/15 | 2.2 | 0.35 |
| 57i | 7/21/15 | 1.9 | 0.32 |
| 57j | 11/10/15 | 1.6 | 0.33 |
| 57k | 4/11/16 | 5.9 | 0.35 |
| 57l | 7/12/16 | 1.4 | 0.32 |
| 57m | 11/7/16 | 1.1 | 0.27 |
| 57n | 12/1/16 | 2.9 | 0.31 |
| 57o | 4/3/17 | 3.2 | 0.50 |
| 57p | 7/26/17 | 1.5 | 0.37 |
| 57q | 11/6/17 | 1.3 | 0.31 |

58.    In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding the concentrations of 1,4-dioxane in samples collected from the Drainage Channel (location SF-1):

| Complaint Paragraph Number | Sample Date | 1,4-Dioxane Concentration (μg/L) |
|---|---|---|
| 58a | 11/7/16 | 0.31 |

| 58b | 12/1/16 | 0.26 |
|---|---|---|
| 58c | 4/3/17 | 0.28 |

59.     The testing data listed in Paragraphs 57–58 indicate that the Drainage Channel is discharging iron, manganese, and 1,4-dioxane to the Ammonoosuc River.

60.     Testing data for samples collected from the Ammonoosuc River itself further indicate that the Drainage Channel is discharging these pollutants to the Ammonoosuc River.

61.     In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding iron and manganese concentrations in samples collected from the Ammonoosuc River *upstream* from the Drainage Channel (location AR-1):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 61a | 7/9/13 | 0.22 | 0.018 |
| 61b | 7/17/14 | 0.19 | 0.017 |
| 61c | 7/21/15 | 0.18 | 0.015 |
| 61d | 7/12/16 | 0.10 | 0.016 |
| 61e | 4/3/17 | 0.10 | 0.018 |
| 61f | 7/26/17 | 0.18 | 0.017 |

62.     In the November 2017 Water Quality Monitoring Results, NCES reported the following information regarding iron and manganese concentrations in samples collected from the Ammonoosuc River *downstream* from the Drainage Channel (location AR-2):

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 62a | 7/9/13 | 0.24 | 0.021 |
| 62b | 7/17/14 | 0.43 | 0.031 |
| 62c | 7/21/15 | 0.25 | 0.030 |
| 62d | 7/12/16 | 0.17 | 0.029 |

| 62e | 4/3/17 | 0.20 | 0.037 |
| 62f | 7/26/17 | 0.23 | 0.029 |

63.     On each of the dates listed in Paragraphs 61 and 62, iron and manganese concentrations downstream from the Drainage Channel were higher than those upstream from the Drainage Channel.

64.     The presence of iron, manganese, and 1,4-dioxane in the Drainage Channel is attributable to, and indicative of, the presence of landfill leachate and/or contaminated groundwater from the Landfill and/or the Unlined Waste Disposal Space.

65.     Iron, manganese, and 1,4-dioxane are commonly found in landfill leachate, and in groundwater contaminated by landfill waste and/or by activities associated with waste disposal.

66.     1,4-dioxane is a synthetic industrial chemical; it is not naturally occurring.

67.     Consultants for Casella and/or NCES have concluded that the presence of iron and manganese in the Drainage Channel is the result of groundwater contamination from the Unlined Waste Disposal Space.

68.     Water Quality Monitoring Results indicate that leachate, contaminated groundwater, and other pollutants attributable to the Landfill are also present in the Drainage Channel.

69.     Water Quality Monitoring Results indicate that groundwater monitoring wells between the Landfill and the Ammonoosuc River regularly contain iron and manganese concentrations that exceed the applicable AGQS and/or SMCL.  These monitoring wells draw groundwater from the flow pattern that leads from the Landfill to the Drainage Channel.  See Paragraph 34; Exhibit 3.

70.     Water Quality Monitoring Results indicate the presence of 1,4-dioxane in groundwater monitoring wells between the Landfill and the Ammonoosuc River.  These monitoring wells draw groundwater from the flow pattern that leads from the Landfill to the Drainage Channel.  See Paragraph 34; Exhibit 3.

71.     The presence of 1,4-dioxane and elevated concentrations of iron and manganese in groundwater that flows from the Landfill to the Drainage Channel demonstrate that the Landfill is a source of the 1,4-dioxane, iron, and manganese in the Drainage Channel.

72.     Average iron and manganese concentrations in samples collected from some groundwater monitoring wells in the GMZ have increased from 2008 to present.  Other groundwater monitoring wells in the GMZ have contained consistent levels of iron and manganese from 2008 to present.

73.     The stable and/or increasing iron and manganese concentrations in these monitoring wells demonstrate that the presence of these metals in groundwater linking the Landfill to the Drainage Channel is attributable, at least in part, to the Landfill.  If iron and manganese concentrations were attributable solely to soil contamination from the Unlined Waste Disposal Space, the concentrations would be expected to exhibit a decreasing—rather than stable or increasing—trend from 2008 to the present, as the residual effects of the Unlined Waste Disposal Space diminish over time.

74.     Between 1996 and 2006, NCES applied sodium bromide to waste added to Stages II and III of the Landfill.  NCES intended the sodium bromide to function as a manner of leak detection—if bromide is detected in groundwater near the Landfill, it is an indication that Landfill cells are leaking.

75.     Following these applications of sodium bromide, bromide has been regularly detected in samples collected from monitoring wells that draw groundwater from the flow pattern that leads from the Landfill to the Drainage Channel.  The presence of bromide in these samples is an indication that the Landfill is releasing leachate and other pollutants to groundwater that is thereafter collected and discharged to the Ammonoosuc River by the Drainage Channel.

## ADVERSE EFFECTS OF POLLUTANTS DISCHARGED FROM THE DRAINAGE CHANNEL

76.     When iron is present in water at concentrations above the SMCL, it can result in a rusty hue, a reddish-colored sediment, and a metallic taste.

77.     Iron can form solid precipitates in water that can settle on the gills and eggs of aquatic organisms and obstruct oxygen uptake and negatively affect reproduction and mobility.

78.     Dissolved iron can be absorbed through the gills and stomachs of aquatic organisms and can bioaccumulate to levels that interfere with cellular processes.

79.     Exposure to elevated levels of manganese can damage the gills, intestinal mucosa, and kidneys of fish.

80.     1,4-dioxane is a likely human carcinogen.  EPA has classified 1,4-dioxane as likely to be carcinogenic by all routes of exposure.

81.     1,4-dioxane is highly mobile in water and does not readily biodegrade in the environment.

82.     Because leachate contains pollutants removed from solid waste, it can present a diverse and variable array of environmental risks depending on its constituents.  The nature of these constituents, and thus the degree of risk, can change over time.  To Plaintiffs' knowledge,

the constituents of the leachate discharged to the river via the Drainage Channel are not being regularly and comprehensively characterized.

83.     Groundwater contaminated by landfilling activity can also present a diverse and variable array of environmental risks depending on its constituents.  The nature of these constituents, and thus the degree of risk, can change over time.  To Plaintiffs' knowledge, the constituents of the contaminated groundwater discharged to the river via the Drainage Channel are not being regularly and comprehensively characterized.

## **VIOLATIONS OF THE CLEAN WATER ACT**

## **COUNT I:  THE DRAINAGE CHANNEL IS A POINT SOURCE THAT IS DISCHARGING POLLUTANTS WITHOUT AN NPDES PERMIT**

84.     Defendants have violated and continue to violate the CWA because they have discharged and continue to discharge pollutants—including, but not limited to, landfill leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane—to the Ammonoosuc River without NPDES permit authorization.

85.     Defendants' past and ongoing discharges of pollutants from the Drainage Channel to the Ammonoosuc River violate the CWA, 33 U.S.C. §§ 1311 and 1342, because: (a) the Drainage Channel is a "point source" within the meaning of the CWA; (b) the Ammonoosuc River is a "navigable water" within the meaning of the CWA; (c) the Drainage Channel is adding substances to the Ammonoosuc River that are "pollutants" within the meaning of the CWA; and (d) Defendants are not authorized by any NPDES permit to discharge pollutants from the Drainage Channel to the Ammonoosuc River.

### A.      **The Drainage Channel is a Point Source.**

86.     The CWA defines point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete

fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

87.     The Drainage Channel is a confined and discrete channel, or conduit, from which groundwater that emerges from the Main Seep, and from other groundwater seeps and wetlands, is discharged to the Ammonoosuc River.

88.     As discussed above in Paragraphs 55–75, water discharged from the Drainage Channel to the Ammonoosuc River contains leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane.

89.     Leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane are pollutants within the meaning of the CWA.  See infra Paragraphs 96–97.

90.     The Drainage Channel thus is a confined and discrete conduit from which pollutants may be, and are, discharged to the Ammonoosuc River, and is therefore a point source within the meaning of the CWA.

**B.      The Ammonoosuc River is a Navigable Water.**

91.     The CWA defines navigable waters as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  "Waters of the United States" are defined by EPA regulations to include, *inter alia*, all tributaries to interstate waters.  See 40 C.F.R. § 122.2.

92.     The Ammonoosuc River is a permanent flowing body of water that empties into the Connecticut River.  The Connecticut River is an interstate waterway.  It serves as a border between New Hampshire and Vermont, flows south into Massachusetts and Connecticut, and empties into Long Island Sound.

93.     The Ammonoosuc River thus is a navigable water within the meaning of the CWA.

C.     **The Drainage Channel is Adding Pollutants to the Ammonoosuc River.**

94.     The CWA defines "pollutant" as including, *inter alia*, "solid waste, . . . chemical wastes, . . . and industrial [and] municipal waste." 33 U.S.C. § 1362(6).

95.     The Drainage Channel is adding iron, manganese, 1,4-dioxane, contaminated groundwater, and leachate to the Ammonoosuc River. Each of these substances is a pollutant within the meaning of the CWA.

96.     The iron, manganese, and 1,4-dioxane discharged via the Drainage Channel are solid and chemical waste, because they are discarded to the river as waste by Defendants, and they are solid, chemical, and industrial and/or municipal waste because they originate from and/or are attributable to industrial waste, municipal waste, and/or activities associated with waste disposal.

97.     The contaminated groundwater and leachate discharged via the Drainage Channel are solid and chemical waste because they are discarded to the river as waste by Defendants, and because they contain chemicals that are discarded to the river as waste by the Defendants. They are also solid, chemical, and industrial and/or municipal waste because they are attributable to, originate from, and/or contain chemicals that originate from industrial waste, municipal waste, and/or activities associated with waste disposal.

D.     **Defendants Are Not Authorized to Discharge Pollutants From the Drainage Channel to the Ammonoosuc River.**

98.     No NPDES permit authorizes the discharge of pollutants from the Drainage Channel to the Ammonoosuc River.

99.     The Landfill is registered under the 2015 NPDES Multi-Sector General Permit ("MSGP").

100.     The MSGP does not authorize the discharge of pollutants from the Drainage Channel to the Ammonoosuc River.

101.     Section 8.L.3.1 of the MSGP, concerning sector-specific requirements for "Landfills, Land Application Site, and Open Dumps," states that the MSGP does not authorize discharges of leachate, drained free liquids, or contaminated groundwater.

102.     The New Hampshire Groundwater Permit does not authorize the discharge of pollutants from the Drainage Channel to the Ammonoosuc River.

**E.     Defendants' Unauthorized Discharges Are Ongoing and Continuous.**

103.     Defendants have conveyed pollutants—including, but not limited to, landfill leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane—to the Ammonoosuc River via the Drainage Channel each day from March 8, 2013, (the start of the applicable statute of limitations under the CWA) through the present, and they will continue to discharge these pollutants each day unless or until action is taken to stop the discharge.

104.     The Water Quality Monitoring Results and other monitoring conducted by Defendants and/or their consultants generally indicate that the flow of contaminated groundwater from the Main Seep to the Discharge Channel is continuous, and they do not indicate any interruption in this flow.  Defendants and/or their consultants have estimated this flow as being approximately 100 gallons per minute, which translates to 144,000 gallons per day.

105.     Each day of discharge of each pollutant from the Drainage Channel to the Ammonoosuc River without NPDES permit authorization constitutes a separate and distinct day of violation of the CWA.

## COUNT II:  THE LANDFILL IS A POINT SOURCE THAT IS DISCHARGING POLLUTANTS WITHOUT AN NPDES PERMIT

106.    Plaintiffs assert Count II in the alternative, because Defendants take the position that the Drainage Channel is a "water of the United States" and not a point source.  If the Court were to agree with Defendants on that issue, recent U.S. Supreme Court jurisprudence makes clear that Defendants would still be in violation of the CWA for discharging pollutants without a NPDES permit, as set forth below.

107.    The Landfill adds pollutants, through groundwater, to the Drainage Channel and thus to the Ammonoosuc River in a manner that is the functional equivalent of a direct discharge from a point source (the Landfill) into navigable waters (the Drainage Channel and the Ammonoosuc River).  Defendants have not obtained a NPDES permit authorizing this discharge and are therefore violating the CWA, 33 U.S.C. §§ 1311 and 1342.

### A.    Factual Background for Count II

108.    Preferential groundwater flow paths lead from the Landfill to groundwater seeps on the steep south slope of the Ammonoosuc River.  *See* Paragraphs 33-38, above.

109.    The unlined segment of the Landfill (referred to above as the Unlined Waste Disposal Space, a term that Defendants claim is inaccurate) released pollutants directly into the ground beneath it during its approximately 20 years of active operation.

110.    The unlined segment of the Landfill released pollutants directly into the ground beneath it during the excavation work occurring from 1991-93 that was intended to remove the wastes contained in the unlined segment.

111.    Not all of the wastes contained in the unlined landfill were removed by the 1991-93 excavation work.  Any remaining unexcavated portions of the unlined segment of the Landfill, and any wastes once contained in the unlined segment that were released into the

ground and not removed by the excavation work, have continued to release pollutants into the groundwater beneath what is now Stage II of the Landfill.

112.    A significant mass of pollutants originating in the unlined segment of the Landfill still remains in the ground beneath the Landfill.  These pollutants continue to come into contact with groundwater and to be carried through preferential groundwater flow paths until they are discharged to the Drainage Channel.

113.    The Landfill pollutants referenced in the preceding paragraph include, but are not limited to:  leachate; metals, such as iron and manganese; volatile organic compounds or "VOCs," such as 1,4-dioxane; nitrate; chlorides; ammonia; per- and polyfluoroalkyl substances or "PFAS"; chemical oxygen demand; and organic matter.

114.    Any leaks, spills or other releases of pollutants from, or that are attributable to activity at, the lined segments of the Landfill can also reach the groundwater and the same preferential groundwater flow paths that discharge to the Drainage Channel.

115.    The continuing presence in the ground of pollutants released by the Landfill has created an anoxic environment in the ground and groundwater.  The anoxic conditions created by the Landfill wastes cause additional amounts of iron and manganese to precipitate or mobilize from the soil by means of chemical "redox" (oxygen-reduction) reactions.  The iron and manganese enter the groundwater and the same preferential groundwater flow paths that discharge to the Drainage Channel.  These additional amounts of iron and manganese are also Landfill pollutants, as they are released, or mobilized, from the soil and discharged to navigable water because of the existence and operation of the Landfill.

B.     **The Landfill is a Point Source.**

116.    The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

117.    The Landfill was built to contain solid waste.  The Landfill is akin to a well that is used to hold wastes.  The Landfill is a "container" within the meaning of 33 U.S.C. § 1362(14).

118.    The Landfill has contours, boundaries, cells, walls, liners and covers that are mapped, clearly delineated, obvious, and easily discerned.  The Landfill is "discernable" within the meaning of 33 U.S.C. § 1362(14).

119.    The Landfill is confined to a particular defined area, and its purpose is to accept and confine solid waste within that area.  The Landfill is "confined" within the meaning of 33 U.S.C. § 1362(14).

120.    The Landfill is separate and distinct from the surrounding terrain that has not been made into a landfill.  The Landfill is "discrete" within the meaning of 33 U.S.C § 1362(14).

121.    The unlined segment of the Landfill was designed in such a way that it would necessarily convey pollutants directly into the ground and groundwater, because landfills generate leachate and the unlined segment of the Landfill was intentionally constructed without a liner that could collect that leachate.  The lined segments of the Landfill are also designed in such a way that they necessarily convey pollutants:  they have leachate collection and conveyance systems that, when operated and maintained properly, are designed to collect leachate for transfer and ultimate disposal.  The Landfill operates as a "conveyance" within the meaning of 33 U.S.C § 1362(14).

122.    The Landfill has released pollutants into the ground and groundwater beneath it. These pollutants have in turn caused additional amounts of iron and manganese to be added from the soil into the groundwater beneath the Landfill.  Both types of Landfill pollutants are transported by groundwater to various seeps, including but not limited to the Main Seep, that flow into the Drainage Channel, which in turn flows into the Ammonoosuc River.  *See* Paragraphs 109-15, above

123.    The CWA defines "pollutant" as including, *inter alia*, "solid waste, . . . chemical wastes, . . . and industrial [and] municipal waste." 33 U.S.C. § 1362(6).  All of the substances described in Paragraphs 113 and 115 are pollutants within the meaning of the CWA.  They are solid waste and chemical wastes because they are discarded by Defendants.  They are industrial and/or municipal wastes because they originate from or are attributable to industrial waste, municipal waste, or activities associated with waste disposal.

124.    There are no local sources of the pollutants described in Paragraphs 113 and 115 other than the Landfill.  Defendants have not identified any such alternative source.

125.    The Landfill is a point source as defined by 33 U.S.C. § 1362(14).

**C.      The Ammonoosuc River and the Drainage Channel are Navigable Waters.**

126.    The Ammonoosuc River is a water of the United States and thus a navigable water within the meaning of the CWA.  *See* Paragraphs 91-93, above.

127.    Defendants have taken the position in this action that the Drainage Channel is a water of the United States, and thus a "navigable water" for the purposes of the CWA because, they maintain, it is a perennial stream and empties into the Ammonoosuc River.

128.    For purposes of this Count II, the Drainage Channel is a water of the United States and thus a navigable water within the meaning of the CWA.

**D.     The Landfill is Adding Pollutants to the Drainage Channel and to the Ammonoosuc River.**

129.     Landfill pollutants are conveyed from the area beneath the Landfill by well-established preferential groundwater flow paths for a short distance – ranging from hundreds of feet to as much as 2,000 feet – before they emerge from the ground.

130.     Monitoring results from groundwater wells located between the Landfill and the Drainage Channel confirm the flow of Landfill pollutants along these flow paths.  *See, e.g.,* Paragraphs 69-72.

131.     The groundwater containing these pollutants emerges at clearly defined points. Most of the groundwater that runs into the Drainage Channel emerges at the Main Seep, which forms the head of the Drainage Channel.  Smaller groundwater flows emerge at smaller identifiable seeps that flow into the Drainage Channel downgradient from the Main Seep.  The pollutants in these groundwater flows are discharged as wastes into the Drainage Channel.

132.     Although the original release of pollutants from the Landfill into the ground began decades ago, the addition of these pollutants to navigable waters still occurs each day.

133.     Water Quality Monitoring Results submitted by Defendant NCES to NHDES indicate that the Main Seep is discharging Landfill pollutants to the Drainage Channel.

134.     Paragraph 56, above, sets forth the iron and manganese concentrations in samples collected from the Main Seep (location S-1) from 2012 through 2017.  Samples collected from the Main Seep since 2017 show that these discharges into the Drainage Channel are continuing:

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 134a | 4/23/18 | 1.1 | 0.25 |
| 134b | 7/10/18 | 1.9 | 0.31 |
| 13bc | 11/5/18 | 0.32 | 0.094 |

23

| | | | |
|---|---|---|---|
| 134d | 4/22/19 | 0.76 | 0.22 |
| 1343 | 7/8/19 | 0.38 | 0.095 |
| 134f | 11/5/19 | 0.41 | 0.1 |

135. Water Quality Monitoring Results submitted by Defendant NCES to NHDES indicate that other seeps are likely discharging Landfill pollutants to the Drainage Channel.

136. Paragraphs 57 and 58, above, set forth the iron, manganese, and 1,4-dioxane concentrations in samples collected from a location close to the mouth of the Drainage Channel (location SF-1) from 2012 through 2017. Samples collected from location SF-1 since 2017 show that pollutant discharges into the Drainage Channel are continuing:

| Complaint Paragraph Number | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|
| 136a | 4/23/18 | 2.3 | 0.34 |
| 136b | 7/10/18 | 2.5 | 0.44 |
| 136c | 11/5/18 | 1 | 0.29 |
| 136d | 4/22/19 | 1.5 | 0.31 |
| 136e | 7/8/19 | 1.3 | 0.29 |
| 136f | 11/5/19 | 1.7 | 0.28 |

137. The testing data listed in Paragraphs 57, 58 and 136 indicate that the Drainage Channel is discharging Landfill pollutants to the Ammonoosuc River.

138. Testing data for samples collected from the Ammonoosuc River itself further indicate that the Drainage Channel is discharging Landfill pollutants to the Ammonoosuc River. These data show that iron and manganese concentrations in the river downstream from the Drainage Channel (location AR-2) are consistently higher than those in the river upstream from the Drainage Channel. *See* Paragraphs 60-64, above, and the following data collected since 2017:

| Complaint Paragraph Number | Sample Location | Sample Date | Iron Concentration (mg/L) | Manganese Concentration (mg/L) |
|---|---|---|---|---|
| 138a | AR-1 | 7/10/18 | 0.21 | 0.017 |
| 138b | AR-1 | 7/8/19 | 0.22 | 0.019 |
| 138c | AR-2 | 7/10/18 | 0.23 | 0.025 |
| 138d | AR-2 | 7/8/19 | 0.22 | 0.020 |

139.    The process is a continuous addition of pollutants to groundwater that has resulted in the discharge to the Drainage Channel of significant amounts of the wastes released from the Landfill.

140.    The manner of discharge to the Drainage Channel, whereby polluted groundwater converges and then emerges primarily at the Main Seep, creates visually dramatic impacts to the Drainage Channel.

141.    Defendants removed 176 tons of contaminated sediments from the Drainage Channel during 2010.  The sediments were orange in color.  Defendants deposited these sediments into the Landfill.

142.    Although some pollutants may be diluted in concentration by groundwater and some may be magnified in concentration by passing through the anoxic soil and groundwater, pollutants identified at monitoring locations S-1 and SF-1 in the Drainage Channel are clearly identifiable as having originated in the Landfill or as having originated from chemical processes created by Landfill wastes.

143.    The specific identity of the Landfill pollutants discharged to the Drainage Channel is maintained as they travel through the groundwater from the Landfill (or, in the case of the excess iron and manganese, from the soils beneath the Landfill) to the seeps feeding the Drainage Channel.

144.    The Water Quality Monitoring Results listed in Paragraphs 56, 57, 134 and 136, which go back to 2012, consistently show levels of iron and manganese in the Drainage Channel that exceed, often by many times, the applicable surface water quality standards for those pollutants.

145.    The transit time for some Landfill pollutants to reach the Main Seep and the Drainage Channel through groundwater has been described by one of Defendants' testifying experts as "pretty quick, a couple of years."

146.    Defendants have known for many years that Landfill pollutants discharge into the Drainage Channel.  At least as far back as 1995, NHDES required Defendants to monitor for pollutants associated with landfills (including iron, manganese, and VOCs) at monitoring locations S-1, SF-1, AR-1 and AR-2.  NHDES ordered Defendants in 2002 to remediate iron and manganese concentrations and deposits at the Main Seep, even though at that time the Main Seep and Drainage Channel were on land Defendants did not own.

147.    Because this flow of pollutants into the Drainage Channel is continuous, the addition of Landfill pollutants to the Drainage Channel continues to occur each and every day.

148.    Because the flow of pollutants from the Drainage Channel into the Ammonoosuc River is continuous, the addition of Landfill pollutants to the Ammonoosuc River continues to occur each and every day.

149.    This continuing daily discharge of Landfill pollutants is the functional equivalent of a continuing direct discharge from the Landfill into the Drainage Channel and the Ammonoosuc River.

**E.   Defendants Are Not Authorized to Discharge Pollutants From the Landfill to the Drainage Channel or to the Ammonoosuc River.**

150.   No NPDES permit authorizes the discharge of pollutants from the Landfill to the Drainage Channel or to the Ammonoosuc River.  *See* Paragraphs 98-102.

**F.   Defendants' Unauthorized Discharges Are Ongoing and Continuous.**

151.   Defendants have conveyed pollutants from the Landfill—including, but not limited to, leachate, contaminated groundwater, iron, manganese, and 1,4-dioxane—to the Drainage Channel, and thus to the Ammonoosuc River, each day from May 15, 2015, (the start of the applicable statute of limitations period under the CWA for Count II) through to the present, and they will continue to do so each day unless or until action is taken to stop the discharge.

152.   Each day of discharge of each pollutant from the Landfill to the Drainage Channel, and thus to the Ammonoosuc River, without NPDES permit authorization constitutes a separate and distinct day of violation of the CWA.

**PLAINTIFFS AND THEIR MEMBERS ARE HARMED BY THE CWA VIOLATIONS**

153.   Members of Toxics Action and CLF live near, own property near, work near, and/or visit the Ammonoosuc River and use the river for recreational and aesthetic purposes.

154.   Plaintiffs' members consider a clean and vibrant Ammonoosuc River to be an important resource and an aesthetically significant part of the area in which they live, work, visit, and/or recreate.

155.   Plaintiffs have members who want the Ammonoosuc River to contain as little pollution as possible, to be free of illegal pollution discharges, and to be afforded the full protections of the Clean Water Act.

156.    Plaintiffs have members who used to swim in and otherwise use the Ammonoosuc River downstream from the Drainage Channel, but now limit, or avoid entirely, swimming in or using those areas due to concerns about the human health, aquatic health, and aesthetic impacts of pollutants discharged by the Defendants to the Ammonoosuc.

157.    Plaintiffs have members who have observed discoloration and other signs of pollution in and near the Ammonoosuc River (including red, brown, and/or orange discoloration, which can be attributable to iron pollution), which has decreased their enjoyment of the river.

158.    Plaintiffs have members who would recreate in or near, or otherwise use and enjoy the area of the river downstream from the Drainage Channel, but who refrain from doing so because they are concerned about the cancer risk from 1,4-dioxane.

159.    Plaintiffs have members who are concerned that the Ammonoosuc River has been polluted by Defendants' discharges and that the health of aquatic life has been harmed by this pollution.  Their enjoyment derived from activities in and around the Ammonoosuc River is diminished due to these concerns.

160.    Plaintiffs have members who spend less time in and around the Ammonoosuc River than they otherwise would because they are concerned about pollutants discharged by Defendants to the Drainage Channel and then into the Ammonoosuc River.

161.    Plaintiffs have members who are concerned that the Ammonoosuc River and, by extension, the Drainage Channel have been, and continue to be, deprived of the protections afforded by the Clean Water Act, and who have been deprived of the public process and other avenues for access and comment associated with the Clean Water Act's permitting process.

162.    Because Defendants have not applied for, or received, a NPDES permit for pollutant discharges from the Landfill to the Drainage Channel, or from the Drainage Channel to

the Ammonoosuc River, Plaintiffs and their members are deprived of access to the monitoring and reporting that would be required if Defendants were governed by an NPDES permit authorizing their discharge of pollutants to the Drainage Channel and/or to the Ammonoosuc River.

**RELIEF REQUESTED**

Plaintiffs request that this Court:

a.  Declare Defendants to have violated and be in violation of the CWA by discharging pollutants from the Drainage Channel to the Ammonoosuc River without NPDES authorization or, in the alternative, to have violated and be in violation of the CWA by discharging pollutants from the Landfill to the Drainage Channel, and thus to the Ammonoosuc River, without NPDES authorization;

b.  Order Defendants to comply with the CWA by ceasing all unauthorized pollutant discharges to the Drainage Channel or the Ammonoosuc River, seeking NPDES permit authorization for any future pollutant discharges to the Drainage Channel or Ammonoosuc River, and complying with the discharge limitations, monitoring requirements, and other requirements of such permit if and when issued;

c.  Order Defendants to implement measures to remedy, mitigate, or offset the harm to the environment caused by the violations alleged herein;

d.  Assess an appropriate civil penalty against Defendants for each day of each violation of the CWA occurring from March 8, 2013, forward (Count I) or from May 15, 2015, forward (Count II), as provided by 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4.

e.   Award Plaintiffs their costs of litigation (including reasonable attorney and expert

witness fees), as provided by 33 U.S.C. § 1365(d);

f.   Order such other relief as the Court deems appropriate.


PLAINTIFFS,

TOXICS ACTION CENTER, INC., and
CONSERVATION LAW FOUNDATION

Dated:  July 15, 2020

/s/ Thomas Irwin
Thomas Irwin (NH Bar #11302)
Conservation Law Foundation
27 North Main Street
Concord, NH 03301
(603) 573-9139
*Attorney for Conservation Law Foundation*
Email: tirwin@clf.org

/s/ Daniel J. Mullen
Daniel J. Mullen (NH Bar #1830)
Ransmeier & Spellman P.C.
One Capitol Street
Concord, NH 03301
(603) 410-6643
*Attorney for Toxics Action Center*
Email: dmullen@ranspell.com

/s/ Joshua R. Kratka
Joshua R. Kratka
Charles C. Caldart
*Admitted pro hac vice*
National Environmental Law Center
294 Washington Street, Suite 500
Boston, MA 02108
(617) 747-4333
*Attorneys for Conservation Law Foundation
and Toxics Action Center*
Email: josh.kratka@nelconline.org

/s/ David A. Nicholas
*Admitted pro hac vice*
20 Whitney Road

Newton, MA 02460
(617) 964-1548
*Attorney for Toxics Action Center*
Email: dnicholas100@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2020, I re-filed a copy of this First Amended Complaint and the accompanying exhibits, as directed by the Court, with the Court's ECF system, which will cause an electronic notice of such filing to be sent to all counsel who have appeared in this case.

*/s/ Joshua R. Kratka*
Joshua R. Kratka