UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Toxics Action Center, Inc. &
Conservation Law Foundation</u>

     v.                                    Case No. 18-cv-393-PB
                                       Opinion No. 2021 DNH 123

<u>Casella Waste Systems, Inc. &
North Country Environmental
Services, Inc.</u>

<u>**MEMORANDUM AND ORDER**</u>

In this citizen-suit enforcement action, two non-profit environmental organizations have sued Casella Waste Systems, Inc. ("Casella") and its subsidiary, North Country Environmental Services, Inc. ("NCES") for violating the Clean Water Act ("CWA") by discharging pollutants into the Ammonoosuc River without a permit.  The principal issue presented by the parties' cross-motions for summary judgment is whether a surface water channel at the landfill site that carries pollutants into the river is a "point source" as that term is used in the CWA. Because I conclude that facts material to the resolution of this issue remain in genuine dispute, I deny the cross-motions.

## I.  <u>BACKGROUND</u>

NCES owns and operates a solid waste landfill on a 61-acre site in Bethlehem, New Hampshire.  The site lies a few hundred

yards south of the Ammonoosuc.[1]  The landfill has been in operation since the 1970s and has gone through multiple stages of development.

The first waste disposal facility on the site was a five-acre, unlined landfill that a local resident started in 1976 by depositing solid waste into an excavated gravel pit.  That waste eventually leached contaminants into the groundwater beneath the site, forming a contaminant plume.  The contamination was first detected in the early 1980s.

In the late 1980s, the New Hampshire Department of Environmental Services ("NHDES") granted a permit to a predecessor of NCES to construct an eighteen-acre, double-lined landfill on the site.  As a condition of that permit, NHDES required defendants' predecessor to remove all solid waste and stained soil from the unlined landfill.  After the excavation was completed in 1993, a doubled-lined landfill was constructed over the site of the unlined landfill.  NHDES also required the installation of a network of groundwater monitoring wells between the site of the unlined landfill and the river to detect and monitor contaminants.

---

[1] The Ammonoosuc begins at the Lake of the Clouds on the western slopes of Mount Washington and flows into the Connecticut River in Haverhill, New Hampshire.

In 1994, a subsidiary of Casella acquired the stock of the corporation that then owned and operated the landfill and changed the name of the company to NCES.  The following year, NHDES established a Groundwater Management Zone ("GMZ") at the site to monitor the migration and attenuation of the contaminant plume.  NCES has been reporting the results of that monitoring to NHDES three times per year for the past twenty-seven years.

Groundwater underneath and near the landfill flows to the northeast, towards the Ammonoosuc.  The groundwater naturally emerges on the embankment above the river in a network of seeps and springs, the largest of which is called the "Main Seep."  Water emerging from the Main Seep has created a channel that runs down the slope and discharges into the Ammonoosuc.  This surface water channel, referred to as the "Drainage Channel," is between one and five feet wide and is approximately 370 feet long.[2]  The flow down the Drainage Channel occurs at all times at an estimated rate of 50-100 gallons per minute.  The Main Seep, the Drainage Channel, and the Channel's confluence with the Ammonoosuc River are all located within the GMZ.

---

[2] The term "Drainage Channel," which plaintiffs have embraced, appears in some correspondence between defendants and NHDES. Although defendants maintain that the term is inaccurate and argumentative, they, too, use it in their briefing simply to avoid confusion.

Elevated levels of iron and manganese have been detected consistently in the Main Seep and the Drainage Channel since GMZ monitoring began.[3]  Since March 2013, elevated levels of both metals have been detected in all water samples taken at the lower end of the Drainage Channel, about 20-25 feet from the point where it discharges into the Ammonoosuc.  On all but three occasions during that period, water samples collected from the Ammonoosuc downstream from the Drainage Channel had higher levels of iron and manganese than water samples taken upstream from the Drainage Channel.

Iron and manganese are constituents of leachate generated at the landfill but they also occur naturally in the soil at the site.  Contamination from the former unlined landfill has increased the levels of these metals in the groundwater that emerges at the Main Seep.  The leachate has consumed oxygen present in the groundwater and altered geochemistry at the site in a way that causes naturally occurring iron and manganese in the soil to be more easily released into the groundwater than would otherwise be the case under normal conditions.  When the groundwater emerges at the Main Seep, the two metals precipitate out of solution as they are exposed to oxygen in the air.  Over

---

[3] In the 1990s, NCES also regularly detected elevated levels of multiple volatile organic compounds ("VOCs").  The last time VOCs were detected at the Main Seep was in July 2005.

time, these precipitates accumulated in the beds of the Main
Seep and the Drainage Channel, creating rust-colored sediments.

As a condition of renewing the landfill's Groundwater
Permit in 2002, NHDES required NCES to investigate and submit
"[o]ptions for remediation of water quality" in the Main Seep
and the Drainage Channel, "including reduction of manganese and
iron concentrations and elimination of iron bacteria deposits."
Doc. No. 94-19 at 4.  In response, NCES submitted a report to
NHDES designed "to provide an evaluation of remedial options to
reduce manganese and iron concentrations and bacteria deposits
at the Main Seep."  Doc. No. 99-1 at 1.  This report presented a
range of options for addressing water conditions, including
chemical treatment of the groundwater and physical measures such
as intercepting the groundwater upgradient from the Main Seep
and pumping it either back to the landfill for discharge or
directly to the river via above-ground piping.  The report
concluded that none of the identified options were feasible and
instead recommended physically removing the rust-colored
sediments and taking "[a]dditional measures to improve the
course" of the Drainage Channel to facilitate periodic cleanup
in the future.  Doc. No. 99-1 at 15.  In addition to remediating
the appearance of the Drainage Channel, the report highlighted
"[a]nother important benefit of this alternative":

[T]he removal of iron and manganese that occurs during
flow down the [Drainage Channel] would continue,
thereby limiting the mass loading of iron and
manganese to the river.  This alternative recognizes
that the course of the [Drainage Channel] provides
treatment for removal of iron and manganese before
ultimate discharge of the [Main] Seep to the river.

Doc. No. 99-1 at 16.

In 2010, NCES implemented this alternative, calling it the

"Seep Restoration" project.  NCES excavated approximately 176

tons of contaminated sediment from the Main Seep and the

Drainage Channel using suction dredging techniques.  The

sediment ranged from several inches to several feet in depth.

After the excavation was complete, woody debris and logs of a

specific size were permanently installed in particular locations

in the Drainage Channel to manage the velocity of the waterflow

and to reduce "channel erosion and subsequent downstream

sedimentation."  Doc. No. 94-15 at 9.  In addition, a "non-woven

geotextile" made of synthetic, nonbiodegradable material was

installed on the bed of the Main Seep and covered by a layer of

gravel.  Doc. No. 94-15 at 9.  In a report submitted to NHDES

after the project was completed, NCES reiterated that one of its

goals was "maintaining the naturally occurring iron and

manganese treatment being provided by oxidation along the length

of the drainage channel prior to the discharge to the River."

Doc. No. 94-15 at 6.  Within a year after the sediments were

removed from the Drainage Channel, new rust-colored sediments appeared.

Plaintiffs, Toxics Action Center, Inc., and Conservation Law Foundation, filed their complaint in May 2018.  They allege that defendants have violated and continue to violate the CWA by discharging pollutants to the Ammonoosuc without a permit. Plaintiffs assert in Count I that defendants need a National Pollution Discharge Elimination System ("NPDES") permit to discharge pollutants into the Ammonoosuc because the Drainage Channel, which conveys the pollutants to the river, qualifies as a point source under the CWA.  They argue in the alternative in Count II that the landfill is itself a point source for defendants' discharges.  For reasons that I describe below, I deny the parties' cross-motions for summary judgment because facts material to the resolution of the motions remain in genuine dispute.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016).  In this context, a "material fact" is one that has the "potential to affect the outcome of the suit."  Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez

v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  A "genuine

dispute" exists if a factfinder could resolve the disputed fact

in the nonmovant's favor.  Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d

1, 7 (1st Cir. 2018).

On cross-motions for summary judgment, the standard of

review is applied to each motion separately.  See Am. Home

Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812

(1st Cir. 2006); see also Mandel v. Bos. Phoenix, Inc., 456 F.3d

198, 205 (1st Cir. 2006) ("The presence of cross-motions for

summary judgment neither dilutes nor distorts this standard of

review.").  Thus, I must "determine whether either of the

parties deserves judgment as a matter of law on facts that are

not disputed."  Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241

F.3d 103, 107 (1st Cir. 2001).

### III. <u>ANALYSIS</u>

The CWA requires an NPDES permit whenever "pollutants" are

added to "the waters of the United States" from a "point

source."  See 33 U.S.C. § 1311(a) (prohibiting "the discharge of

any pollutant" except as otherwise authorized); § 1312

(authorizing the issuance of NPDES permits for otherwise

prohibited discharges); § 1362(12) (defining "discharge of a

pollutant" to include "any addition of any pollutant to

navigable waters from any point source"); § 1362(7) (defining

"navigable waters" as "the waters of the United States").

Defendants do not challenge plaintiffs' claim that the Drainage Channel is conveying iron and manganese from the landfill site through the Drainage Channel into the Ammonoosuc.  Nor do they dispute plaintiffs' contention that iron and manganese are pollutants under the CWA.  Instead, the parties' cross-motions for summary judgment are focused on plaintiffs' contention that the discharges are from a point source.  Plaintiffs claim in Count I that the Drainage Channel is a point source and claim in the alternative in Count II that the point source is the landfill itself.  Defendants challenge both claims.  I devote the bulk of this Memorandum and Order to the parties' arguments with respect to Count I and only briefly explain why their arguments concerning Count II are not sufficiently developed to permit in-depth analysis.

**A.   Is the Drainage Channel a Point Source?**

The CWA defines a "point source" as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).  The term includes, but is not limited to, "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure [or] container." Id. Plaintiffs assert in Count I that the Drainage Channel qualifies as a point source because it is a "channel" that conveys pollutants directly from the Main Seep to the Ammonoosuc.

9

Defendants agree that the Drainage Channel is a channel. They argue, however, that it cannot be a point source because it is also a water of the United States.  Defendants' argument proceeds in two steps.  First, defendants rely on regulations adopted by the Environmental Protection Agency and the Army Corps of Engineers (collectively, "the Agencies") to support their contention that the Drainage Channel is a water of the United States.  These regulations state that a "tributary" is a water of the United States.  See 33 C.F.R. § 328.3(a)(2); 40 C.F.R. § 120.2(1)(ii).  They also explain that a naturally occurring surface water channel can be a tributary.  See 33 C.F.R. § 328.3(c)(12) ("The term tributary means a river, stream, or similar naturally occurring surface water channel that contributes surface water flow to [waters of the United States] in a typical year . . ."); 40 C.F.R. § 120.2(3)(xii) (same).[4]  According to defendants, the Drainage Channel qualifies as a tributary, and thus it is a water of the United States, because it is a naturally occurring surface water channel that

---

[4] The current definition of a tributary is narrower in scope than the Agencies' prior definition promulgated in 2015, which specified that a tributary "can be a natural, man-altered, or man-made water."  Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054, 37,105 (June 29, 2015). The 2015 rule was preliminarily enjoined in a number of states before it went into effect and was ultimately repealed by the Agencies in 2019.  See The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250, 22,260 (April 21, 2020).

flows throughout the year and empties directly into the Ammonoosuc.

The second step in defendants' argument is less clearly explained.  Viewing their position generously, they claim that a channel can in some circumstances be a point source and in other circumstances can be a water of the United States but a channel cannot simultaneously be both a point source and a water of the United States.  Support for their assertion can be found in the definition of "discharge of a pollutant," which requires an "addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12) (emphasis added).  Defendants reason from this definition that a water of the United States cannot at the same time be a point source because the release of pollutants from one water of the United States to another does not result in the addition of pollutants to the waters of the United States as a whole.  Thus, they claim, the Drainage Channel cannot be a point source because it is a water of the United States that merely transfers pollutants from one water of the United States to another.

Plaintiffs counter with three arguments.  They first claim that the Drainage Channel is not a tributary because defendants have altered its natural features.  Next, they assert that the Drainage Channel is not a water of the United States because it is a "waste treatment system."  Finally, they assert that the

Drainage Channel is a point source even if it is also a water of
the United States.  I address these arguments in turn.

 1. <u>Whether the Drainage Channel is a Tributary</u>

 Plaintiffs argue that although the Drainage Channel is
naturally occurring[5] and flows constantly, it is not a tributary
because defendants have altered its flow rate, its physical
characteristics, and the water flowing through it.  In making
this argument, plaintiffs primarily focus on the 2010 "Seep
Restoration" project, when defendants removed contaminated
sediments and installed woody debris and logs throughout the
Channel to manage the velocity of the flow.  They also point to
the continuing sedimentation and the changed composition of the
water caused by the landfill as evidence that the Drainage
Channel is no longer "natural."

---

[5] The phrase "naturally occurring" refers to surface water
channels that "originally occurred naturally." The Navigable
Waters Protection Rule, 85 Fed. Reg. at 22,298.  Although
plaintiffs stated at oral argument that they do not concede that
the Drainage Channel is naturally occurring, they did not seek
summary judgment on that ground.  On the contrary, plaintiffs'
briefs made multiple factual assertions that effectively concede
that the Channel originally occurred naturally.  See Pls.' Obj.
to Defs.' Mot. for Summ. J., Doc. No. 94 at 9 ("groundwater
naturally emerges at the Main Seep because that is the point at
which the slope of the riverbank intersects the water table");
Doc. No. 94 at 8 ("Plaintiffs also agree that 'water emerging
from the Main Seep has created a channel that runs down the
slope and discharges in the Ammonoosuc.'") (quoting Defs.' Mot.
for Summ. J., Doc. No. 89 at 4); Pls.' Cross-Mot. for Summ. J.,
Doc. No. 96 at 5 (same).

Plaintiffs' position is incompatible with the plain text of the applicable regulations.  The regulations specify that modifying a tributary does not change its status as a water of the United States, provided that it continues to meet the flow conditions included in the definition.  See 33 C.F.R. § 328.3(c)(12); 40 C.F.R. § 120.2(3)(xii).  The Agencies have explained that the extent of modifications is not a factor:

> The agencies' longstanding interpretation of the CWA is that tributaries that are altered or relocated tributaries are jurisdictional, and the agencies are not changing this interpretation.  If a tributary is channelized, its bed and/or banks are altered in some way, it is re-routed and entirely relocated, or its flow is modified through water diversions or through other means, then it remains jurisdictional under the final rule as long as it continues to satisfy the flow conditions in the definition of "tributary."

The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250, 22,298-99 (April 21, 2020).  Accordingly, the fact that human intervention has altered multiple features of the Drainage Channel does not preclude a finding that it is a tributary.

2. Whether the Drainage Channel is a Waste Treatment System

Even if the Drainage Channel is deemed a tributary, plaintiffs argue that the Drainage Channel does not qualify as a water of the United States because it is a "waste treatment system."  I conclude that facts material to plaintiffs' contention remain in genuine dispute.

The regulations implementing the CWA provide that a waterway can lose its status as a water of the United States. See 33 C.F.R. § 328.3(b); 40 C.F.R. § 120.2(2).  One such exclusion is for "waste treatment systems."  33 C.F.R. § 328.3(b)(12); 40 C.F.R. § 120.2(2)(xii).  "The term waste treatment system includes all components . . . designed to either covey or retain, concentrate, settle, reduce, or remove pollutants, either actively or passively, from wastewater prior to discharge (or eliminating any such discharge)."  33 C.F.R. § 328.3(c)(15); 40 C.F.R. § 120.2(3)(xv).  Under this provision, a tributary that is designed to serve as a waste treatment system is not a water of the United States.

It is uncontested that the Drainage Channel passively settles some iron and manganese out of the water flowing through its bed due to a natural process of oxidation and sedimentation. As a result, the Channel is reducing the concentration of these metals in the water that is discharged to the river.  To qualify as a waste treatment system, however, the water flowing through the Drainage Channel must be "wastewater" and the channel must have been "designed" to fulfill a pollution reducing function.

   a.   Whether the Drainage Channel Conveys Wastewater

The regulations promulgating the waste treatment system exclusion do not define the term "wastewater."  The EPA, however, has defined that term in separate regulations that set

forth effluent limitation guidelines for different point source
categories.  See 40 C.F.R. §§ 401-471.  The parties agree that
the landfills point source category, which "applies to
discharges of wastewater from landfill units," is applicable
here.  See 40 C.F.R. § 445.1(a).  In that context, the EPA has
defined "landfill wastewater" broadly as "all wastewater
associated with, or produced by, landfilling activities except
for sanitary wastewater, non-contaminated storm water,
contaminated ground water, and wastewater from recovery pumping
wells."  40 C.F.R. § 445.2(f).  The term includes, but is not
limited to, "leachate, gas collection condensate, drained free
liquids, laboratory derived wastewater, contaminated storm water
and contact washwater."  Id.

It is undisputed for purposes of the present motions that
the unlined landfill conveyed leachate to the groundwater
beneath the site, and that this leachate has created conditions
that cause high levels of iron and manganese in the soil to be
dissolved into the groundwater that emerges at the Main Seep and
flows through the Drainage Channel.  Thus, the water feeding the
Channel is contaminated with these pollutants as a result of
landfilling activities and it, therefore, meets the definition
of landfill wastewater.

To the extent defendants maintain that the water in the
channel is excluded as "contaminated ground water," their

argument has no merit.  The regulation defines "contaminated ground water" as "water below the land surface in the zone of saturation which has been contaminated by activities associated with waste disposal."  40 C.F.R. § 445.2(a).  The groundwater beneath the site of the former unlined landfill appears to satisfy this definition.  But once that groundwater emerges from the Main Seep and starts flowing through the Drainage Channel – which is when the waste treatment begins – it is no longer below the land surface.  At that point, the contaminated water flows at surface level, so it is no longer groundwater.

This interpretation of the regulation's plain language is consistent with the Agencies' guidance on what constitutes "groundwater" in a related regulation.  Like waste treatment systems, "groundwater" is excluded from the waters of the United States.  See 33 C.F.R. § 328.3(b)(2); 40 C.F.R. § 120.2(2)(ii). The Agencies have explained, however, that this "exclusion does not apply to surface expressions of groundwater, such as where groundwater discharges to the channel bed and becomes baseflow in intermittent or perennial streams."  The Navigable Waters Protection Rule, 85 Fed. Reg. at 22,325.  This example precisely describes the water that flows through the Drainage Channel.  By extension then, that water is not "contaminated ground water"

excluded from the definition of landfill wastewater.[6]  Because landfill-related pollutants flow through the Drainage Channel from a surface expression of groundwater, I agree with plaintiffs that the Channel conveys wastewater.

### b.  Whether the Drainage Channel was Designed to Treat Wastewater

Plaintiffs also contend that the Drainage Channel was "designed" to treat iron and manganese in the wastewater before it is discharged to the river.  To support their contention, plaintiffs point out that, as part of renewing the facility's Groundwater Permit in 2002, NHDES required NCES to investigate options to improve the water quality in the Main Seep and the Drainage Channel, which included both "reduction of manganese and iron concentrations" in the water and the "elimination of" the contaminated sediments.  Doc. No. 94-19 at 4.  Defendants

---

[6] The Agencies' rationale for not regulating pollutants in groundwater under the CWA is that groundwater quality is regulated through other legal mechanisms, including the Safe Drinking Water Act, the Resource Conservation and Recovery Act, and various state and local laws.  See The Navigable Waters Protection Rule, 85 Fed. Reg. at 22,318-19 (citing this rationale behind the exclusion of groundwater from the waters of the United States); Effluent Limitations Guidelines, Pretreatment Standards, and New Source Performance Standards for the Landfills Point Source Category, 65 Fed. Reg. 3,008, 3,015 (Jan. 19, 2000) ("EPA concluded that, whether as a result of corrective action measures taken pursuant to RCRA authority or State action to clean up contaminated landfill sites, landfill discharges of treated contaminated ground water are being adequately controlled.").

submitted a range of treatment options to the State agency for approval and ultimately recommended physical removal of sediments and "[a]dditional measures to improve the course" of the Drainage Channel.  Doc. No. 99-1 at 15.  Defendants claimed that this option would allow the Drainage Channel to continue to "provide[] treatment for removal of iron and manganese before ultimate discharge" to the river.  Doc. No. 99-1 at 16.  When they implemented the project in 2010, defendants not only removed the sediments but also reconstructed the Drainage Channel by installing permanent structures to manage the velocity of the flow and thus reduce "channel erosion and subsequent downstream sedimentation."  Doc. No. 94-15 at 9. Plaintiffs argue that this evidence conclusively establishes that defendants intended to redesign the Drainage Channel in ways that promote the passive settling of iron and manganese along its bed.

Defendants counter that the evident purpose of the 2010 project was not to create a waste treatment facility but to remove contaminated sediments and to restore the Drainage Channel in accordance with NHDES permit requirements.  Even if the effect of the natural cycle of oxidation results in some metals precipitating out of solution along the length of the Channel, defendants maintain, this is not a treatment system that they created, designed, or sought to harness.

Viewing the record in the light most favorable to defendants, I conclude that a factual dispute exists as to whether the Drainage Channel was designed to serve as a waste treatment system.  On one hand, as defendants boasted to NHDES on several occasions, the reconstruction of the Channel was done in ways that sought to encourage the natural treatment of iron and manganese before they reach the river, which suggests that it was designed to treat those pollutants.  On the other hand, defendants did not undertake that work unilaterally but in response to a permit condition, and they point to evidence that they merely sought to "restore" the Drainage Channel to its prior condition.  Especially since the issue is one of intent, summary judgment is not appropriate.  See Brandt v. Fitzpatrick, 957 F.3d 67, 75 (1st Cir. 2020) (unsettled issues of motive and intent as to the conduct of a party will normally preclude a grant of summary judgment).  Accordingly, a triable issue exists as to whether defendants "designed" the Drainage Channel to treat iron and manganese from landfill wastewater prior to discharge to the Ammonoosuc.[7]

_____

[7] Defendants also argue that the waste treatment system exclusion does not apply because the purpose of the exclusion when it was first promulgated in the 1970s was to exempt facilities that discharge pollutants into their own closed system treatment ponds.  See, e.g., N. Cal. River Watch v. City of Healdsburg, 496 F. 3d 993, 1002 (9th Cir. 2007) (explaining that this was the original purpose).  When the Agencies defined the term "waste treatment system" in 2020, however, they neither included

    3.    Whether the Drainage Channel is Simultaneously a Point
          Source and a Water of the United States

     Plaintiffs argue that they should prevail even if the

Drainage Channel is a water of the United States because a water

of the United States can also simultaneously be a point source.

That position, however, cannot be squared with the statutory

text.

     The CWA defines a "discharge of a pollutant" as "any

addition of any pollutant to navigable waters from any point

source." 33 U.S.C. § 1362(12) (emphasis added).  As Justice

Scalia's plurality opinion in Rapanos v. United States

recognized, this definition "conceive[s] of 'point sources' and

'navigable waters' as separate and distinct categories." 547

U.S. 715, 735 (2006).  Otherwise, the definition "would make

little sense if the two categories were significantly

overlapping."  Id.[8]

_____

such a limitation in the text of the regulation nor otherwise
indicated that the limitation would apply.  The text of the
regulation is not ambiguous.  The definition of a waste
treatment system is plainly broad enough to encompass the use of
a surface water channel (such as the Drainage Channel) to treat
wastewater before its discharge into a water of the United
States.  Absent uncertainty, the regulation "just means what it
means — and the court must give it effect, as the court would
any law."  Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019).

[8] Plaintiffs instead lean on Justice Kennedy's concurrence in
Rapanos for the proposition that "certain water-bodies could
conceivably constitute both a point source and a [navigable]
water."  547 U.S. at 772 (Kennedy, J., concurring).  They also
point out that Justice Scalia's plurality opinion stops short of

If a waterway can simultaneously be a navigable water (that is, a water of the United States) and a point source, the distinction the statute draws between the two categories using the prepositions "from" and "to" would be rendered meaningless. "[T]he word 'from' seeks a 'point source' origin," Cnty. of Maui v. Haw. Wildlife Fund, 140 S. Ct. 1462, 1476 (2020), whereas the word "to" indicates a destination – the waters of the United States.  Conflating the two categories requires reading those terms out of the statute.

Plaintiffs' argument is also incompatible with the term "addition."  Although that term is not defined in the CWA, it is commonly understood to mean the act of combining one thing with another in a way that results in an increase in what was originally there.  See Webster's Third New International Dictionary 24 (1961) (defining "addition" as "the act or process of adding: the joining or uniting of one thing to another" and listing "increase" and "augmentation" as its synonyms). Assuming a point source and a water of the United States were one and the same, a pollutant that is present in such a point source would already be in the waters of the United States, so

---

concluding that the two terms are mutually exclusively.  But neither opinion offers guidance for identifying those apparently exceptional cases where the two categories may overlap.

there would be no addition of pollutants to the waters of the
United States.

Plaintiffs argue in response that the "addition" of
pollutants occurs when a polluted water of the United States
(the Drainage Channel) empties into another water of the United
States (the Ammonoosuc).  That argument runs headlong into the
EPA's longstanding position that "navigable waters" are one
unitary whole and that an "addition" occurs only when pollutants
first enter navigable waters from "the outside world," not when
they are moved between navigable waters.  See National Pollutant
Discharge Elimination System (NPDES) Water Transfers Rule, 73
Fed. Reg. 33,697, 33,700-01 (June 13, 2008).  This so-called
"unitary waters" theory underlies the EPA's Water Transfers
Rule, which exempts from NPDES permitting requirements
"[d]ischarges from a water transfer," defined as an engineered
activity that connects one water of the United States to
another.  See 40 C.F.R. § 122.3(i).  The EPA has explained that
such transfers are exempt because movements of pollutants from
one water of the United States to another water of the United
States "do not result in the 'addition' of a pollutant" to
navigable waters.  See Water Transfers Rule, 73 Fed. Reg. at
33,699.

The two circuit courts that have considered the Water
Transfers Rule have upheld the unitary waters theory as a

reasonable interpretation of the CWA that is entitled to deference under Chevron.  See Catskill Mountains Ch. of Trout Unlimited, Inc. v. EPA, 846 F.3d 492, 533 (2d Cir. 2017); Friends of Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1228 (11th Cir. 2009).  I agree with those courts.  The definition of "navigable waters" as a singular entity – "the waters of the United States" - does not differentiate among separate water bodies but refers to them in a collective sense.  See 33 U.S.C. § 1362(7) (emphasis added).  A metaphor that the Eleventh Circuit used aptly illustrates the rationality of the unitary waters theory:

> Two buckets sit side by side, one with four marbles in it and the other with none.  There is a rule prohibiting "any addition of any marbles to buckets by any person."  A person comes along, picks up two marbles from the first bucket, and drops them into the second bucket.  Has the marble-mover "add[ed] any marbles to buckets"? . . . . [A]s the EPA would decide, there were four marbles in buckets before, and there are still four marbles in buckets, so no addition of marbles has occurred.

Friends of Everglades, 570 F.3d at 1228.

Plaintiffs do not argue that the unitary waters theory is an unreasonable interpretation of the statute.  Instead, they point out that the discharge from the Drainage Channel to the Ammonoosuc is not a water transfer as defined in the rule because the conjunction of the Channel and the Ammonoosuc is not an engineered connection.  That is true but inapposite.  The

unitary waters theory that underlies the rule also applies to the natural convergence of a river and its tributary.  See Water Transfers Rule, 73 Fed. Reg. at 33,704 ("[C]ommenters who read the natural convergence of two rivers as being a water transfer are incorrect, though such natural convergences also do not require NPDES permits.").  To the extent both waterways are waters of the United States, they are not to be considered individually in this context.  Thus, the movement of pollutants from the Drainage Channel to the Ammonoosuc does not result in an "addition" of pollutants to navigable waters if the Drainage Channel is itself a water of the United States.

Plaintiffs contend that the EPA has nonetheless taken the position that a waterway may be both a point source and a water of the United States.  The most recent agency guidance they cite, however, does not stand for the proposition that a waterway can be both at the same time.  On the contrary, the EPA has recognized that certain waterways, such as ditches, may be either a water of the United States or a point source depending on their unique features, not both.  See The Navigable Waters Protection Rule, 85 Fed. Reg. at 22,297 ("Either [a ditch] is water of the United States that subjects a discharger to sections 402 and 404 permitting requirements for the direct discharges into the ditch, or, if it is non-jurisdictional but conveys pollutants to downstream jurisdictional waters, it may

24

be a point source that subjects a discharger into a ditch to section 402 permitting requirements."); Revised Definition of "Waters of the United States," 84 Fed. Reg. 4,154, 4,179 (Feb. 14, 2019) ("[T]he agencies propose to delineate the categories of ditches that would be 'waters of the United States,' and are proposing to exclude all other ditches from that definition."). The older agency sources plaintiffs cite are either vague or pre-date and contradict the unitary waters theory. See Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054, 37,098 (June 29, 2015) (merely noting that "the approach that ditches can be considered both [a point source and a water of the United States] reflects the CWA itself as well as longstanding agency policy"); In re Riverside Irrigation Dist., 1975 WL 23864, at *4 (EPA Gen. Couns. Mem., June 27, 1975) (opining that irrigation ditches that discharge to navigable waters required NPDES permits even if they themselves qualify as navigable waters).[9]

---

[9] Plaintiffs also cite three district court opinions from other circuits for the proposition that a channel can be a point source and a water of the United States at the same time. See United States v. Vierstra, 803 F. Supp. 2d 1166, 1173-74 (D. Id. 2011); N.C. Shellfish Growers Ass'n v. Holly Ridge Assoc., LLC, 278 F. Supp. 2d 654, 672-73, 679 (E.D.N.C. 2003); Albahary v. City and Town of Bristol, 963 F. Supp. 150, 155 (D. Conn. 1997). Because these courts did not engage with the statutory text, their persuasive value is limited.  In addition, two of the cases involved human-made tributaries, so under the current regulations neither would be considered a water of the United

Lastly, plaintiffs argue that their interpretation should prevail because it is consistent with the congressional purpose in passing the CWA, namely protecting the Nation's waters.  But "it frustrates rather than effectuates legislative intent to simplistically assume that whatever furthers the statute's primary objective must be the law." Norfolk S. R. Co. v. Sorrell, 549 U.S. 158, 171 (2007) (quoting Rodriguez v. United States, 480 U.S. 522, 526 (1987) (per curiam)).  Importantly, "even after a court looks to the broad purpose of a statute, it still must give effect to the words actually used by Congress to achieve that purpose." Boettger v. Bowen, 923 F.2d 1183, 1186 (6th Cir. 1991).  Reaching a result in this case that is consistent with what plaintiffs claim are the CWA's broad goals would require reading specific terms out of the statute. Because plaintiffs' contention that the Drainage Channel can simultaneously be a point source and a water of the United States is incompatible with the statutory text, I cannot adopt their argument.

**B.   Is the Landfill a Point Source?**

Plaintiffs argue in the alternative in Count II that the landfill itself is a point source that discharges pollutants into the Drainage Channel and the Ammonoosuc.  Although each

States.  See Vierstra, 803 F. Supp. 2d at 1173-74; N.C. Shellfish Growers Ass'n, 278 F. Supp. 2d at 672-73.

side argues that it is entitled to complete or partial summary judgment on Count II, they have not developed a sufficient record to permit me to reliably address their arguments. Whether the landfill qualifies as a "discernible, confined and discrete conveyance" as that phrase is used in the CWA's definition of a point source, see 33 U.S.C. § 1362(14), presents a complicated factual question that requires a more fully developed record to resolve. Equally troubling is the parties' failure to carefully assess how the Supreme Court's recent decision in County of Maui, 140 S. Ct. 1462, affects my analysis of their arguments. In that case, the court held that a release of pollutants from a point source to groundwater before reaching the waters of the United States requires an NPDES permit only if the release is the "functional equivalent of a direct discharge." Id. at 1476 (emphasis omitted). The parties have failed to sufficiently brief this issue, and I decline to take up the issue on my own. Accordingly, I deny the parties' cross-motions with respect to Count II without prejudice.

## IV.  CONCLUSION

In sum, the undisputed evidence shows that unless the Drainage Channel is a waste treatment system, it is a tributary of the Ammonoosuc River and therefore may be considered a water of the United States and not a point source within the meaning of the CWA. A genuine issue of material fact exists, however,

as to whether the Channel was designed to function as a waste treatment system.  I reject plaintiffs' alternative theory that a channel can be both a point source and a water of the United States at the same time.  Accordingly, I deny the cross-motions for summary judgment with respect to Count I to the extent that they are based on the theories of liability discussed in this Memorandum and Order.

I also deny the parties' cross-motions addressing Count II without prejudice because the parties' arguments with respect to that count have not been sufficiently developed to permit me to resolve the difficult questions of fact and law that the parties' motions present.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

August 11, 2021

cc:  Daniel J. Mullen, Esq.
     David A. Nicholas, Esq.
     Joshua R. Kratka, Esq.
     Kevin P. Budris, Esq.
     Margaret M. A. Nivison, Esq.
     Charles Craig Caldart, Esq.
     Thomas F. Irwin, Esq.
     Bryan K. Gould, Esq.
     Callan E. Sullivan, Esq.
     Cooley Ann Arroyo, Esq.